SA/SDD/RMT
F.#2012R01574

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

     - against -

ALI YASIN AHMED,
MADHI HASHI and
MOHAMED YUSUF,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

12 CR 661 (S-2) (SLT)

GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENSE PRE-TRIAL MOTIONS

LORETTA E. LYNCH
United States Attorney
Eastern District of New York

Shreve Ariail
Seth D. DuCharme
Richard M. Tucker
Assistant U.S. Attorneys
     (Of Counsel)

# <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT .................................................................................................1

STATEMENT OF FACTS ......................................................................................................2

I.   Background on al-Shabaab ...........................................................................................2

    A.  Al-Shabaab Is In Open Confrontation With The United States ...................................3

    B.  Al-Shabaab Members Have Engaged In Acts Of Violence Against U.S.
        Persons And Interests Abroad ...................................................................................4

    C.  Al-Shabaab Has Actively Recruited Americans To Travel To Somalia And
        Join The Terrorist Organization ...............................................................................12

II.  The Defendants' Membership In Al-Shabaab ..............................................................17

III. Procedural Posture ...................................................................................................19

ARGUMENT ....................................................................................................................21

I.   The Charged Conduct In This Case Has A Clear Nexus To The United States,
    And Thus This Prosecution Is Proper Under The Due Process Clause ...........................22

    A.  Legal Framework .................................................................................................22

    B.  Discussion ...........................................................................................................23

II.  The Indictment Properly Alleges All The Elements Of Section 2339B ...........................28

    A.  Legal Framework .................................................................................................28

        1.  Extraterritorial Application Of Criminal Statutes ..............................................28

        2.  Section 2339B ...............................................................................................30

    B.  The Indictment Properly Alleges Each And Every Element Of Section 2339B
        As Set Forth In The Plain Language Of The Statute ...............................................30

        1.  Counts One And Two Of The Indictment Allege All The Elements Of The
            Charged Crimes ............................................................................................31

        2.  Section 2339B(d)(1), Properly Construed As A Disjunctive List, Establishes
            Alternative Bases For Extraterritorial Jurisdiction ...........................................33

C.  Section 2339B Is Constitutional ................................................................36

    1.  Section 2339B Was Passed Pursuant To Multiple Sources Of Congressional
Power, And The Government Will Establish At Trial That The Offense
Conduct Substantially Affected Interstate And Foreign Commerce .....................37

        a.  Section 2339B Was Passed Pursuant To Congress's Powers To Regulate
Commerce, To Punish Offenses Against The Law Of Nations, And To
Enforce Treaty Obligations ...............................................................39

        b.  The Government Will Establish That The Offense Conduct Affected
Interstate And Foreign Commerce ......................................................41

    2.  Section 2339B(d)(1)(D) Need Not Be An Element For The Statute To Comply
With The Due Process Clause ................................................................42

    3.  Section 2339B Is Not "Vague" Or "Standardless," Nor Does It Allow For
Discriminatory Enforcement ..................................................................43

    4.  As The Statute Makes Clear, Congress Intended For Section 2339B To Be
Enforced Extraterritorially, And Such Enforcement Is Both Proper Under
The Constitution And Consistent With International Law ....................................44

D.  The Statute Is Not Ambiguous, And Thus The Rule Of Lenity Has No
Application In This Analysis ..................................................................48

III. Section 2339B Is Not Unconstitutionally Vague .................................................49

  A.  Legal Framework ................................................................................49

    1.  Section 2339B ...............................................................................49

    2.  Vagueness Challenges Under The Due Process Clause .......................................52

  B.  The Statutory Definition Of "Engage In Terrorist Activity" Incorporates
The Statutory Definition Of "Terrorist Activity" ...........................................53

  C.  Section 2339B Is Not Facially Void For Vagueness ..........................................54

IV. The Second Circuit Has Held That Section 924(c) May Be Extraterritorially Applied ....57

V.  The Indictment Fairly Informs The Defendants Of The Charges Against Them ..............58

  A.  The Indictment Properly Alleges The Knowledge Element Of Section 2339B .........59

  B.  Count One Is Properly Pleaded In The Indictment ........................................60

C.  Count Five Properly Alleges A Violation Of Section 924(c) ......................................62

VI.  The Indictment Was Timely Filed ........................................................................64

VII.  The Defense Is Not Entitled To A Bill Of Particulars ........................................................64

    A.  Legal Framework ........................................................................64

    B.  A Bill Of Particulars Is Not Warranted Here ........................................66

VIII.  Precluding Witnesses From Referring To Terrorism During Trial ..............................67

IX.  Rule 404(b) Notice ........................................................................68

X.  The Government Will Not Seek To Use The Defendants' Mirandized Statements
    To The FBI At Trial ........................................................................69

XI.  Count Three Should Not Be Dismissed ........................................................................70

XII.  Yusuf's Aliases Should Not Be Struck From The Indictment Because They Are
    Relevant To The Charged Conduct And The Government's Evidence At Trial............71

    A.  Legal Framework ........................................................................72

    B.  The Government's Evidence And Witnesses At Trial Will Reference Yusuf's
    Aliases ........................................................................72

XIII.  The Defendant's Objection To The Proffered Voice Identification Testimony
    Misapprehends The Nature Of The Analysis Conducted By The Expert ....................73

CONCLUSION........................................................................77

## PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in opposition to (1) defendant Mohamed Yusuf's pre-trial motions, arguing, inter alia, that the indictment should be dismissed and that certain evidence should be suppressed (ECF #129, ECF #147); (2) defendant Ali Yasin Ahmed's motion to dismiss Count Five, charging a violation of Title 18, United States Code, Section 924(c) (ECF #130); and (3) defendant Mohamed Yusuf's motion to preclude the testimony of expert witness Jonas Lindh (ECF #133). For the foregoing reasons, these motions should be denied.

<u>STATEMENT OF FACTS</u>

The defendants Ali Yasin Ahmed, Madhi Hashi and Mohamed Yusuf have been charged with crimes relating to their support for and membership in a foreign terrorist organization.  More specifically, in the second superseding indictment, returned by the grand jury on December 1, 2014, the defendants are charged with conspiring to provide material support to al-Shabaab, a designated Foreign Terrorist Organization, in violation of Title 18, United States Code, Section 2339B, providing material support to al-Shabaab, in violation of Title 18, United States Code, Section 2339B, and attempting to provide material support to al-Shabaab, in violation of Title 18, United States Code, Section 2339B.  Ahmed and Yusuf are further charged with receiving military-type training from al-Shabaab, in violation of Title 18, United States Code, Section 2339D(a), and all three defendants are charged with using machineguns in furtherance of a crimes of violence, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(ii), 924(c)(1)(A)(iii) and 924(c)(1)(B)(ii).

I.      <u>Background On Al-Shabaab</u>

As set forth in greater detail in the government's motion for an anonymous jury (<u>see</u> ECF #124 at 3-8), al-Shabaab is a foreign terrorist organization based in Somalia that wields significant influence over much of the Horn of Africa.  Al-Shabaab's senior leadership is affiliated with al-Qaeda, and many of its members have trained and fought in Afghanistan.  The merger of the two groups was publicly announced in February 2012 by the emir of al-Shabaab and Ayman al-Zawahiri, the leader of al-Qaeda.  In 2008, the U.S. Government designated al-Shabaab as a Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act (as amended) and as a Specially Designated Global

2

Terrorist entity under Section 1(b) of Executive Order 13224 (as amended).  In 2012, the Rewards for Justice program added several al-Shabaab leaders to its site, offering large rewards for information leading to their capture.

A.    Al-Shabaab Is In Open Confrontation With The United States

Al-Shabaab has made numerous public statements demonstrating an intent to harm the United States.  For example, in April 2009, al-Shabaab declared that it was responsible for mortar attacks against a U.S. Congressman who had been visiting Somalia. Similarly, after an al-Shabaab member was killed by what al-Shabaab believed to be a U.S. missile strike in or about May 2008, al-Shabaab leaders declared that the mujahideen would "hunt the U.S. government" and that governments supporting the United States and Ethiopia should keep their citizens out of Somalia.  In addition, on or about April 5, 2008, al-Shabaab declared:

> To the other mujahideen included in the American terrorist list: O Mujahideen brothers! . . .  May you be successful in your jihad and may you frustrate the enemies.  May Allah help you . . . .  Please know, our beloved ones, that we are going through a crucial stage, in which the oppressors have crossed the line.  That is why we call upon you to round up and join forces under one leadership and a uniform flag in order to frustrate the enemies of Allah and execute his command . . . . As a result, our jihad will be stronger and more harmful to our enemies.
>
> In conclusion, we say to the patron and protector of the cross, America: the wager that you made on the Ethiopians, Ugandans, and Burundians in Somalia was a failure, and history has proven it. Allah willing, we will attack them, roam [through their ranks], cut off every path they will take, chase away those who follow them, and fight them as insects and wolves. [We] will give them a taste of the heat of flame, and throw them into hell.

B.     Al-Shabaab Members Have Engaged In Acts Of Violence Against U.S.
       Persons And Interests Abroad

Al-Shabaab has claimed responsibility for many bombings – including various types of suicide attacks in Mogadishu and in central and northern Somalia, typically targeting Somali government officials, AMISOM[1] and perceived allies of the Somali Federal Government ("TFG"), including the United States.  Some al-Shabaab personalities have previously threatened the West and vowed to launch attacks in neighboring countries; associated extremists are likely responsible for the rash of bombings that have occurred in Kenya.  Al-Shabaab is responsible for the assassination of Somali peace activists, international aid workers, numerous civil society figures, and journalists, and for blocking the delivery of aid from some Western relief agencies during the 2011 famine that killed tens of thousands of Somalis.

A number of attacks claimed or otherwise carried out by al-Shabaab are set forth below:

- On February 22, 2009, an al-Shabaab militant wearing an explosive belt targeted an African Union ("AU") military base in Somalia manned by Burundian soldiers.  Al-Shabaab also claimed responsibility for a second suicide bombing attack on the same day at a Christian church filled with approximately 200 worshippers.[2]

- On May 24, 2009, al-Shabaab dispatched a suicide bomber "Abdul Qadir Hassan Mohamed" to target a Somali government security base in the city of Mogadishu.  According to al-Shabaab, the blast killed 22 and wounded dozens of others.[3]

---

[1] AMISOM, which stands for the African Union Mission to Somalia, is a regional peacekeeping mission operated by the African Union in conjunction with the United Nations.

[2] http://www.al-faloja.info/vb/showthread.php?t=48637.  February 22, 2009.

[3] http://www.al-faloja.info/vb/showthread.php?t=64435.  May 24, 2009.

4

- On June 18, 2009, al-Shabaab sent suicide bomber "Mohamed Dero Sheikh Adam" (a.k.a. "Al-Zubair") to target a hotel in the town of Beledweyne hosting a major meeting for Somali government ministers, along with Ethiopian envoys. Al-Shabaab claimed that the attack killed more than 70 Ethiopian and Somali officials, including Somali security minister Omar Hashi Adam, the Somali Ambassador to Ethiopia, and many others.[4]

- On September 17, 2009, al-Shabaab executed twin suicide car bombing attacks targeting "two of the safest, most forbidding headquarters of the crusader's military leadership at the Mogadishu Airport." According to al-Shabaab, one of the bases was operated by AMISOM forces and the other belonged to the U.S. and NATO. The group later boasted in an official communiqué, "the crusaders have admitted that 9 crusaders, most of them officers, were killed. Among them was the second in command of the AMISOM forces, the Burundi general Joefinal Ningaruza. The military commander of the crusader AMISOM, the Ugandan general Nathan Mujissa received injuries to his head."[5]

- On December 3, 2009, al-Shabaab carried out the bombing of the Hotel Shamo in Mogadishu that killed 25 and wounded at least 60 others. Casualties from the attack included three top Somali government ministers. Though the Somali government quickly accused al-Shabaab of being responsible for the attack, the group never officially took credit—and in fact, at least one senior spokesman quickly denied complicity. Addressing reporters, al-Shabaab leader Ali Mahmoud Rage (a.k.a. Ali Dheere) insisted, "We declare that al-Shabaab did not mastermind explosion… We believe it is a plot by the government itself. It is not in the nature of al-Shabaab to target innocent people."[6] No other organization has ever issued a credible claim of responsibility for the 2009 Hotel Shamo bombing. Kenyan security analysts quoted at the time by the Al-Jazeera satellite news channel noted that because so many of the bombing victims were innocent Somali civilians, al-Shabaab had no choice but to disavow the attack because otherwise "this will seriously undermine their credibility."[7]  Notably, however, defendant Ahmed was intercepted in a communication with Bille Ilyas Mohamed, a Swedish foreign fighter located at the time in Sweden who trained with Ahmed and Yusuf in Saleh Nabhan's training camp located in Kismayo. During that intercepted communication, on May 18,

---

[4] http://www.al-faloja.info/vb/showthread.php?t=68953.  June 20, 2009.

[5] http://www.al-faloja1.com/vb/showthread.php?t=83872.  September 17, 2009.

[6] http://news.bbc.co.uk/2/hi/africa/8394528.stm

[7] http://www.aljazeera.com/news/africa/2009/12/20091246521559996.html

2010, Ahmed effectively ascribed responsibility for the Hotel Shamo bombing to al-Shabaab when he identified another al-Shabaab foreign fighter, whom he referred to as Abdurhman al Denmark, as having carried out the suicide attack there.

- On April 27, 2010, al-Shabaab dispatched two suicide bombers in a truck packed with explosives to attack a "crusader" AMISOM military base in Mogadishu.  According to al-Shabaab spokesman Ali Mahmoud Rage, the attack was launched in order to avenge the recent killing of the leaders of the Islamic State of Iraq (ISI), Abu Omar al-Baghdadi and Abu Hamza al-Muhajir, by the United States.[8]  Two weeks later, al-Shabaab released the video-recorded "martyrdom" will from one of the bombers.  He explained to the camera, "since we have tasted pain, now it is time for the disbelievers to taste it too.  Inshallah, this is an act of retaliation on behalf of Amir al-Mumineen Abu Omar al-Baghdadi and the Minister of Warfare Abu Hamza al-Muhajir.  Inshallah, we will avenge their death.  And this jihad will not stop because of the martyrdom of one or two leaders but will continue until the day of judgement Inshallah."[9]

- On August 24, 2010, two al-Shabaab suicide bombers blew themselves up inside the Muna Hotel in Mogadishu, seeking to target Somali government officials known to frequent the facility.  According to a report posted on the al-Shabaab website Alkataaib.ws, the attack killed as many as 50 people.[10]

- On February 22, 2011, al-Shabaab executed a suicide truck bombing attack targeting a Somali military barracks near the presidential palace in Mogadishu.  According to an al-Shabaab communiqué published the following day, "most of the soldiers were either wounded or killed, and as of now there isn't a confirmed account for the numbers of casualties and the wounded."[11]

- On May 30, 2011, al-Shabaab suicide bombers executed a spree of attacks in Mogadishu targeting a major Ugandan AMISOM security base in Mogadishu and another Ugandan position at the Port of Mogadishu.  During the first attack, according to al-Shabaab, "the mujahideen from the 'Martyrdom Brigade' attacked the Ugandan troops in the building and in a battle that lasted more than 40 minutes, took control of the entire compound – leaving an estimated 33 Ugandan soldiers either dead or injured."  Al-Shabaab boasted that the second attack in the port area "instantly kill[ed] 3 Ugandan soldiers huddled at their post."  The group explained in an official

---

[8] http://www.alfaloja.ws/vb/showthread.php?t=113777.  April 27, 2010.

[9] http://www.alfaloja.ws/vb/showthread.php?t=115498.  May 8, 2010.

[10] http://www.alkataaib.ws/news/082010/082010_27.html.  August 2010.

[11] http://www.shamikh1.net/vb/showthread.php?t=96016.  February 21, 2011.

communique, "the port serves as an economic pipeline for the African and apostate troops in Mogadishu and is regarded as one of the most heavily-guarded territories after the main airport."[12]

- On November 30, 2011, al-Shabaab dispatched a suicide bomber to attack the Somali military barracks at Villa Baidoa in Mogadishu, inflicting an unknown number of casualties. Al-Shabaab spokesman Abdelaziz Abu Musab claimed credit on behalf of the group and "warned Muslims to avoid going near crusader army bases and those of apostate government militias, stressing that the mujahideen are carrying out their operations in defense of Muslim lands, their honor, and their wealth."[13]

- On January 25, 2012, al-Shabaab suicide bomber "Mohammed Abdul Hassan" executed an attack on an Ethiopian military base in the town of Beledweyne using a car packed with explosives.  The attack targeted a meeting between Ethiopian army officers and Somali government officials, and the blast "resulted in a huge explosion that shook the whole city."  According to an official communiqué published by al-Shabaab, the bombing killed at least forty Ethiopians, including senior military officials.[14]

- On February 1, 2012, Shabaab al-Mujahideen executed a suicide bombing attack targeting the home of "a senior warlord" in Galkayo, Somalia, Abdi Hasan Awale Qeybdiid, killing several guards.[15]

- On March 14, 2012, al-Shabaab suicide bomber "Hassan Abdul Qadir Abdul" launched an attack targeting "the so-called presidential palace, in which reside top apostate officials and leaders of the African Crusaders."  According to al-Shabaab, "the explosion shook the entire presidential palace and corpses and body parts littered the place."  Al-Shabaab spokesman Ali Mahmoud Rage claimed responsibility for the group and indicated that the attack was in response to allegations of Quran desecration by "apostate militias" in Mogadishu.[16]

- On April 17, 2012, an al-Shabaab suicide bomber targeted a military outpost in the town of Baidoa staffed by Ethiopian troops and "apostate militias."  According to al-

---

[12] http://www.shamikh1.info/vb/showthread.php?t=113747.  June 9, 2011.

[13] http://www.shamikh1.info/vb/showthread.php?t=138176.  December 5, 2011.

[14] http://www.shamikh1.info/vb/showthread.php?t=145996.  January 27, 2012.

[15] http://www.shamikh1.info/vb/showthread.php?t=146998.  February 2, 2012.

[16] http://www.shamikh1.info/vb/showthread.php?t=154655.  March 15, 2012.

Shabaab, the attack killed at least four Ethiopian army officers and one senior militiaman.[17]

- On May 1, 2012, al-Shabaab carried out a suicide bombing attack targeting a base in the town of Dhusamareb hosting "a meeting attended by several apostate government officials… and Ethiopian officers."  According to al-Shabaab, the attack killed at least 15, including "high-ranking apostate government officials."[18]

- On June 17, 2012, an al-Shabaab suicide bomber attacked an "apostate intelligence outpost" in the town of Afgoi staffed, according to al-Shabaab, "by more than 200 apostates working in the service of the apostate intelligence officials" in addition to "several Western experts and officers."  Al-Shabaab boasted that the attack killed 80 and wounded more than 60 others.[19]

Al-Shabaab's suicide attacks have not been confined to the borders of Somalia.  On July 11, 2010, twin suicide bombers attacked crowded venues in Kampala, Uganda (the "Kampala Bombings") showing the televised 2010 FIFA World Cup soccer final, killing 74 (including one U.S. national) and wounding at least 70 others.  Two weeks later, al-Shabaab issued an official communiqué claiming responsibility for the Kampala bombings:

> Despite the many warnings that were directed towards this force to end their brutal assault against our innocent population, their oppression only continued to escalate.  Whenever the Mujahideen face the invaders and resist their oppression, the Ugandan and Burundian African Union forces immediately respond by targeted the markets and residential areas with their highly sophisticated weapons.  We, the leaders of Harakat Shabaab al-Mujahideen, hereby claim responsibility for the blessed operations in Kampala.  In addition, we state that these operations were carried out in order to heal the hearts of the believers and to nurse the wounds of our ailing Muslims population… These blessed operations will, by the permission of Allah, act as a warning to all the

---

[17] http://www.shamikh1.info/vb/showthread.php?t=158539.  April 24, 2012.

[18] http://www.shamikh1.info/vb/showthread.php?t=160564.  May 8, 2012.

[19] http://www.shamikh1.info/vb/showthread.php?t=166948.  June 19, 2012.

transgressing forces to stop their atrocities against the Somali Muslim population.[20]

Notably, at trial one or more cooperating witness will testify that the Kampala Bombings were initially conceived of by Saleh Nahban, an al-Qaeda-linked Kenyan foreign fighter from Mombasa, who, shortly before his reported death in 2009, served as the overall leader of al-Shabaab's foreign fighters or *muhajireen*.  Nabhan also served as the overall commander of defendants Yusuf and Ahmed when they trained in his camp located in Kismayo and fought as *muhajireen* on the front lines of al-Shabaab's battle against the TFG and its allies in Mogadishu.  Shortly after the battles of the Karan District and Abdul Aziz in Mogadishu, Nabhan dispatched another foreign fighter who had trained with and fought alongside Ahmed and Yusuf in Kismayo and in Mogadishu, respectively, to scout locations for potential suicide attacks in Kampala, Uganda.  Nabhan advised the foreign fighter to assess the viability of attacks on, among other locations, the U.S. Embassy located there. Nabhan, whose substantial ties to al-Qaeda included his close relationship to Fazul Abdullah Mohamed, also known as "Harun Fazul," who was indicted for his involvement in al-Qaeda's 1998 attacks on the United States Embassies in Nairobi, Kenyan and Dar es Salam, Tanzania, and to Osama Bin Laden, under whose leadership he trained, advised the foreign fighter that he viewed the potential attacks on Kampala as an attack on both Uganda and its supporters, including the United States.

Al-Shabaab is also responsible for a June 2013 attack in Mogadishu on a United Nations compound that killed 22 people.   Moreover, in the wake of Kenyan military

---

[20] Shabaab al-Mujahideen Movement.  "Statement Regarding the Blessed Kampala Operations From the Leaders of the Shabaab al-Mujahideen Movement."  July 24, 2010.  http://www.alfaloja.ws/vb/showthread?t=126734.

intervention in southern Somalia, al-Shabaab sought to target Kenya in retaliation.  On September 21, 2013, a team of heavily armed commandos stormed the Westgate shopping mall in Nairobi, Kenya, seizing control of the facility.  In the ensuing three-day siege and shootout with Kenyan security forces, at least 67 people were killed and over 175 people were wounded.  Between September 22 and September 25, several different senior al-Shabaab leaders claimed responsibility on behalf of their movement.  One or more cooperating witnesses who will testify at trial regarding the defendants' criminal conduct was in direct contact with al-Shabaab members who carried out the attacks at the Westgate mall while the siege was ongoing.  On September 22, a Somali-language audio recording surfaced of top al-Shabaab spokesman Ali Mahmoud Rage (a.k.a. Ali Dheere):

> Everyone is aware of the situation of Muslims in Somalia and the moods (feeling) of those who read and listen (know) that the Christian government of Kenya invaded Somalia in the month of October 2011… We warned the Kenyan government about what its trying to get into and made clear that the invasion it's carrying on us and our nation is not a simple matter and it can't be won easily.  And after that, lots of Kenyans blood will be shed, your economy will degrade, and that Kenya will become one of the unsafe places on Earth.  Truly we were patient for long and Kenya never heeded this… We have been assaulted and invaded and thus we have to answer back to all of these as Allah commands the Muslim believers that they should revenge back when attacked, and this is an example of the revenge we are taking against Kenya and its people.   Today, September 21, 2013, specially trained mujahideen attacked one of Kenya's major business centers in Nairobi and it was easy for our men to take control of the building with Allah's help around 11am.  As I speak to you now, the mujahideen fighters have control of the situation and are engaging the military and police, as well as all those who are involved… We are now telling you if you want to see Kenya peaceful, you will never see peace as long as you continue your aggression and continue killing our youth.  Nairobi will never be peaceful.  Therefore, it's up to you to choose to either continue with destruction or you get your army out of our nation and stop your aggression.  It is your choice.  It's your decision since

you are the ones who elected the so-called leaders or else Allah willing you will see for yourselves more destruction and your economy collapsing.[21]

Two days later, on September 24, the "Shahada News Agency" published a second Arabic-language audio recording of Rage claiming responsibility for the Westgate attack that was also aired, in excerpts, on the Al-Jazeera satellite television network.[22]

On September 25, al-Shabaab published a new audio recording of its Emir, Ahmed Abdi Godane, also known as "Mukhtar Abu Zubair" ("Godane") (along with a translated English-language transcript) via its account on Twitter.[23]

On Saturday 21 September 2013, and which was just 10 days after the anniversary date of the blessed 911 operations, a battle which is among the epic battles in the history of Islam began in Nairobi, and in which some of the Mujahideen Martyrom Seekers have written with their blood. Allah has honoured the Mujahideen fighters to write this epic battle - the Badar of Nairobi - with their blood and to change the course of history and avenge the deaths of the weak, oppressed Muslims… The attack at Westgate Mall was to torment the Kenyan leaders who've impulsively invaded the Islamic Wilaayat. It was also a retribution against the Western states that supported the Kenyan invasion and are spilling the blood of innocent Muslims in order to pave the way for their mineral companies. It also acts as a clear testament to the historical blunder that the Kenyan government made when it decided to invade the Islamic Wilaayaat.  The attack has also glaringly illuminated the sheer vulnerability of the different sections of the Kenyan forces, be they police, intelligence or the military, and this was demonstrated by the utter failure that their forces came against when they tried to storm the building that was occupied by the Mujahideen… The attack is also a slap in the face of on the dwindling economy of the Kenyan government and has also successfully foiled the clandestine schemes of the Zionist Jews in Kenya. It's a disaster for the Western politicians and their intelligence apparatuse who have miserably failed to save their own citizens.  We tell the Kenyan public: You have entered into a war that is not yours and is serving against your national interests… There is no way that you, the Kenyan public, could possibly endure a prolonged war in Somalia and you cannot also withstand a war of attrition inside your own country.

---

[21] https://www.youtube.com/watch?v=sqPIZIAZX-k.  September 22, 2013.

[22] Shahada News Agency.  Audio recording of Shaykh Ali Dheere. http://www.alfidaa.org/vb/showthread.php?t=76099.  September 24, 2013.

[23] http://www.twitter.com/HSM_PR/status/382929486729072640.  September 25, 2013.

So make your choice today and withdraw all your forces from the Islamic Wilaayaat, otherwise be prepared for an abundance of blood that will be spilt in your country, economic downfall and displacement.[24]

Four men are facing terrorism-related charges in Kenya for the Westgate attack.   Even more recently, al-Shaabab has promised to seek revenge for the death of their leader Godane, who was killed this past September, reportedly in a U.S. airstrike.

C.    Al-Shabaab Has Actively Recruited Americans To Travel To Somalia And Join The Terrorist Organization

Additionally, al-Shabaab has regularly sought to recruit U.S. citizens to travel to Somalia and join as foreign fighters or *muhajireen* in the terrorist organization during the time period that the defendants also served as members of the terrorist organization.  Some of those individuals are discussed below:

SHIRWA AHMED

One or more cooperating witnesses whom the government intends to call to testify at trial have identified Shirwa Mohamud Ahmed, also known as "Abdirahman," ("Shirwa Ahmed"), as a young Somali-American man who traveled to Somalia from the United States to join the *muhajireen* with al-Shabaab.  Shirwa Ahmed traveled to Somalia at the same time as a number of Minneapolis men and, on October 29, 2008, became the first known American to die as a suicide bomber for al-Shabaab.

As set forth in the government's expert notice related to the October 29, 2008 attacks, al-Shabaab was assessed to have carried out five coordinated suicide bombing attacks on various buildings operated by the United Nations and the Somali government in the cities of Hargeisa and Bossasso.   Forensic analysis has proven that Shirwa Ahmed was

---

[24] http://www.twitter.com/HSM_PR/status/382929486729072640.  September 25, 2013.

12

one of the suicide bombers involved in the attacks.  Notably, during intercepted communications on November 13, 2008, defendants Ahmed and Yusuf discussed the attacks while considering their decision to travel to Somalia to join al-Shabaab.  In particular, defendant Yusuf, who at times had expressed doubts about traveling to Somalia to join al-Shabaab, articulated his concern that al-Shabaab would carry out such horrific violence.  In response, Ahmed minimized the significance of suicide bombings against civilian targets and suggested that if such suicide attacks were in fact a sin, they were an immaterial, forgivable sin comparable to masturbation.  With a full understanding of al-Shabaab's willingness to carry out horrific acts of violence against civilian targets, Ahmed and Yusuf left Sweden for Somalia to join al-Shabaab in December 2008.

### ZAKARIA MARUF, also known as "Khalil"

One or more cooperating witnesses have also identified Zararia Maruf, also known as "Khalil," as a Somali-American man who traveled from the United States to join as a foreign fighter with al-Shabaab in Somalia.   Maruf, who served as a foreign fighter in the Karan district battles in Mogadishu, died during combat with the TFG.

### MOHAMED ABDULAHHI HASSAN, also known as "Ubeida" or "Miski"

One or more cooperating witnesses have also identified Mohamed Abdullah Hassan, also known as "Ubeida, or "Miski," as a Somali–American man, particularly closely associated with Yusuf and Ahmed, who traveled from the United States to join and fight with al-Shabaab in Somalia while the defendants served as foreign fighters with al-Shabaab.

13

MUSTAFA ALI SALAT, also known as "Khalil"

One or more cooperating witnesses have also identified Mustafa Ali Salat, also known as "Khalil," as a Somali-American man who traveled from the United States to join the *muhajireen* in Somalia while the defendants served as foreign fighters with al-Shabaab. Salat was also identified as having been involved in a chemical research and development program operated by the terrorist organization.

TROY MATHEW KASTIGAR

One or more cooperating witnesses have also identified Troy Mathew Kastigar, also known as "Mohamed," as an American-born citizen who traveled from the United States to join the *muhajireen* in Somalia while the defendants served as foreign fighters with al-Shabaab.

ABDIKADIR ALI ABDI, also known as "Bara"

One or more cooperating witness have also identified Abdikadir Ali Abdi, also known as "Bara," as a Somali-American citizen who traveled from the United States to join the *muhajireen* with al-Shabaab in Somalia while the defendants served as foreign fighters with al-Shabaab. Notably, in 2010, Abdi was also identified as having been involved in a chemical research and development program operated by the terrorist organization.

ABDISALAN HUSSEIN ALI, also known as "Uhud," or "Bullethead"

One or more cooperating witnesses have also identified Abdisalan Hussein Ali, also known as "Uhud," or "Bullethead," as a Somali-American citizen who traveled from the United States to join and fight the *muhajireen* with al-Shabaab while the defendants served as foreign fighters with al-Shabaab.

<u>SAID FIDHIN, also known as "Ismail," or "Samatar"</u>

One or more cooperating witnesses have also identified Said Fidhin, also known as "Ismail," or "Samatar," as a Somali-American citizen who traveled from the United States to join the *muhajireen* with al-Shabaab. Fidhin was also identified as having joined the education department of al-Shabaab. Additional, in early 2013, when the intelligence wing of al-Shabaab, known as the Amniyat carried out its purge of certain foreign fighters and other factions within the organization that al-Shabaab Emir Godane assessed were not loyal to him (like Hashi and Omar Hammami and one or more cooperating witnesses discussed below), Fidhin was arrested because he was interested in teaching secular subjects such as math and science.

<u>OMAR HAMMAMI, also known as "Abu Mansour al Amriki"</u>

One or more cooperating witnesses have identified Omar Hammami, also known as "Abu Mansour al Amriki," as an American-born man who traveled from the United States to join the *muhajireen* with al-Shabaab during the time period the defendants served as foreign fighters for the terrorist organization. Notably, Hammami was a close friend and companion of Hashi, and he also served as a key military commander for the foreign fighters, including Hashi, Ahmed and Yusuf, training *muhajireen* members in Kismayo and elsewhere. Hammami was an outspoken foreign fighter for al-Shabaab and handled media outreach for the organization. Like Hashi and Fidhin, and one or more cooperating witness who will be testifying for the government, in 2012 Hammami fell out of favor with al-Shabaab's leadership, during Godane's purge of certain foreign fighters that he

assessed were not loyal to him.   Hammami reportedly was killed by Amniyat assassins loyal to Godane.

Notably, Hashi's falling out with Godane arose in connection with Godane's suspicion that Hashi was partially responsible for the death of U.K.-born foreign fighter Bilal Berjawi.  This falling out served as one of the key motivations behind Hashi, Ahmed and Yusuf's decision to leave Somalia, traveling through Djibouti where they were arrested en route to Yemen to join the designated foreign terrorist organization, al-Qaeda in the Arabian Peninsula.

### AHMED ALI OMAR, also known as "Mustafa"

One or more cooperating witnesses have also identified Ahmed Ali Omar, also known as "Mustafa," as a Somali-American man who traveled from the United States to join the *muhajireen* with al-Shabaab during the time period the defendants served as foreign fighters for the terrorist organization.  Notably, Omar served as a key military commander of the foreign fighters during the time period that the defendants served in the *muhajireen* for al-Shabaab.

### JEHAD MUSTAFA, also known as "Ahmed Gure"

One or more cooperating witnesses have also identified Jehad Mustafa, also known as "Ahmed Gure," as a Somali-American man who traveled from the United States to join the *muhajireen* with al-Shabaab during the time period the defendants served as foreign fighters for the terrorist organization.  Notably, Mustafa served as Saleh Nabhan's replacement as the leader of the foreign fighters, and Hashi, Ahmed and Yusuf served under his command.

<u>KHALID MOHAMED ABSHIR, also known as "Abdullah the Sniper"</u>

One or more cooperating witnesses have identified Khalid Mohamed Abshir, also known as "Abdullah the Sniper," as a Somali-American man who traveled from the United States to join the *mujahireen* with al-Shabaab during the time period the defendants served as foreign fighters for the terrorist organization. Notably, Abshir served as a key military commander within al-Shabaab's foreign fighters and, as his *nom de guerre* or *kunya* suggests, trained a number of al-Shabaab's foreign fighters to serve as snipers.[25]

II.     <u>The Defendants' Membership In Al-Shabaab</u>

On or about August 5, 2012, the defendants were apprehended in East Africa by Djiboutian authorities after illegally crossing the border of Somalia into Djibouti, on their way to Yemen to join the designated foreign terrorist organization al-Qaeda in the Arabian Peninsula.  The Djiboutian authorities detained the defendants pursuant to Djiboutian law and subsequently turned them over to the United States government for prosecution in the November 2012.

In addition to the information set forth above regarding the defendants, the government intends to call witnesses who have personal knowledge of the defendants' involvement in al-Shabaab, who will testify, *inter alia*, about the defendants' training and fighting on behalf of al-Shabaab against Somali government forces.[26]  The government also

---

[25] The U.S. citizens discussed above are appropriately characterized as co-conspirators of the defendants.

[26] Notably, the defendants' membership in al-Shabaab does not seem to be in dispute thus far in the litigation.  (<u>See e.g.</u> ECF No. 99, Hashi Aff. ¶ 9) (affirming his provision of information to investigators regarding "Al-Shabaab, [his] membership in and experiences with that organization . . .").

intends to offer evidence of recorded conversations, some of which were discussed above, in which defendants Ahmed and Yusuf discussed their intent to travel to Somalia and their support for violent jihad with other members of al-Shabaab located in Somalia and elsewhere.   A number of those conversations were intercepted in Sweden when the defendants were battling on the front lines as *muhajireen* in Somalia.  Among other conversations, Ahmed was intercepted discussing in detail various individuals who had been "martyred" for al-Shabaab, including some of the defendants' associates who died in suicide bombing attacks.   In at least one conversation, Yusuf provided a status update regarding his current assignment in al-Shabaab, and his use of a firearm as a member of the *muhajireen*.

Moreover, the government will offer into evidence various propaganda videos published on the internet in the United States and directed towards U.S. citizens, including an al-Shabaab propaganda video depicting, among others, some of the individuals referenced above.  The video includes a recording from Saleh Nabhan encouraging young men from around to the globe to travel to Somalia to join the foreign fighters withal-Shabaab.   Titled "Inspire the Believers" and stylized as "An Invitation to the Lands of Jihad," in which viewers are urged to "clarify your banner . . . convert it to action . . . convey the message . . . [and to] inspirer the believers" to join al-Shabaab, this production which was produced by al-Shabaab's media arm al-Kataib, within which U.S. citizen Omar Hamammi played a large role, included a section on "Tactics and Training" for fighting al-Shabaab's opponents, and another section on "Using Small Firearms to Kill the Kaffir" or non-believers.   The video also depicts al-Shabaab training camps attended by the defendants, and various automatic weapons and other heavy artillery used by al-Shabaab.

Significantly too, "Inspire the Believers" also depicts a number of al-Shabaab's *muhajireen* from around the world including fighters from Sudan, Ethiopia, Sweden, the United Kingdom, Pakistan, Kenya and Tanzania urging people to join and fight on behalf of al-Shabaab.  Defendant Yusuf, referred to in the video as "Abu Zaid," appears as a partially masked representative of the *muhajireen* from Sweden.   During the recording, Yusuf encourages other young men from around the world to "make *hijra* from the land of the infidels [and travel to Somalia] . . . so that you may take part in [ ] jihad" in Somalia.

The government also expects to call expert witnesses to explain al-Shabaab's recruiting methods, including its use of such internet propaganda, to provide a general history of the organization, including the group's involvement in suicide bombing attacks and other extraordinarily violent conduct – some of which was discussed above - in the context of the global jihadist movement and the defendants' actions as members of al-Shabaab.  (See ECF No. 177, Government's Expert Notice re: Matt Bryden, Evan Kohlman and Others).

III.    Procedural Posture

On October 18, 2012, the grand jury returned an indictment charging the defendants with conspiring to provide material support to al-Shabaab, in violation of Title 18, United States Code, Section 2339B, and the use of firearms in furtherance of that crime of violence, in violation of Title 18, United States Code, Section 924(c).  On November 15, 2012, after the defendants had been transferred to the United States, the grand jury returned the first superseding indictment, charging the defendants with conspiring to provide material support to al-Shabaab, in violation of Title 18, United States Code, Section 2339B, providing

19

material support to al-Shabaab, in violation of Title 18, United States Code, Section 2339B, and the use of firearms in furtherance of that crime of violence, in violation of Title 18, United States Code, Section 924(c).

On December 1, 2014, a grand jury returned the second superseding indictment in this case, charging the defendants with conspiring to provide material support to al-Shabaab, a designated Foreign Terrorist Organization, in violation of Title 18, United States Code, Section 2339B, providing material support to al-Shabaab, in violation of Title 18, United States Code, Section 2339B, and attempting to provide material support to al-Shabaab, in violation of Title 18, United States Code, Section 2339B.  Ahmed and Yusuf are further charged with receiving military-type training from al-Shabaab, in violation of Title 18, United States Code, Section 2339D(a), and all three defendants are charged with using machineguns and other firearms in furtherance of a crimes of violence, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(ii), 924(c)(1)(A)(iii) and 924(c)(1)(B)(ii).

<u>ARGUMENT</u>

In their motions, the defendants[27] make many broad, frequently perfunctory, ultimately flawed arguments.  These include:

- first, that this prosecution violates the Due Process Clause of the Fifth Amendment, notwithstanding the clear nexus between the charged conduct and the United States;

- second, that the indictment should be dismissed because it fails to allege certain purportedly "essential elements" of Section 2339B that, as the statutory language makes clear, are not actually elements of that offense; and

- third, that, contrary to established precedent, Section 2339B is unconstitutionally vague.

Further, the defendants argue that Title 18, United States Code, Section 924(c) does not apply extraterritorially, that the indictment is deficient on its face because it does not fairly inform the defendants of the charges, and that the government must be required to elect to proceed on either Count Two or Count Three of the second superseding indictment before trial.  Defendant Yusuf also seeks to preclude the government from offering the testimony of an expert witness in voice identification analysis, who among other things identifies Yusuf as the speaker referred to in the "Inspire the Believers" video discussed above.  The defendants also seek to strike references to aliases in the indictment, to preclude government witnesses from referring to "terrorism" at trial, and they renew moot challenges to the admission of the defendants' <u>Mirandized</u> statements at trial.  They also challenge the admissibility of testimony from at least one of the government's expert witnesses.  The defendants' arguments, which frequently contradict both established law and common sense, should be rejected in their entirety.

---

[27] Because the defendants ultimately all raise the same arguments and join one another's motions, the government will hereafter refer to them collectively in this response.

I.     The Charged Conduct In This Case Has A Clear Nexus To The United States,
       And Thus This Prosecution Is Proper Under The Due Process Clause

                The defendants argue that "[t]he indictment in this case does not allege any

nexus" between the defendants or their alleged conduct and the United States, and therefore

their prosecution "is fundamentally unfair and violates the Fifth Amendment."  (ECF #129 at

3-7).  This argument fails.  As a threshold matter, the government is not required to set forth

the nature of the nexus to the United States in the indictment itself.  It is well-established law

that a "criminal defendant is entitled to an indictment that states the essential elements of the

charge against him."  United States v. Pirro, 212 F.3d 86, 91 (2d Cir. 2000) (citing Jones v.

United States, 526 U.S. 227, 232 (1999)).  Little more is required.  See Fed. R. Crim. P.

7(c)(1) (describing indictment as a "concise . . . statement of the essential facts.").  Indeed,

the Second Circuit has "consistently upheld indictments that 'do little more than to track the

language of the statute charged and state the time and place (in approximate terms) of the

alleged crime.'"  United States v. Walsh, 194 F.3d 37, 44 (2d Cir. 1999) (quoting United

States v. Tramunti, 513 F.2d 1087, 1113 (2d Cir. 1975)); see also United States v. Yannotti,

541 F.3d 112, 127 (2d Cir. 2008).  However, and as described further below, there is an

ample nexus between the defendants' membership in al-Shabaab and the United States to

satisfy the Due Process Clause.

       A.     Legal Framework

                "[A]s a general proposition, Congress has the authority to 'enforce its laws

beyond the territorial boundaries of the United States.'"  United States v. Yousef, 327 F.3d

56, 86 (2d Cir. 2003) (quoting EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 248 (1991)).

However, "[i]n order to  apply a federal criminal statute to a defendant consistently with due

                                          22

process, there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair." Yousef, 327 F.3d at 111 (quoting United States v. Davis, 905 F.2d 245, 248–49 (9th Cir. 1990)) (modification omitted).  "For non-citizens acting entirely abroad, a jurisdictional nexus exists when the aim of that activity is to cause harm inside the United States or to U.S. citizens or interests." United States v. Al Kassar, 660 F.3d 108, 118 (2d Cir. 2011).  Where a conspiracy is charged, "[j]urisdictional nexus is determined by the aims of the conspiracy, not by its effects."  Id. at 119.

In addition to the "sufficient nexus" test, courts determining whether a prosecution comported with due process have also analyzed whether defendants had "fair warning" that their extraterritorial conduct exposed them to prosecution.  See, e.g., Al Kassar, 660 F.3d at 119.  Notably, the Second Circuit has made clear that the Due Process Clause does not require that defendants understand that they could be subject to criminal prosecution in the United States, "so long as they would reasonably understand that their conduct was criminal and subject them to prosecution somewhere."  Id.

B.   Discussion

As alleged in the indictment, the defendants were members of a conspiracy to provide material support to the designated foreign terrorist organization al-Shabaab. Notably, one of the required elements for designation as a foreign terrorist organization by the Secretary of State is the finding that "the terrorist activity or terrorism of the organization threatens the security of United States nationals or the national security of the United States." 8 U.S.C. § 1189(a)(1)(C).  Providing material support to such a terrorist organization plainly

implicates U.S. interests, as courts in this Circuit have repeatedly found.  See, e.g., Al Kassar, 660 F.3d at 118 (finding sufficient nexus to United States in case where defendants were charged following sting where they provided weapons to undercover agents posing as members of designated foreign terrorist organization FARC); United States v. Naseer, Case No. 10 CR 19 (RJD), 2014 WL 3871350, at *2 (E.D.N.Y. Aug. 6, 2014) (denying due process challenge in case where al-Qaeda member's conduct occurred entirely overseas); United States v. Ahmed, No. 10 CR 131(PKC), 2011 WL 5041456, at *2–*3 (S.D.N.Y. Oct. 21, 2011) (denying due process challenge in case where defendant charged with providing material support to al-Shabaab, even where indictment did not allege defendant engaged or intended to engage in specific acts either within the United States or directed at its citizens or property here or in other countries).

The courts' rationale for finding a sufficient nexus in Al Kassar, Naseer and Ahmed also applies in this case.  As described above in the Statement of Facts, and as set forth in voluminous discovery already provided to the defense, al-Shabaab is in open conflict with the United States.  As the government will establish at trial, al-Shabaab's leadership has encouraged its members to attack U.S. citizens and its interests abroad.  Indeed, given the United States support of the TFG and the various countries that made up the AMISON, including Burundi, Uganda, Kenya and Ethiopia, beginning in 2009, foreign fighters for al-Shabaab, under the leadership of Saleh Nabhan, sought to carry out attacks on the United States Embassy in Kampala and at locations frequented by westerners in that city, including American citizens, in order to strike a blow at what al-Shabaab considered the heart of their enemy, the United States.  Its use of suicide bombers and other violence to create mass

24

casualties in Kampala during the 2010 World Cup and during the 2013 Westgate Mall attack

has undoubtedly been aimed to influence U.S. foreign policy in Africa and elsewhere.

Moreover, al-Shabaab has produced and disseminated significant promotional media –

including a video in which the defendant Yusuf appears – aimed specifically at attracting

young men from the United States and elsewhere, to travel to Somalia and to join the

*mujahareen* of al-Shabaab.  Indeed, many such American foreign fighters were among the

defendants' co-conspirators and at least one, Omar Hammami, was a key member of the

foreign fighters responsible for the production of such media that was critical to al-Shabaab's

recruitment process.  Likewise, Jehad Mustafa, also known as "Ahmed Gurey," an American

citizen, served as the overall commander of al-Shabaab's *muhajireen,* of which Hashi,

Ahmed and Yusuf were members, after the death of Saleh Nabhan, al-Shabaab's al-Qaeda-

linked leader who was responsible for initiating the Kampala attacks utilizing one or more

foreign fighters who had fought alongside the defendants to carry out al-Shabaab's terrorist

goals.   This close nexus between the goals of the charged conspiracy – e.g., to recruit

Americans and other westerners to join al-Shabaab, and then to use violence to impact U.S.

foreign policy – and the United States clearly supports prosecution.

   In attempting to argue otherwise, the defense cites to no case in which a court

has found the lack of a requisite nexus.  Instead, they argue that no defendant in this case is

"alleged to have had any focus on, aims directed at, or contacts with the United States during

the extended period charged in the indictment."  (ECF #129 at 3-4).  Of course, as set forth

above, this is factually incorrect.  The defendants were members of a conspiracy of al-

Shabaab foreign fighters who both targeted U.S. interests abroad, and who sought to recruit

Americans to fight for al-Shabaab.  This is sufficient to satisfy the nexus requirement.  See, e.g., Naseer, 2014 WL 3871350, at *2 (finding that designation as a foreign terrorist organization and the knowledge requirement of Section 2339B "ensure that there is a nexus to American interests so as to render the prosecution neither arbitrary nor fundamentally unfair" (internal quotation marks and citation omitted)).

The defense also argues that the Due Process Clause was violated because "nothing that the government has provided to date shows that the defendant had any notice or reason to believe that he was subjecting himself to U.S. law and could be haled into a U.S. court for his conduct."  (ECF #129 at 4).  However, the Second Circuit rejected this very argument in Al Kassar, explaining that the Due Process Clause does not require that defendants "understand that they could be subject to criminal prosecution in the United States so long as they would reasonably understand that their conduct was criminal and subject them to prosecution somewhere."  660 F.3d at 119.  There is no question that a defendant who conspired to provide material support to an organization that orchestrated the suicide bombings described above, including the suicide bombings in Kampala that killed 74 people, including a U.S. citizen, would reasonably have understood that his conduct was criminal, whether or not he knew that he could be subject to prosecution in the United States specifically.  See id. (supplying weapons to a designated terrorist organization with the knowledge they would be used to attack U.S. personnel was "self-evidently criminal" and "their deliberate attempts to avoid detection suggested the defendants so understood"); see also Naseer, 2014 WL 3871350, at *2 ("defendant who allegedly plotted to bomb targets in the United Kingdom on behalf of al-Qaeda would reasonably have understood that his

26

conduct was criminal, whether or not he knew with specificity that he could be subject to prosecution in the United States"); Ahmed, 2011 WL 5041456, at *3 (defendant who renders material support to terrorist organizations "ought to reasonably expect that he would be subject to prosecution in some jurisdiction").

Unable to cite to any U.S. legal authority to support their argument that this prosecution violates the Due Process Clause, the defense launches into an extended discussion about international law and the definitions of "terrorism" and "terrorist activity," the relevance of which is unclear.  (See ECF #129 at 4-6).  It is well-established that, "in fashioning the reach of our criminal law, 'Congress is not bound by international law.'" Yousef, 327 F.3d at 86 (quoting United States v. Pinto–Mejia, 720 F.2d 248, 259 (2d Cir. 1983)).  "If it chooses to do so, [Congress] may legislate with respect to conduct outside the United States, in excess of the limits posed by international law."  Id.  Further, the Ninth Circuit decision to which the defense cites for the proposition that international law could somehow be relevant to this argument regarding the Due Process Clause of the U.S. Constitution mentions the subject only in passing in a footnote, with no further discussion, except to note, "However, danger exists that emphasis on international law principles will cause us to lose sight of the ultimate question: would application of the statute to the defendant be arbitrary or fundamentally unfair?"  Davis, 905 F.2d 249 n.2.  None of the leading counterterrorism cases from this Circuit, cited above, consider international law in considering whether the Fifth Amendment is satisfied.  In any case, the fact that there is not "unqualified condemnation" around the world (ECF #129 at 5) of the defendants' conduct is sadly correct, but entirely irrelevant.  That there remain members of al-Shabaab and other

27

terrorist organizations who applaud the defendants' criminal conduct and who continue to

employ violence in order to influence U.S. foreign policy through terror is immaterial to the

question of whether the defendants' prosecution in this case comports with due process.

In sum, because the aim of the defendants' conspiracy – of which they were

members with other al-Shabaab foreign fighters – was to "cause harm inside the United

States or to U.S. citizens or interests," their prosecution is consistent with due process under

U.S. law.

II.     The Indictment Properly Alleges All The Elements Of Section 2339B

The defense next argues that Section 2339B should be "construed to require

as essential elements of both the substantive and conspiracy offense that 'the offense occurs

in whole or in part within the United States' and 'the offense occurs in or affects interstate or

foreign commerce.'"  (ECF #129 at 7-8).  The defense then claims that, because these

purported elements are not alleged in the indictment, the indictment must be dismissed under

Fed. R. Crim. P. 12(b)(3)(B).  (ECF #129 at 7).

These purported elements do not appear in Section 2339B(a); the defense lifts

them from Section 2339B(d), the portion of the statute relating to the scope of Section

2339B's extraterritorial application.  Because this argument flies entirely in the face of the

plain language of the statute and lacks any legal support whatsoever, it fails.

A.     Legal Framework

1.     Extraterritorial Application Of Criminal Statutes

Where Congress has "expressly indicated its intent to reach" extraterritorial

conduct, the Court is "bound to follow the Congressional direction unless this would violate

the due process clause of the Fifth Amendment." United States v. Pinto–Mejia, 720 F.2d

248, 259 (2d Cir. 1983) (quotation marks omitted).[28] Where a criminal statute does not

expressly address the issue of extraterritoriality, courts must look to the nature of the

criminalized offense to determine whether that statute can be applied extraterritorially. For

cases involving "[c]rimes against private individuals or their property," United States v.

Bowman, 260 U.S. 94, 98 (1922), there exists a "presumption that United States law governs

domestically but does not rule the world." See United States v. Vilar, 729 F.3d 62, 72 (2d

Cir. 2013) (citing Kiobel v. Royal Dutch Petroleum Co., 133 S.Ct. 1659, 1664 (2013)). If

punishment of such crimes "is to be extended to include those committed outside of the strict

territorial jurisdiction, it is natural for Congress to say so in the statute, and failure to do so

will negative the purpose of Congress in this regard." Bowman, 260 U.S. at 98. However,

"the same rule of interpretation should not be applied to criminal statutes which are, as a

class, not logically dependent on their locality for the Government's jurisdiction," such as

where the law at issue "is aimed at protecting the right of the government to defendant

itself." See Vilar, 729 F.3d at 73 (quoting Bowman, 260 U.S. at 98 (internal quotation marks

omitted)).

---

[28] Notwithstanding the defense's suggestions to the contrary, this question of whether the government has authority to charge extraterritorial conduct under a statute is distinct from the question of whether a district court has subject-matter jurisdiction to hear a criminal case. Title 18, United States Code, Section 3231, provides that "[t]he district courts of the United States shall have original jurisdiction . . . of all offenses against the laws of the United States." In determining whether it has subject-matter jurisdiction over a criminal case, a court should "ask only whether the indictment alleges all of the statutory elements of a federal offense." United States v. Yousef, 750 F.3d 254, 259-60 (2d Cir. 2014) (quotation marks omitted). A defendant's contention "'that in fact certain of [the statutory] elements are lacking . . . goes to the merits of the prosecution, not to the jurisdiction of the court to entertain the case or to punish the defendant if all of the alleged elements are proven.'" Id. (quoting Hayle v. United States, 815 F.2d 879, 882 (2d Cir. 1987)).

2.    Section 2339B

Section 2339B provides that "whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be [punished]."  18 U.S.C. § 2339B(a)(1).  Notably, Section 2339B explicitly targets conduct occurring abroad.  See 18 U.S.C. § 2339B(d)(2); see also Naseer, 2014 WL 3871350, at *1 ("The material support statute explicitly applies to overseas conduct.").  Specifically, under the heading "extraterritorial jurisdiction," the statute states that "[t]here is jurisdiction over an offense under subjection (a) if –

> (A) an offender is a national of the United States . . . or an alien lawfully admitted for permanent residence in the United States . . .;
>
> (B) an offender is a stateless person whose habitual residence is in the United States;
>
> (C) after the conduct required for the offense occurs an offender is brought into or found in the United States, even if the conduct required for the offense occurs outside the United States;
>
> (D) the offense occurs in whole or in part within the United States;
>
> (E) the offense occurs in or affects interstate or foreign commerce; or
>
> (F) an offender aids or abets any person over whom jurisdiction exists under this paragraph in committing an offense under subsection (a) or conspires with any person over whom jurisdiction exists under this paragraph to commit an offense under subsection (a).

18 U.S.C. § 2339B(d)(1).

B.    The Indictment Properly Alleges Each And Every Element Of Section 2339B As Set Forth In The Plain Language Of The Statute

The defense contends that the indictment fails to allege all the elements of Section 2339B, arguing that the statute "must be construed to require as essential elements of both the substantive and conspiracy offense that 'the offense occurs in whole or in part

30

within the United States' and 'the offense occurs in or affects interstate or foreign commerce.'"  (ECF #129 at 7-8).  In so doing, the defense plucks two of the six alternative bases for Section 2339B's extraterritorial jurisdiction and attempts to convert them <u>both</u> into new elements of the offense.  The defense's main ground for this statutory transplant is that those two subsections – Section 2339B(d)(1)(D) and (d)(1)(E) – "fall within the prescriptive jurisdiction arena," while the remaining subsections of Section 2339B(d)(1) relate to the Court's "adjudicative" jurisdiction.  (ECF #129 at 10-12).  This argument, which is based on flawed understandings of both the fundamental rules of statutory construction and the statutory language at issue in this case, fails.

    1.    **Counts One And Two Of The Indictment Allege All The Elements Of The Charged Crimes**

At trial, the government must prove the following elements beyond a reasonable doubt to establish a defendant's guilt of conspiring to provide material support to a designated terrorism organization, in violation of Title 18, United States Code, Section 2339B:

> <u>First</u>, that two or more persons reached an agreement or understanding to provide material support to al-Shabaab;
>
> <u>Second</u>, that the defendant knowingly and intentionally joined in the agreement or understanding with the specific intent to provide material support to al-Shabaab; and
>
> <u>Third</u>, that the defendant committed this offense within the extraterritorial jurisdiction of the United States.

<u>See, e.g.</u>, charge of Hon. Michael J. Davis in <u>United States v. Mahamud Said Omar</u>, 09 CR 242 (DMN) (D. Minn. 2012); <u>see also</u> <u>United States v. Soto</u>, 716 F.2d 989, 993 (2d Cir. 1983).  For a defendant to be convicted of the substantive crime of providing material

31

support to a designated terrorist organization under Section 2339B, the government must

prove the following elements:

> First, that the defendant provided material support or resources;

> Second, that the defendant provided this support or these resources to a foreign terrorist organization, specifically al-Shabaab;

> Third, that the defendant did so knowingly and intentionally; and

> Fourth, that the defendant committed this offense within the extraterritorial jurisdiction of the United States.

See, e.g., charge of Hon. John Gleeson in United States v. Adis Medunjanin, 10 CR 19 (JG)

(E.D.N.Y 2012); charge of the Hon. John Gleeson in United States v. Betim Kaziu, 09 CR

660 (JG) (E.D.N.Y. 2011); charge of the Hon. Sterling Johnson Jr. in United States v. Al-

Moayad, E.D.N.Y., 03 CR 1322 (SJ) (E.D.N.Y. 2005).

> The operative indictment here reads with respect to Count One:

> In or about and between April 2008 and August 2012, both dates being approximate and inclusive, within the extraterritorial jurisdiction of the United States, the defendants ALI YASIN AHMED, also known as "Ismail," MADHI HASHI, also known as "Talha," and MOHAMED YUSUF, also known as "Abu Zaid," "Hudeyfa" and "Mohammed Abdulkadir," together with others, did knowingly and intentionally conspire to provide material support and resources, as defined in Title 18, United States Code, Section 2339A(b), including currency and personnel, including themselves, to a foreign terrorist organization, to wit: al-Shabaab.

As to Count Two, the indictment reads:

> In or about and between December 2008 and August 2012, both dates being approximate and inclusive, within the extraterritorial jurisdiction of the United States, the defendants ALI YASIN AHMED, also known as "Ismail," MADHI HASHI, also known

as "Talha," and MOHAMED YUSUF, also known as "Abu
Zaid," "Hudeyfa" and "Mohammed Abdulkadir," together with
others, did knowingly and intentionally provide material support
and resources, as defined in 18 U.S.C. Section 2339A(b),
including currency and personnel, including themselves, to a
foreign terrorist organization, to wit: al-Shabaab.

Put simply, the indictment alleges the required elements.  Indeed, no court has

ever held that either Section 2339(d)(1)(D) or Section 2339(d)(1)(E) were themselves

elements – let alone that the government must allege and prove both.  This comes as little

surprise, because the plain language of the statute precludes the defense's bizarre reading of

it.

> 2.      Section 2339B(d)(1), Properly Construed As A Disjunctive List,
>         Establishes Alternative Bases For Extraterritorial Jurisdiction

Notwithstanding the plain language of the statute, the defense argues that

Sections 2339B(d)(1)(D) and 2339B(d)(1)(E) must both be elements that the government

must allege and prove at trial because those sections would otherwise be "superfluous."  In

support of that claim, the defense argues:

> Since the "offender" subdivisions [(A), (B), (C) or (F)] are all
> encompassing and cover any person whether domestic or foreign, and
> since 18 U.S.C. § 3231 provides the district courts with "original
> jurisdiction . . . of all offense against the laws of the United States,"
> there is no one who could be prosecuted based on either subdivision
> (D) or (E) who would not also be subject to "jurisdiction" under one of
> the all-encompassing "offender" subdivisions [i.e., (A), (B), (C) or (F)].

(ECF #129 at 14).  Because that assertion is wrong, and because Congress's intent is clear

from the face of the statute, the defense's argument fails.

As a threshold matter, it is the "cardinal principle of statutory construction that

a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause,

33

sentence, or word shall be superfluous, void, or insignificant." TRW Inc. v. Andrews, 534
U.S. 19, 31 (2001). However, "[s]tatutory interpretation always begins with the plain
language of the statute, assuming the statute is unambiguous." Universal Church v. Geltzer,
463 F.3d 218, 223 (2d Cir. 2006). When a court determines that the language of a statute is
unambiguous, its inquiry is complete. See, e.g., Marvel Characters, Inc. v. Simon, 310 F.3d
280, 290 (2d Cir. 2002).

      Here, Section 2339(d)(1) sets forth six alternative means by which Section
2339(a) can be applied extraterritorially. They are plainly alternative means of
extraterritorial application, because the disjunctive "or" appears between Section
2339B(d)(1)(E) and Section 2339B(d)(1)(F). See, e.g., Reiter v. Sonotone Corp., 442 U.S.
330, 339 (1979) ("Canons of construction ordinarily suggest that terms connected by a
disjunctive be given separate meanings, unless the context dictates otherwise . . . ."); Mattel,
Inc. v. Barbie-Club.com, 310 F.3d 293, 303 (2d Cir. 2002) ("Congress's choice of the
disjunctive carries significance"). Moreover, a plain reading of the statute does not render
Sections 2339B(d)(1)(D) and 2339B(d)(1)(E) superfluous, as the defense contends, because,
contrary to the defense's claim, there could be individuals who would be subject to
prosecution under Sections 2339B(d)(1)(D) and 2339B(d)(1)(E) who would not fall within
the ambit of Section 2339B(d)(1)'s other provisions. For example, a stateless person who
has never been to the United States could, while acting alone but in material support and on
behalf of al-Shabaab, bomb a warehouse containing commercial goods bound for the United
States. This individual's conduct would clearly be criminalized under Section 2339B(a).
However, he would not be subject to that statute's extraterritorial application under Sections

2339B(d)(1)(A) (not a U.S. national), (B) (not habitually residing in the United States), (C) (not in the United States at the time of charging),[29] (D) (offense did not occur in the United States) or (F) (defendant was a principal and not in a conspiracy).  In that instance, Section 2339B(d)(1)(E) would be the sole basis for extraterritorial jurisdiction, since the attack affected interstate and foreign commerce.

Accordingly, and because each provision of Section 2339B(d)(1) covers a different scenario in which Congress has directed that extraterritorial application of Section 2339B is appropriate, no provision is superfluous.  As a result, the statute should be applied in a manner consistent with its plain language – i.e., that the government must establish only one of Section 2339B(d)(1)'s provisions at trial to establish, as the government alleges in the indictment, that the defendants committed the charged conduct "within the extraterritorial jurisdiction of the United States."

In point of fact, as described above and as the government will establish at trial, several of the bases for extraterritorial jurisdiction set forth in Section 2339B(d)(1) apply in this case:

- the defendants are now in the United States (Section 2339B(d)(1)(C));

- the offenses occurred in or affected interstate or foreign commerce (Section 2339B(d)(1)(E); and

---

[29] Attempting to cover this fundamental flaw in their argument, the defense speciously notes that, to be tried, an individual must eventually be brought to the United States for trial, and thus would eventually fall under Section 2339B(d)(1)(C).  (ECF #129 at 14 n.8).  However, extraterritorial jurisdiction must exist at the time of charging.  In a case like this, were the defendants abroad when they were first indicted, Section 2339B(d)(1)(C) would not apply.  At the time the grand jury returned its first indictment, there existed (and still exist) other bases for extraterritorial application of the statute.

- the defendants aided and abetted and conspired with other U.S. nationals who were part of al-Shabaab's foreign fighter cadre in Somalia (Section 2339B(d)(1)(F)).

Accordingly, because the operative indictment alleges that the offenses occurred "within the extraterritorial jurisdiction of the United States," the indictment is sufficient. Sections 2339B(d)(1)(D) and 2339B(d)(1)(E) represent not separate, additional elements that the government must prove, but different ways in which the government may establish that the offense occurred within the extraterritorial jurisdiction of the United States.[30]

C.     Section 2339B Is Constitutional

Notwithstanding the plain language of Section 2339B, the defense next argues that if the Court does not treat both Sections 2339B(d)(1)(D) and 2339B(d)(1)(E) as additional elements of the offense, then "several constitutional questions emerge." (ECF #129 at 15). Specifically, the defense argues that:

- Congress lacked the constitutional authority to pass Section 2339B unless Section 2339B(d)(1)(E) is an element of the offense (ECF #129 at 14-22, 32);

- Section 2339B(d)(1)(D) must be an element of the offense or the statute violates the Due Process Clause (ECF #129 at 15-22, 32);

- construing Sections 2339B(d)(1)(D) and 2339B(d)(1)(E) as elements "avoids a constitutional challenge that the statute is vague, standardless, and allows for discriminatory enforcement by the Executive" (ECF #129 at 22-23, 32); and

---

[30] The defense argues that Sections 2339B(d)(1)(D) and 2339B(d)(1)(E) relate to a concept they term "prescriptive jurisdiction," i.e. to define the conduct being criminalized by Congress, while the remaining provisions of Section 2339B(d)(1) pertain to a court's power "to subject persons or things to the judicial process." (ECF #129 at 8). However, the defense cites no authority in support for this distinction. In reality, and as Congress made clear through the statute's plain language, Section 2339B(a) defines the conduct being criminalized, and Section 2339B(d) defines the scope of the Court's power "to subject persons or things to the judicial process" under that statute.

- unless Sections 2339B(d)(1)(D) and 2339B(d)(1)(E) are elements of the statute, extraterritorial application is inconsistent with the "presumption against extraterritoriality" and international law (ECF #129 at 23-29, 32).

These scattershot arguments are underdeveloped, repetitive and periodically nonsensical, with the defense often failing to set forth even the most basic legal frameworks required to address the various constitutional claims raised (often in only a few, throw-away sentences).  In reality, the defense arguments amount to little more than a transparent game of chicken, designed to intimidate the government and Court into accepting a skewed interpretation of a clearly worded statute, rather than to engage in the rigorous analysis required to rebut the defense's meritless claims.  However, as the Supreme Court has made clear in rejecting similarly meritless challenges to the constitutionality of Section 2339B, "[a]lthough this Court will often strain to construe legislation so as to save it against constitutional attack, it must not and will not carry this to the point of perverting the purpose of a statute."  Holder v. Humanitarian Law Project, 561 U.S. 1, 7 (2010) (quoting Scales v. United States, 367 U.S. 203, 211 (1961)).  Accordingly, and in order to prevent the defense from perverting a statute aimed at preventing individuals from providing material support to terrorist organizations, the government addresses the defense's meritless constitutional challenges to the statute directly, and seriatim.

1.  Section 2339B Was Passed Pursuant To Multiple Sources Of Congressional Power, And The Government Will Establish At Trial That The Offense Conduct Substantially Affected Interstate And Foreign Commerce

The defense claims that Congress exceeded its constitutional authority in enacting Section 2339B, unless the government is required to allege in the indictment and prove at trial that the offense occurred in or affected interstate or foreign commerce.  (ECF

#129 at 14-22, 32).  More specifically, the defense argues that Section 2339B was passed pursuant to Congress's powers under the Commerce Clause, but unless an impact on interstate and foreign commerce is an element of the offense, then the statute "is not tied to an enumerated power of Congress" and is thus unconstitutional under the Supreme Court's holding in United States v. Lopez, 514 U.S. 549, 557 (1995).   (ECF #129 at18-19, 32).

Of course, the federal government "is acknowledged by all to be one of enumerated powers," McCulloch v. Maryland, 17 U.S. 316, 428 (1819), which means that "[e]very law enacted by Congress must be based on one or more of" those powers, United States v. Morrison, 529 U.S. 598, 607 (2000).  However, "[d]ue respect for the decisions of a coordinate branch of Government demands that [a court] invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds." Morrison, 529 U.S. at 606 (applying a "presumption of constitutionality" when examining the scope of Congressional power).  The Supreme Court has also acknowledged that the Necessary and Proper Clause makes clear that the Constitution's grants of specific federal legislative authority are accompanied by broad power to enact laws that are "convenient, or useful" or "conducive" to the authority's "beneficial exercise."  McCulloch, 17 U.S. at 413, 418; see also id., at 421 ("[Congress can] legislate on that vast mass of incidental powers which must be involved in the constitution . . .").

Congress passed Section 2339B in 1996 and amended it in 2004, and the defense cites (and the government could find) no case in which any defendant has argued that Congress lacked the constitutional authority to enact that law.  Indeed, as set forth below in Part II.C.1.a, in passing Section 2339B, Congress made findings that the law was to be

38

enacted based on several of Congress's enumerated powers under the Constitution. However, for the reasons set forth below in Part II.C.1.b, and because the government will establish at trial that the charged conduct affected interstate and foreign commerce in order to establish jurisdiction, the Court need not even reach this argument.

> a.  Section 2339B Was Passed Pursuant To Congress's Powers To Regulate Commerce, To Punish Offenses Against The Law Of Nations, And To Enforce Treaty Obligations

The Constitution bestows upon Congress eighteen specific powers, including the powers to "regulate Commerce with foreign Nations, and among the several States," "to define and punish . . . Offences against the Law of Nations," and to carry out the nation's treaty obligations.  See U.S. Const. Art. I, § 8, cls. 1–18, § 10; Art. II, § 2, cl. 2.  In passing Section 2339B, Congress made findings implicating all three of those sources of Congressional power:

> (a) Findings.--The Congress finds that--
>
> (1) international terrorism is a serious and deadly problem that threatens the vital interests of the United States;
>
> (2) the Constitution confers upon Congress the power to punish crimes against the law of nations and to carry out the treaty obligations of the United States, and therefore Congress may by law impose penalties relating to the provision of material support to foreign organizations engaged in terrorist activity;
>
> . . .
>
> (4) international terrorism affects the interstate and foreign commerce of the United States by harming international trade and market stability, and limiting international travel by United States citizens as well as foreign visitors to the United States;

Section 301 of Pub. L. 104-132.

The defense, without any discussion or legal support, rejects Congress's findings that it passed Section 2339B based on its treaty powers and its powers to define and punish offenses that are against the law of nations, arguing simply that the "statute, by its terms, is not related to a valid international treaty or universally condemned conduct." (See ECF #129 at 18.)  The defense is incorrect on both points.

First, the United States is party to several treaties aimed at combatting international terrorism that implicate Section 2339B, such as the International Convention for the Suppression of Terrorist Bombings and the International Convention for the Suppression of the Financing of Terrorism (the "Terrorist Fundraising Convention").  Notably, the Terrorist Fundraising Convention prohibits the collection of funds by any person with the intention or knowledge that they be used in full or in part to carry out a terrorist act proscribed elsewhere in the Convention.  The Terrorist Fundraising Convention also requires signatories to take measures necessary within their respective legal systems to punish offenders.  Terrorist Fundraising Convention Arts. 4, 5.  Under Missouri v. Holland, 252 U.S. 416, 432 (1920), the treaty-making power, coupled with the Necessary and Proper Clause, affords Congress the Constitutional authority to enact legislation that bears a rational relationship to the fulfillment of its treaty obligations.  Given that Section 2339B criminalized the provision of currency in material support a terrorist organization, the statute can be construed as an implementation of Congress's treaty-based responsibilities to enact implementing legislation.   See, e.g., United States v. Lawrence, 727 F.3d 386, 394 (5th Cir. 2014) (upholding legislation implementing UN Single Convention on Narcotic Drugs); United States v. Belfast, 611 F.3d 783 (11th Cir. 2010) (upholding legislation implementing

UN Torture Convention); <u>United States v. Lue</u>, 134 F.3d 79, 83 (2d Cir. 1998) (upholding

legislation implementing Hostage-Taking Convention).

Second, as stated in Section 301 of Pub. L. 104-132, Congress made a finding

in enacting Section 2339B that "the Constitution confers upon Congress the power to punish

crimes against the law of nations . . . and therefore Congress may by law impose penalties

relating to the provision of material support to foreign organizations engaged in terrorist

activity."  In so doing, Congress made a determination that providing material support to

terrorist organizations is against the law of nations, and therefore it decided to criminalize

such conduct.[31]  <u>See</u> U.S. Const. Art. I, § 8, cl. 10 (Congress empowered "To define and

punish . . . Offences against the Law of Nations").

In sum, Congress identified and possesses numerous sources of power that

authorized it to enact Section 2339B.  An impact on interstate and foreign commerce is not

an element of the offense, and to the extent jurisdiction is based on another provision of

Section 2339B(d), such an impact need not be alleged or proved.

      b.     The Government Will Establish That The Offense
             <u>Conduct Affected Interstate And Foreign Commerce</u>

Notwithstanding the fact that Congress possessed multiple sources of authority

under the Constitution that allowed it to enact Section 2339B in addition to the Commerce

Clause, the Court need not reach the question of under which of these powers Congress acted

---

[31] That the Second Circuit concluded in <u>Yousef</u>, 327 F.3d at 106, that terrorism does not provide a basis for "universal jurisdiction" under international law does not alter this analysis.  For purposes of lawmaking authority, the Constitution makes clear that Congress – and not the courts – defines the "law of nations."  <u>See</u> U.S. Const. Art. I, § 8, cl. 10.

in passing the statute in 1996 and amending it in 2004.  This is because the government

intends to establish at trial that the offense conduct affected interstate or foreign commerce as

one of the bases for extraterritorial jurisdiction in this case under Section 2339B(d)(1).

Although the statute makes clear that an impact on commerce is <u>not</u> itself an element of the

offense, the government must establish a basis for jurisdiction under Section 2339B(d)(1).  In

so doing, it will establish that enforcement of Section 2339B in this case comports with

Congress's powers under the Commerce Clause.

> 2.      Section 2339B(d)(1)(D) Need Not Be An Element For The Statute To
>         Comply With The Due Process Clause

The defense also argues that Section 2339B(d)(1)(D) – that the offense

occurred in whole or in part within the United States – is an element that must be proved at

trial in order to set "forth a territorial nexus with the United States without which application

of the law to non-nationals based exclusively on foreign conduct might be arbitrary and

fundamentally unfair."  (ECF #129 at 18).  This argument, which seems to be a rehashing of

the defense's earlier due process challenge, is entirely inconsistent with the language of the

statute and the controlling case law in the Circuit, and therefore fails.

As already discussed in Parts I and II.B,[32] the plain language of Section 2339B

establishes that Congress intended the statute to be applied extraterritorially.  Section

2339B(d)(1)(D) is merely one of six ways in which extraterritorial enforcement is

authorized.  Further, there is no legal requirement in the statute, under the Due Process

Clause, or in the case law that offense conduct occur in whole or in part within the United

---

[32] <u>See also</u> <u>infra</u> Part II.C.4, responding to the defense argument that
extraterritorial application of the statute is inconsistent with the "presumption against
extraterritoriality" and international law.

States.  See, e.g., Al Kassar, 660 F.3d at 118; Naseer, 2014 WL 3871350, at *2; Ahmed,

2011 WL 5041456, at *2–*3.  Accordingly, Section 2339B(d)(1)(D) is itself neither an

element that must be alleged in the indictment nor a fact that must be proved at trial.

>           3.      Section 2339B Is Not "Vague" Or "Standardless," Nor Does It Allow
>                   For Discriminatory Enforcement

The defense argues that Section 2339B is "vague and standardless, allowing

for discriminatory enforcement and violating the principle that legislative powers are non-

delegable."  (ECF #129 at 22-23, 32).  The essence of the defense's argument on this point

appears to relate to Section 2339B(d)(1)(C), which would permit extraterritorial application

of the statute where, "after the conduct required for the offense occurs an offender is brought

into or found in the United States, even if the conduct required for the offense occurs outside

the United States."  The defense argues (without providing any further explanation or

relevant legal authority) that by not requiring the government to establish that offense

conduct occurred in the United States or affected interstate or foreign commerce, "then

application of the statute to foreigners (like the defendants here) who (allegedly) committed

all conduct abroad (and never set foot in or communicated with anyone in the United States

or targeted the United States) would depend entirely on the whim of the Executive."  (ECF

#129 at 22).

However, as previously discussed, and as even the defense notes elsewhere in

its papers, extraterritorial application of any statute is limited by the Due Process Clause.

(See Part I).  Accordingly, while bringing a defendant into the United States would satisfy

the statutory requirement for extraterritorial jurisdiction for Section 2339B, the government

would still be required to show a sufficient nexus to the United States so as to satisfy the

Fifth Amendment.  Thus, the "whim of the Executive" would remain regulated by both the Constitution and the Court.  Accordingly, the defense's arguments on this point are without merit.

> 4.      As The Statute Makes Clear, Congress Intended For Section 2339B To Be Enforced Extraterritorially, And Such Enforcement Is Both Proper Under The Constitution And Consistent With International Law

Rehashing yet again its arguments from preceding sections, the defense next argues that Sections 2339B(d)(1)(D) and 2339B(d)(1)(E) must both be treated as offense elements in order for the statute to comply with the "presumption against extraterritoriality," the Due Process Clause, and international law, generally.  (ECF #129 at 23-29).  This argument is predicated on a fundamental misunderstanding of the law, and therefore fails.

As set forth in greater detail in Parts I.A. and II.A.1, "as a general proposition, Congress has the authority to 'enforce its laws beyond the territorial boundaries of the United States.'"  Yousef, 327 F.3d at 86.  Where Congress has "expressly indicated its intent to reach" extraterritorial conduct, the Court is "bound to follow the Congressional direction unless this would violate the due process clause of the Fifth Amendment."  Pinto–Mejia, 720 F.2d at 259 (quotation marks omitted); see also United States v. Gatlin, 216 F.3d 207, 211 n.5 (2d Cir. 2000) ("[s]tatutes prohibiting crimes against the United States government may be applied extraterritorially even in the absence of 'clear evidence' that Congress so intended").  Notably, U.S. law – and not international law, as the defense repeatedly and incorrectly suggests – controls on the question of whether a statute applies extraterritorially. See Yousef, 327 F.3d at 109 ("courts of the United States are . . . obligated to give effect to an unambiguous exercise by Congress of its [power to grant jurisdiction to agencies or to

courts] even if such an exercise would exceed the limitations imposed by international law."
(emphasis in original) (internal quotation marks and citations omitted)).  Put simply, the
Court must consider the statutory language to determine if Congress intended for the statute
to be applied extraterritorially.  If Congress so intended, and if the extraterritorial application
of the statute in this case comports with due process (and it does, for the reasons discussed in
Part I), then the inquiry is complete.  "United States law is not subordinate to customary
international law or necessarily subordinate to treaty-based international law and, in fact,
may conflict with both."  Yousef, 327 F.3d at 91.

Further, the defense is simply incorrect that the so-called "presumption against
extraterritoriality" compels a different result or even impacts this analysis.  It is certainly true
that "although there is no general bar against the extraterritorial application of our criminal
laws to American citizens, the Supreme Court has long recognized a presumption against
such applications."  United States v. Kim, 246 F.3d 186, 188–89 (2d Cir. 2001).  Indeed the
defense is correct that the Second Circuit made clear in Vilar that this presumption against
extraterritoriality can apply to criminal statutes.  729 F.3d at 73.  However, the defense
ignores the rest of the Second Circuit's ruling in Vilar – and the other cases addressing the
"presumption" – which hold that "the presumption against extraterritoriality does apply to
criminal statutes, except in situations where the law at issue is aimed at protecting 'the right
of the government to defend itself.'"  Id. (quoting Bowman, 260 U.S. at 98) (emphasis
added).  A statute criminalizing the provision of material support to terrorist organizations
that the Secretary of State has identified as employing violence to influence U.S. foreign

policy certainly implicates the U.S. Government's right to defend itself and thus, the "presumption against extraterritoriality" does not apply here.

Here, Congress explicitly set forth the scope of Section 2339B's extraterritorial application in Section 2339B(d).  Under such circumstances – particularly where, as here the statute "is aimed at protecting the right of the government to defendant itself" – no further analysis is required.  In such a case, as the defense notes, "when a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms."  See Loginovskaya v. Batratchenko, 764 F.3d 266, 271 (2d Cir. 2014) (quoting Morrison v. National Australia Bank Ltd., 561 U.S. 247, 264 (2010)).  The government does not argue otherwise.  Rather, as set forth in Part II, the government has identified several bases for extraterritorial jurisdiction set forth explicitly in Section 2339B(d)(1).

Although the plain language of Section 2339B(d) establishes that Congress intended that the statute should be applied extraterritorially, and thus ends the inquiry on this point, it should be noted that notwithstanding the defense's arguments to the contrary, there is a basis under international law for the extraterritorial application of the statute.  Indeed, it is the same basis that the Second Circuit identified in Yousef with respect to Title 18, United States Code, Section 32.  As the Court of Appeals explained in that case:

> Customary international law is comprised of those practices and customs that States view as obligatory and that are engaged in or otherwise acceded to by a preponderance of States in a uniform and consistent fashion.  Customary international law recognizes five bases on which a State may exercise criminal jurisdiction over a citizen or non-citizen for acts committed outside of the prosecuting State.  These five well-recognized bases of criminal jurisdiction are: (1) the "objective territorial principle," which

> provides for jurisdiction over conduct committed outside a
> State's borders that has, or is intended to have, a substantial
> effect within its territory; (2) the "nationality principle," which
> provides for jurisdiction over extraterritorial acts committed by
> a State's own citizen; (3) the "protective principle," which
> provides for jurisdiction over acts committed outside the State
> that harm the State's interests; (4) the "passive personality
> principle," which provides for jurisdiction over acts that harm a
> State's citizens abroad; and (5) the "universality principle,"
> which provides for jurisdiction over extraterritorial acts by a
> citizen or non-citizen that are so heinous as to be universally
> condemned by all civilized nations.

Yousef, 327 F.3d at 91 n.24.  The Court of Appeals held that the prosecution in Yousef, in

which the defendant was charged, inter alia, with bombing a foreign civilian airline on which

no U.S. citizens were killed, was consistent with the "protective principle" of international

law.  Id. at 110.  The Second Circuit further explained:

> The protective (or "security") principle permits a State to
> assume jurisdiction over non-nationals for acts done abroad that
> affect the security of the State.  The protective principle
> generally is invoked to obtain jurisdiction over politically
> motivated acts but is not limited to acts with a political purpose.

Id. (internal citations omitted); see also In re Marc Rich & Co., 707 F.2d 663,666 (2d Cir.

1983) (stating that the protective principle provides jurisdiction over acts committed outside

of a State's territory that are directed at interfering with the State's "governmental

functions," provided that the act also is contrary to the laws of the host State, if such State

has a "reasonably developed" legal system).

   The prosecution in the instant case is likewise consistent with the "protective

principle" of international law.  As discussed above, al-Shabaab's leadership has made public

statements denouncing the United States and declaring that al-Shabaab is in open conflict

with the United States.  Al-Shabaab has targeted U.S. interests in Africa, and has recruited

47

U.S. citizens to join that terrorist organization and, as a result, many like Shirwa Ahmed and Zacaria Maruf have been killed as a result – Shirwa Ahmed as a suicide bomber in October 2008 and Maruf on the front lines in Mogadishu.  Such actions plainly affect the security of the United States.

In summary, in enacting Section 2339B, Congress made clear through the terms of the statute that it is to be applied extraterritorially.  The "presumption against extraterritoriality" does not limit the scope of the statute's extraterritorial application as defined by Congress.  In addition, the statute is binding on the parties and the Court, irrespective of whether extraterritorial application of Section 2339B is consistent with international law.  Nevertheless, extraterritorial application is, in fact, consistent with the "protective principle" of international law.  Accordingly, the defense arguments fail.

D.  The Statute Is Not Ambiguous, And Thus The Rule Of Lenity Has No Application In This Analysis

As a final alternative, the defense argues, "because the language of the statute is neither clear nor definite, the rule of lenity requires that subdivisions § 2339B(d)(1)(D) and (E) be read as limits on the extraterritorial reach of the statute."  (ECF #129 at 32).  This is simply incorrect.  For the reasons set forth above, the statute, including the scope of its extraterritorial application, is unambiguous, notwithstanding the defense's efforts to misconstrue and muddle Congress's clear intent.  The rule of lenity "only comes into play when a court after looking at all aids to legislative meaning can do no more than guess as to what Congress intended."  United States v. Cullen, 499 F.3d 157, 164 (2d Cir. 2007) (internal quotation marks omitted).  No guessing is required here.

48

III.     Section 2339B Is Not Unconstitutionally Vague

        The defense next argues that Section 2339B is unconstitutionally void for vagueness.  Specifically, the defense claims that where the statute reads, "has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act)," it is not possible to ascertain whether the statute is referring to the definition of "terrorist activity" or "engaged in terrorist activity" in the Immigration and Nationality Act.  (ECF #129 at 33-37).  The defense also argues that "the expansive definition of 'terrorist activity' . . . creates a further vagueness problem."  (ECF #129 at 35).  The defense's first argument fails because even a passing review of the relevant statutory language reveals that the two definitions are meant to operate together, and that the definition of "engaged in terrorist activity" references and incorporates "terrorist activity" as a defined term.  The second argument, which amounts to a facial vagueness challenge, fails as a matter of law.

    A.     Legal Framework

       1.     Section 2339B

Section 2339B(a)(1) reads:

> Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life.  To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization (as defined in subsection (g)(6)), that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d) (2) of the

Foreign Relations Authorization Act, Fiscal Years 1988 and 1989).

The relevant portion of Section 212(a)(3)(B) of the Immigration and Nationality Act

(codified in Title 8, United States Code, Section 1182(a)(3)(B)) reads:

(iii) "Terrorist activity" defined

As used in this chapter, the term "terrorist activity" means any activity which is unlawful under the laws of the place where it is committed (or which, if it had been committed in the United States, would be unlawful under the laws of the United States or any State) and which involves any of the following:

(I) The highjacking or sabotage of any conveyance (including an aircraft, vessel, or vehicle).

(II) The seizing or detaining, and threatening to kill, injure, or continue to detain, another individual in order to compel a third person (including a governmental organization) to do or abstain from doing any act as an explicit or implicit condition for the release of the individual seized or detained.

(III) A violent attack upon an internationally protected person (as defined in section 1116(b)(4) of Title 18) or upon the liberty of such a person.

(IV) An assassination.

(V) The use of any--

(a) biological agent, chemical agent, or nuclear weapon or device, or

(b) explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain),

with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property.

(VI) A threat, attempt, or conspiracy to do any of the foregoing.

(iv) "Engage in terrorist activity" defined

As used in this chapter, the term "engage in terrorist activity" means, in an individual capacity or as a member of an organization--

(I) to commit or to incite to commit, under circumstances indicating an intention to cause death or serious bodily injury, a terrorist activity;

(II) to prepare or plan a terrorist activity;

(III) to gather information on potential targets for terrorist activity;

(IV) to solicit funds or other things of value for--

(aa) a terrorist activity;

(bb) a terrorist organization described in clause (vi)(I) or (vi)(II); or

(cc) a terrorist organization described in clause (vi)(III), unless the solicitor can demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization;

(V) to solicit any individual--

(aa) to engage in conduct otherwise described in this subsection;

(bb) for membership in a terrorist organization described in clause (vi)(I) or (vi)(II); or

(cc) for membership in a terrorist organization described in clause (vi)(III) unless the solicitor can demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization; or

(VI) to commit an act that the actor knows, or reasonably should know, affords material support, including a safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training--

    (aa) for the commission of a terrorist activity;

    (bb) to any individual who the actor knows, or reasonably should know, has committed or plans to commit a terrorist activity;

    (cc) to a terrorist organization described in subclause (I) or (II) of clause (vi) or to any member of such an organization; or

    (dd) to a terrorist organization described in clause (vi)(III), or to any member of such an organization, unless the actor can demonstrate by clear and convincing evidence that the actor did not know, and should not reasonably have known, that the organization was a terrorist organization.

    2.    <u>Vagueness Challenges Under The Due Process Clause</u>

"A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." <u>Humanitarian Law Project</u>, 561 U.S. at 18-19 (quoting <u>United States v. Williams</u>, 553 U.S. 285, 304 (2008)).  A court should consider whether a statute is vague as applied to the particular facts at issue, because "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." <u>Hoffman Estates v. Flipside, Hoffman Estates, Inc.</u>, 455 U.S. 489, 495 (1982).

B.     The Statutory Definition Of "Engage In Terrorist Activity" Incorporates
       The Statutory Definition Of "Terrorist Activity"

       The defense argues that Section 2339B is impermissibly vague on its face

because "Terrorist Activity" and "Engage in Terrorist Activity" "are different terms under

the Immigration and Nationality Act, and each is defined differently."  (ECF #129 at 34).

The defense argument fails because (among other reasons)[33] "Terrorist Activity" and

"Engage in Terrorist Activity" are <u>not</u> defined differently in the statute.  Instead, the

definition for "Engage in Terrorist Activity" internally incorporates the definition of

"Terrorist Activity."  Indeed, Title 8, United States Code, Section 1182(a)(3)(B)(iii) sets

forth a list of different types of conduct that constitute "terrorist activity" "as used in this

chapter," and Section 1182(a)(3)(B)(iv) sets forth means by which an individual can

"engage" in the previously defined terrorist activity.  Many of those defined means of

engaging in terrorist activity incorporate the previously defined term of "terrorist activity."

For example, according to the statute, to "Engage in Terrorist Activity" means:

- to commit or to incite to commit, under circumstances indicating an intention to cause death or serious bodily injury, a <u>terrorist activity</u>;

- to prepare or plan a <u>terrorist activity</u>; or

- to gather information on potential targets for <u>terrorist activity</u>.

Put simply, this is not a question of a defendant or a court having to choose one definition or

the other from the statute; they work in concert.  One refers to "engage in terrorist activity"

---

[33] The defense argument also fails because it amounts to a facial challenge to the statute, but the defendant's own conduct is clearly proscribed.  (<u>See</u> <u>infra</u> Part III.C).

as defined in Section 1182(a)(3)(B)(iv), and then refers to Section 1182(a)(3)(B)(iii) as needed.[34]  There is no issue with vagueness.

      C.    <u>Section 2339B Is Not Facially Void For Vagueness</u>

      The defense next argues that "the expansive definition of 'terrorist activity' . . . creates a further vagueness problem."  (ECF #129 at 35).  The defense then cites specifically to Section 1182(a)(3)(B)(iii)(V), which defines terrorist activity to include "[t]he use of any (a) biological agent, chemical agent, or nuclear weapon or device, or (b) explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain) with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property."  The defense argues that this definition is "so broad it encompasses traditionally local activities – just as an example, gang violence in Amsterdam."  (ECF #129 at 36).

      While not stated explicitly, the defense's vagueness challenge to Section 2339B is facial, and not as-applied.  This is made clear by the fact that, to support this claim, the defense has resorted to random hypotheticals about Amsterdam, rather than addressing the actual facts of this case.  (ECF #129 at 36-37 ("Stated simply, a Dutch man who engaged in gang violence in the Netherlands does not have fair notice that he engaged in "terrorist activity" and was potentially subjecting himself to United States law if, unbeknownst to him, the United States designated the gang a foreign terrorist organization.")).

--------

[34] The defense cites to <u>Weiss v. National Westminster Bank PLC</u>, 768 F.3d 202, 208-209 (2d Cir. 2014) in arguing that the Second Circuit "selected 'engage in terrorist activity' as the relevant phrase."  (ECF #129 at 35).  As argued above, this is the logical approach for applying the statute, since Section 1182(a)(3)(B)(iv) incorporates Section 1182(a)(3)(B)(iii)'s definition of "terrorist activity" by reference.

It is well-established law, of course, that such facial attacks on a statute for vagueness are disfavored and fail as a matter of law where a defendant's culpability under the statute is readily apparent.  See Chapman v. United States, 500 U.S. 453, 467 (1991) ("First Amendment freedoms are not infringed by [the statute at issue], so the vagueness claim must be evaluated as the statute is applied"); Hoffman Estates, 455 U.S. at 495 ("[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others").  This preference for as-applied review is "'[e]mbedded in the traditional rules governing constitutional adjudication,'" notably, in "'the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court.'"  Parker v. Levy, 417 U.S. 733, 759 (1974) (quoting Broadrick v. Oklahoma, 413 U.S. 601, 610 (1973)).  That principle, grounded in the separation of powers, serves the jurisprudential maxim that "as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid," a court's "plain duty is to adopt that which will save the Act" enacted by Congress.  Blodgett v. Holden, 275 U.S. 142, 148 (1927); see also United States v. Salerno, 481 U.S. 739, 745 (1987) (observing that defendant mounting facial challenge bears heavy burden because he "must establish that no set of circumstances exists under which the Act would be valid").  In practice, the Hoffman Estates/Salerno rule warrants hypothetical analysis of "all applications" only in cases of pre-enforcement facial vagueness challenges.  See United States v. Farhane, 634 F.3d 127, 138 (2d Cir. 2011)

(holding that Section 2339B was not unconstitutionally overbroad or vague as applied);

Richmond Boro Gun Club, Inc. v. City of New York, 97 F.3d 681, 684–86 (2d Cir. 1996).

Here, the defense raises no issue of vagueness with respect to these defendants, who were, as set forth above, long-time members of al-Shabaab.  As part of their membership, they provided that designated terrorist organization with both currency and personnel – namely, themselves.  They received military-style training from al-Shabaab and then put that training to use, fighting in battles on behalf of al-Shabaab against the Somali government, the Ethiopian government and AMISOM.  Further, they were part of a subgroup of al-Shabaab foreign fighters – including numerous Americans – who plotted attacks on civilians, including terrorist attacks.  These facts, once proved at trial, will establish that the defendants knew that al-Shabaab engaged in terrorist activity, as defined in the statute.

Moreover, it should be noted that nothing about the statutory language at issue is, in fact, vague.   Indeed, the statutory terms here are quite different from the sorts of terms that the Supreme Court has previously declared to be unconstitutionally vague.  The Supreme Court in the past has "struck down statutes that tied criminal culpability to whether the defendant's conduct was 'annoying' or 'indecent' – wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings."  See Humanitarian Law Project, 561 U.S. at 20-21.  Here, Sections 1182(a)(3)(B)(iii) and 1182(a)(3)(B)(iv) provide detailed descriptions of the proscribed conduct.  Those descriptions satisfy the Due Process Clause because they provide "notice sufficient to alert ordinary people [as to] what conduct is prohibited" and "convey[] sufficiently definite warning as to the proscribed conduct when

measured by common understanding and practices."  See Farhane, 634 F.3d at 139 (internal quotation marks and citations omitted).

Ultimately, the defense's arguments regarding vagueness boil down, once again, to the fundamentally flawed argument that there is something "unfair" about this prosecution because "the conduct described in 8 U.S.C. § 1182(a)(3)(B)(V)((b) is quintessentially local and one aware of it or supporting it or engaged in it does not have due notice that his conduct violates U.S. law."  (ECF #129 at 37).  Of course, this argument fails because the defendants' conduct was not local – it was performed in material support of a terrorist organization which regularly employed violence and terror in order to influence U.S. foreign policy around the world.  The statute is not unconstitutionally vague, either facially or as applied, and the ample nexus to the United States satisfies the Due Process Clause.

IV.    The Second Circuit Has Held That Section 924(c) May Be Extraterritorially Applied

The defense argues that Count Five, charging a violation of Title 18, United States Code, Section 924(c), should be dismissed because it does not have "extraterritorial application."  (ECF #129 at 38-39; ECF #130).  Because the Second Circuit ruled in United States v. Siddiqui, 699 F.3d 690, 700-701 (2d Cir. 2012), that Section 924(c) applies extraterritorially where the underlying predicate crime applies extraterritorially, this argument fails.

In claiming otherwise, the defense suggests that the holding in Siddiqui "rests on shaky ground" because the Second Circuit relied on the "proposition that the presumption against extraterritoriality does not apply in criminal cases – a proposition subsequently rejected by the Second Circuit in [Vilar]."  (ECF #129 at 38; ECF #130 at 15).  However, as

discussed above in greater detail, the Second Circuit's holding regarding the presumption against extraterritoriality in Vilar was not so broad as the defense would wish.   Rather, the Court of Appeals explained in Vilar that "the presumption against extraterritoriality does apply to criminal statutes, except in situations where the law at issue is aimed at protecting the right of the government to defend itself."  729 F.3d at 73 (internal quotation marks omitted) (emphasis added).  Because Courts in this Circuit have clearly and repeatedly held that Section 924(c) applies extraterritorially, and because the underlying counts implicate the right of the government to protect itself, the Second Circuit's ruling in Siddiqui remains sound.  See also United States v. Belfast, 611 F.3d 783, 815 (11th Cir.2010) (applying Section 924(c) extraterritorially); United States v. Ahmed, No. 10 CR 131 (PKC), 2012 WL 983545, at *2 (S.D.N.Y. March 22, 2012) (same); United States v. Mardirossian, 818 F. Supp.2d 775, 776–77 (S.D.N.Y. 2011) (same).   Indeed, it makes sense that when Congress has established that a predicate statute has extraterritorial application, the related Section 924(c) charge would apply extraterritorially, irrespective of the so-called "presumption."

The defense also argues, without any explanation, that Section 924(c) is "void for vagueness and the concept of ancillary jurisdiction violates due process."  (ECF #129 at 39).  For the reasons set forth above, the statute is more than sufficiently specific to survive this facial vagueness challenge, and the defendants' conduct had sufficient nexus to the United States to satisfy the Due Process Clause.

## V.    The Indictment Fairly Informs The Defendants Of The Charges Against Them

The defense next argues that the indictment is defective because it does "not fairly inform" the defendants of the charges against them.  (ECF #129 at 39).  As set forth

58

above, a criminal defendant is entitled to an indictment that states the essential elements of

the charge against him." Pirro, 212 F.3d at 91.  Little more is required.  See Fed. R. Crim. P.

7(c)(1) (describing indictment as a "concise . . . statement of the essential facts.").  The

indictment must also be detailed enough to permit the defendant to plead double jeopardy in

a future prosecution based on the same set of events.  See United States v. Stavroulakis, 952

F.2d 686, 693 (2d Cir. 1992).  Indeed, the Second Circuit has "consistently upheld

indictments that 'do little more than to track the language of the statute charged and state the

time and place (in approximate terms) of the alleged crime.'"  Walsh, 194 F.3d at 44

(quoting Tramunti, 513 F.2d at 1113).  Because the indictment in this case meets the

requirements of Fed. R. Crim. P. 7(c), the defense arguments fail.

A.   The Indictment Properly Alleges The Knowledge Element Of Section 2339B

The defense argues that indictment does not provide sufficient detail regarding

the nature of the defendants' criminal knowledge because "[i]n the peculiar circumstance of

a § 2339B prosecution, the generic term 'knowingly' must descend to the particulars."  (ECF

#129 at 40).

As the Supreme Court made clear in Humanitarian Law Project, Section

2339B "prohibits 'knowingly' providing material support" to a designated foreign terrorist

organization.  561 U.S. at 16-17.  The Supreme Court further explained, "Congress plainly

spoke to the necessary mental state for a violation of § 2339B, and it chose knowledge about

the organization's connection to terrorism, not specific intent to further the organization's

terrorist activity."  Id.

The indictment here properly tracks the language of the statute, and thus provides sufficient notice to satisfy Fed. R. Crim. P. 7(c) – namely that the defendants knowingly and intentionally provided, conspired or attempted to provide material support to al-Shabaab, and did so while possessing knowledge about al-Shabaab's "connection to terrorism." Nothing further is required. In any case, the details about the nature of that knowledge, and what the government must prove at trial, are properly explained to the jury in the Court's charge – not the indictment. To the extent that the defense argues that the indictment must specify the precise nature of the source of the defendant's knowledge about al-Shabaab in the indictment, this argument fails. The second sentence of Section 2339B(a)(1) merely provides the various ways in which the government may establish the requisite knowledge "about the organization's connection to terrorism." Id.

   B.   Count One Is Properly Pleaded In The Indictment

The defense next makes a perfunctory argument that Count One, charging a conspiracy to provide material support to al-Shabaab, is deficient because it does not allege any overt acts, and because it "fails to provide adequate notice because the persons with whom the defendants allegedly conspired and the type of 'material support and resources' that the defendants allegedly conspired to provide." (ECF #129 at 41-42).

To start, Section 2339B contains no overt act requirement. The Supreme Court has explained that there are two types of conspiracy statutes: Those that are modeled upon the common law of conspiracy, which does not require the commission of an overt act for the crime of conspiracy to be complete, and those that are modeled upon Title 18, United States Code, Section 371, and so do contain an overt act requirement. Whitfield v. United

60

States, 543 U.S. 209, (2005) (no overt act requirement in money laundering statute, Title 18, United States Code, Section 1956(h) because the "text does not expressly make the commission of an overt act an element of the conspiracy offense"); United States v. Shabani, 513 U.S. 10, 11 (1994) (no overt act requirement in drug conspiracy statute, again because the statutory text does not include one).

Courts will not read an overt act requirement into a conspiracy statute whose text does not include such a requirement.  Nash v. United States, 229 U.S. 373, 378 (1913) (antitrust conspiracies prosecuted under Section One of the Sherman Act do not require proof of an overt act).  As Justice Holmes said in his opinion for the Court in Nash:

> Coming next to the objection that no overt act is laid, the answer
> is that the Sherman Act punishes the conspiracies at which it is
> aimed on the common law footing, that is to say, it does not
> make the doing of any act other than the act of conspiring a
> condition of liability. . . . we can see no reason for reading into
> the Sherman Act more than we find there. . . .

Id.

The text of Section 2339B contains no overt act requirement, and thus the government need not plead an overt act in the indictment or prove an overt act at trial.  See, e.g., charge of Hon. Michael J. Davis in United States v. Mahamud Said Omar, 09 CR 242 (DMN) (D. Minn. 2012).  That the government in a case in the Southern District of New York alleged overt acts in an indictment charging violations of Section 2339B does not estop the government from arguing for a proper interpretation of the statute in this case.[35]

_____

[35] Notably, the defense claims that Judge Forrest "held that commission of an overt act is an essential element of a §2339B conspiracy" in United States v. Mostafa, No. 04 CR 356 (KBF), 2014 WL 1744717 (S.D.N.Y. Apr. 23, 2014).  (ECF #129 at 41).  However, that decision contains no such holding.

The defense also argues that Count One fails to provide adequate notice regarding the nature of the material support the defendants provided, and with whom they conspired.  These arguments are without merit.  First, the indictment alleges that they provided material support in the form of currency and personnel.  Second, the government is not required to identify co-conspirators in an indictment, or even in a bill of particulars.  (See infra Part VII).  Third, the statement of facts contained herein, as well as the various other pleadings the government has filed in this case, including a Motion for an Anonymous Jury, provides detailed information regarding the defendants' criminal conduct and the identities of many of the defendants' co-conspirators.

    C.    Count Five Properly Alleges A Violation Of Section 924(c)

The defense claims that the Section 924(c) charge is "hopelessly imprecise and impermissibly duplicitous."  (ECF #129 at 42).  The defense's objection to Count Five appears to be one of notice – that is, that the indictment does not specifically allege which defendant possessed which firearms when.  Of course, the indictment need not be so specific.

It is well-established both that that the use or possession of multiple firearms over the course of a conspiracy may constitute a single, continuing violation of Section 924(c).  See, e.g., United States v. Payne, 591 F.3d 46, 69 (2d Cir. 2010) ("When a defendant is convicted of violating § 924(c)(1)(A) for using or carrying a firearm during and in relation to a crime that is a continuing offense, the § 924(c)(1) crime itself is a continuing offense."); United States v. Lindsay, 985 F.2d 666, 674 (2d Cir. 1993) (guns used at separate points in conspiracy could give rise to only one Section 924(c) charge).  It is also well-established law that a jury need not be unanimous with respect to which firearm or firearms they find the

defendants used or possessed in furtherance of a conspiracy.  See United States v. Perry,  560 F.3d 246, 257 (4th Cir. 2009) (where charge involves multiple firearms, jury unanimity with respect to the particular firearm used or possessed in furtherance of a drug trafficking offense is generally not required for a § 924(c) conviction); United States v. Hernandez–Albino, 177 F.3d 33, 40 (1st Cir. 1999) ( "the jury need not reach unanimous agreement on the identity of the weapon when the defendant is charged with violating § 924(c) due to carrying more than one firearm," so long as "none of the weapons justifies more than the statutory minimum sentence"); United States v. Morin, 33 F.3d 1351, 1353–54 (11th Cir. 1994) ("[T]o obtain a conviction under 18 U.S.C. § 924(c), the government needs to prove only that the defendant used one of the guns in relation to the drug trafficking" and "the jury is not required to reach a unanimous verdict as to which gun the defendant used."); United States v. Correa–Ventura, 6 F.3d 1070, 1087 (5th Cir. 1993) (noting that "such determinations must be made on a case-by-case basis in light of the charges made, the evidence presented, and the likelihood of jury confusion," but holding that "a specific unanimity instruction was not required with respect to the identity of the firearm" at issue there).

   In any case, these defense arguments are more properly addressed to the Court's jury instructions, and not to the indictment, which needs only to track the language of the statute.  As this memorandum and as the discovery produced make clear, the defendants are alleged to have used, possessed and discharged firearms, including machineguns, and aided and abetted the use and possession of firearms during the course of charged conduct.  As for the alleged enhancements for brandishing, discharging and possessing machineguns, the jury will be required to make unanimous findings as to those

enhancements on the verdict sheet, so as to satisfy <u>Alleyne v. United States</u>, 133 S. Ct. 2151

(2013).  Nothing further is required.

## VI.  The Indictment Was Timely Filed

The defense next argues that the initial indictment in this case was filed more

than 30 days after the defendants were arrested by Djiboutian authorities.  (ECF #129 at 43-

44).  As the government disclosed in its discovery letter dated September 23, 2013, the

defendants were arrested in Djibouti in the early morning on August 5, 2012 by Djiboutian

authorities for illegally entering Djibouti.  As such, they were arrested pursuant to Djiboutian

– not U.S. – legal authority.  The defendants were initially indicted on October 18, 2012, and

not taken into U.S. custody until November 15, 2012.  Accordingly, the indictment was

timely.

## VII.  The Defense Is Not Entitled To A Bill Of Particulars

The defense also moves for a bill of particulars pursuant to Fed. R. Crim. P.

7(f).  (ECF #129 at 44-46).  The Court should deny this motion.

### A.  Legal Framework

Under the Federal Rules of Criminal Procedure, an indictment need only set

forth a "plain, concise, and definite written statement of the essential facts constituting the

offense."  Fed. R. Crim. P. 7(c).  Additional details, in the form of a bill of particulars, are

not appropriate unless the indictment is too vague to inform the defendant of the nature of the

charges so as to allow the preparation of a defense, avoid unfair surprise, and preclude

double jeopardy.  <u>See</u> <u>United States v. GAF Corp.</u>, 928 F.2d 1253, 1260 (2d Cir. 1991);

<u>United States v. Torres</u>, 901 F.2d 205, 234 (2d Cir. 1990).  If the information sought by a

defendant is provided in the indictment or through some other means, a bill of particulars is not warranted.  See United States v. Walsh, 194 F.3d 37, 47 (2d Cir. 1999); United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987); United States v. Urso, 369 F. Supp. 2d 254, 271 (E.D.N.Y. 2005).  "[T]he burden is on the defendant to show that non-disclosure of the requested particulars will lead to prejudicial surprise at trial or will adversely affect his rights."  United States v. Maneti, 781 F. Supp. 169, 186 (W.D.N.Y. 1991).

It is improper to use Rule 7(f) as a mechanism to limit the government's evidence, or to flush out the prosecution's theories in advance of trial.  See Urso, 369 F. Supp. 2d at 272 ("As a general rule, a defendant is not entitled to receive details of the government's conspiracy allegations in a bill of particulars."); United States v. Ianniello, 621 F. Supp. 1455, 1478 (S.D.N.Y. 1985) ("To require most of the further disclosure the defendants seek would do little more than restrict the government's proof at trial, which is not the purpose of a bill of particulars."); United States v. Albunio, Case No. 91 CR 0403, 1992 WL 281037, at *2 (E.D.N.Y. Sept. 9, 1992) ("The defendant's right to know the crime with which he is charged must be distinguished from his right to know the evidentiary details by which proof of his culpability will be established.").  The ultimate test of the appropriateness of a bill of particulars is whether the information is necessary, not whether it is helpful, to the defendant.  See United States v. Aliperti, 867 F. Supp. 142, 148 (E.D.N.Y. 1994).

The law is also clear that a defendant is not entitled to detailed evidence as to how, when, where or with whom an alleged conspiracy took place.  See United States v. Cephas, 937 F.2d 816, 823 (2d Cir. 1991) (bill of particulars not required to identify the

specific activities by which defendant furthered conspiracy); United States v. Feola, 651 F.

Supp. 1068, 1132 (S.D.N.Y. 1987).  Consequently, "demands for particular information with

respect to where, when, and with whom the Government will charge the defendant with

conspiring are routinely denied."  United States v. Trippe, 171 F. Supp. 2d 230, 240

(S.D.N.Y. 2001) (collecting cases); cf. Torres, 901 F.2d at 233-34 (upholding district court's

denial of bill of particulars where defendant had requested, in part, "the identity of those

other persons 'known and unknown' as alleged in . . . the indictment . . . [and] precise dates

and locations" and noting that defendant was not entitled to "evidentiary detail").  "The

Government may not be compelled to provide a bill of particulars disclosing the manner in

which it will attempt to prove the charges, the precise manner in which the defendant

committed the crimes charged, or a preview of the Government's evidence or legal theories."

United States v. Sattar, 314 F. Supp. 2d 279, 318 (S.D.N.Y. 2004) (citation omitted).

Indeed, "[c]ourts have been highly reluctant to require a bill of particulars

when defendants have asked for specific identities of co-conspirators or others allegedly

involved."  United States v. Coffey, 361 F. Supp. 2d 102, 122 (E.D.N.Y. 2005) (collecting

cases).  "[T]he temptations of perjury, subornation and intimidation are ever present in this

case."  Id. (internal quotation marks omitted).

B.    A Bill Of Particulars Is Not Warranted Here

In this case, the superseding indictment and discovery already produced more

than adequately informs the defendants of the nature of the charged offenses and the periods

within which the crimes occurred.  Indeed, the government's factual submissions in this

response as well as in the government's Motion for an Anonymous Jury provide more

66

context.  Together, this is more than sufficient to avoid double jeopardy or unfair surprise.

The defense's motion for a bill of particulars should be denied.

VIII.   <u>Precluding Witnesses From Referring To Terrorism During Trial</u>

The defense next argues that "[t]he Court should issue an order precluding any

government witness – fact or expert – who testifies on the subject of the conduct of the

defendant, al-Shabaab, or any other person or group, from using the terms 'terrorist,'

'terrorist activity (or activities),' or 'terrorism.'"  (ECF #129 at 47-49).  In support of this

argument, the defense cites to two cases standing for the well-established proposition that

expert witnesses should not be permitted to provide testimony embodying legal conclusions.

<u>See, e.g.</u>, <u>United States v. Scop</u>, 846 F.2d 135, 139-42 (2d Cir. 1988) (securities fraud case

where expert made repeated statements concerning "manipulation," existence of "scheme to

defraud," and "fraud"); <u>Hygh v. Jacobs</u>, 961 F.2d 359, 364-66 (2d Cir. 1992) (expert

testimony that police officer's use of force was not "justified under the circumstances"

exceeded the appropriate scope of expert testimony).

The government intends to prove at trial that al-Shabaab was designated a

foreign terrorist organization by the Secretary of State.  The government likewise intends to

prove at trial that al-Shabaab engaged in activities that are identified as "terrorist activity" in

Title 8, United States Code, Sections 1182(a)(3)(B)(iii) and 1182(a)(3)(B)(iv).  Such proof is

necessary to establish that the defendants had the requisite knowledge that al-Shabaab was

engaged in terrorist activities, and that the defendants themselves provided material support

to al-Shabaab.  (<u>See</u> <u>supra</u> Part V.A).  As a general matter, the government agrees that it

would be inappropriate for an expert to testify specifically that al-Shabaab engages in

"terrorist activity" as defined in the statute, and it will not seek to elicit such testimony from its expert witnesses.

However, in light of the government's obligation to prove that the Secretary of State designated al-Shabaab as a "foreign terrorist organization," it would defy logic to prohibit the government's witnesses from testifying regarding their understanding of the Secretary of State's legal determination using such words.  Moreover, in light of the government's obligation to prove that the defendants had the requisite knowledge that al-Shabaab was engaged in terrorist activities, and that the defendants themselves provided material support to al-Shabaab, reference to such terms by cooperating witnesses is unavoidable.  Indeed, several of the government's cooperating witnesses commonly will use those terms (1) in characterizing their understanding of al-Shabaab's designation (as a "foreign terrorist organization), a fact that was embraced by many members of al-Shabaab, (2) in characterizing their own conduct, much of which is similar to that of the defendants and, (3) as members of al-Shabaab, pleading guilty to many of the exact same terrorism crimes with which the defendants are charged.  To preemptively excise those terms from their vocabulary would simply serve to confuse the witnesses and the jury.  The government submits that a simple instruction to the jury, advising them that they are the ultimate finders of fact with respect to whether or not the government has proven the statutory requirements beyond a reasonable doubt, will serve to allay any concerns raised by the defendants here.

IX.    Rule 404(b) Notice

The defense next argues that the government should be precluded from "swamping the trial with irrelevant or, at best, marginally probative but highly inflammatory,

68

prejudicial (and largely hearsay) evidence about gruesome conduct attributed to al-Shabaab."
(ECF #129 at 49).  The government has no intention of "swamping" the trial in that manner.
The government's proof will relate to the illegal conduct of the defendants and their co-
conspirators, as well as the nature of al-Shabaab's terrorist activities – facts that must be
proved to establish that the defendants had the requisite knowledge to be guilty under Section
2339B.

X.     The Government Will Not Seek To Use The Defendants' Mirandized Statements To
       The FBI At Trial

The defense previously moved to suppress the use of the defendants'
Mirandized statements to the FBI at trial.  The government subsequently advised the parties
and the Court that it would not seek to admit those statements at trial, and now confirms that
the government will not seek to admit those statements in its case-in-chief, or to impeach the
defendants should they testify.

The defense further moves for "a taint hearing at which the government bears
the burden of demonstrating that none of the evidence it seeks to produce at trial is the
product of either the illegal interrogation or the illegal arrest; and . . . disclosure of the grand
jury minutes pursuant to Fed. R. Crim. P. 6(3)(E)(ii)."  (ECF #129 at 51).  As an initial
matter, the defense cites to no authority in support of either of these requests.  Moreover, the
defendants' objections as they relate to the grand jury are moot, given that the government
has superseded the indictment in this case and the grand jury returned a superseding
indictment based on evidence unrelated and otherwise not derived from the defendant's
statements.  Additionally, the government has no intention of offering any evidence derived
from the defendant's statements at trial.

XI.     Count Three Should Not Be Dismissed

The defense argues that Count Three of the S-2 superseding indictment, charging the defendants with attempting to provide material support to al-Shabaab in violation of Section 2339B, should be dismissed because it is "multiplicitous."  (ECF #147 at 3-4).  As an initial matter, the government agrees that if any defendant is convicted of both Count Two (the substantive offense) and Count Three (the attempt offense), any attempt charge must merge into the substantive conviction.  Thus, the government would not seek for any defendant to receive sentences on both counts, nor would the Court impose sentences on both counts.

The government's reasoning behind charging the substantive offense and the attempt in separate counts was focused on administrative simplicity with the jury instructions and the verdict sheet.  While it is true that attempt is a "lesser-included" offense of the substantive crime, to establish an attempt, the government must prove legally distinct elements – namely, that the defendant being considered intended to commit the crime of providing material support, and that he did some act that was a "substantial step" in an effort to bring about or accomplish the crime.  See, e.g., charge of the Hon. John Gleeson in United States v. Betim Kaziu, 09 CR 660 (JG) (E.D.N.Y. 2011).  Further, to the extent there is any risk of prejudice stemming from the defendants being charged in a five-count indictment rather than a four-count indictment, that risk of prejudice could be eliminated through proper instruction regarding the difference between a substantive offense and an attempt.  See, e.g., United States v. Goodale, No. 11 CR 37, 2012 WL 733874, at *2 (D. Vt. Mar. 6, 2012)

("Assuming the jury was properly instructed on the nature of an attempt charge, the risk of prejudice would be minimal.").[36]

Accordingly, Count Three should not be dismissed prior to trial, and the government will engage in an election of counts at sentencing if the defendants are convicted of both Count Two and Count Three.[37]

XII.  Yusuf's Aliases Should Not Be Struck From The Indictment Because They Are Relevant To The Charged Conduct And The Government's Evidence At Trial

The defense also moves pursuant to Fed. R. Crim. P. 7(d) for Yusuf's aliases, "Abu Zaid," "Hudeyfa" and "Mohammed Abdulkadir," to be stricken from the indictment. (ECF #147 at 7-11).  The Court should deny this request.

---

[36] In arguing that the risk of prejudice weighs in favor of an election of counts prior to trial, the defense claims that the addition of the attempt charge constitutes "what Judge Weinstein has called (in a case involving different circumstances), 'overindictment.'" (ECF #147 at 3).  In the case cited by the defense in support of this proposition, United States v. Polouizzi, 687 F. Supp. 2d 133, 159 (E.D.N.Y. 2010), the defendant was charged with and convicted of eleven counts of possession of child pornography and twelve counts of receipt of child pornography – a far cry from the five charges in this case.  The other cases cited by the defense are also inapposite.  See, e.g., United States v. Smith, 111 F.2d 83, 85 (2d Cir. 1940) (not addressing substantive and attempt charges, but affirming conviction where multiple indictments were consolidated); United States v. Clarridge, 811 F. Supp. 697, 702-702 (D.D.C. 1992) (charges of false statement and perjury were multiplicitous where each statement was made in response to questions by the same committee staff member and covered the very same subject matter).

[37] To the extent the Court grants the defense's motion to dismiss Count Three on this ground, the government anticipates requesting that the jury be instructed on both theories of guilt, and will seek a verdict form allowing the jury to convict on either theory. (See ECF #147 at 5 (conceding that "the government will have the opportunity to seek a verdict and punishment on the lesser-included attempt if, at trial, it presents sufficient evidence justifying conviction on the attempt").

A.    Legal Framework

Under Federal Rule of Criminal Procedure 7(d), the Court may strike

surplusage from an indictment upon defendant's motion.  Fed.R.Crim.P. 7(d).  The Second

Circuit has held, however, that district courts should not grant motions to strike surplusage

unless "the challenged allegations are not relevant to the crime charged and are inflammatory

and prejudicial."  United States v. Mulder, 273 F.3d 91, 99 (2d Cir. 2001) (quoting United

States v. Scarpa, 913 F.2d 993, 1013 (2d Cir. 1990)).  Moreover, "even language deemed

prejudicial should not be stricken if evidence of the allegation is admissible and relevant to

the charge."  United States v. Rivera, No. 09 CR 619 (SJF), 2010 WL 1438787, at *5

(E.D.N.Y. Apr. 7, 2010) (citing Scarpa, 913 F.2d at 1013).  "Given this exacting standard,

such motions [to strike] are rarely granted."  Id. (quoting United States v. Coffey, 361 F.

Supp. 2d 102, 123 (E.D.N.Y. 2005)).

B.    The Government's Evidence And Witnesses At Trial Will Reference Yusuf's
      Aliases

Put simply, the aliases alleged in the indictment should not be struck because

the government's evidence and witnesses at trial will reference those aliases.  Multiple

cooperating witnesses will testify that they knew Yusuf by the aliases including "Hudeyfa"

and "Mohammed Abdulkadir."  Indeed, one or more cooperating witnesses will testify that

they knew Yusuf only by his aliases, or "kunyas," and not by his true name.

As the defense notes, the third alias at issue, "Abu Zaid," is displayed below

Yusuf when he is recorded speaking in the al-Shabaab recruitment video titled "Inspire the

Believers."  In addition to the voice identification analysis, referenced above and discussed

below, confirming that Yusuf is the individual who appears in that al-Shabaab video, at least

72

one cooperating witness will specifically testify that Yusuf was the al-Shabaab fighter

identified as "Abu Zaid" and depicted during the relevant portion of the video.

Accordingly, because all of Yusuf's aliases are relevant to the charged

conduct, the defense's motion to strike them from the indictment should be denied.

XIII.   The Defendant's Objection To The Proffered Voice Identification Testimony
        Misapprehends The Nature Of The Analysis Conducted By The Expert

Finally, Yusuf moves in limine to preclude the anticipated expert testimony of

Jonas Lindh, "on the ground that [his likely testimony] does not meet the reliability

requirements and standard of Federal Rule of Evidence 702 and the case law following

Daubert v. Merrel Dow. Phars., 509 U.S. 579 (1993)."  (ECF # 133).  In particular, in support

of his motion, Yusuf relies largely on a decision out of the Southern District of Texas

precluding expert testimony on an outdated and misused voice identification analysis

technique known as "aural spectrographic voice identification."  See United States v.

Angleton, 269 F. Supp. 892 (S.D. Tex. 2003).  Given that Yusuf's criticism of Mr. Lindh's

potential testimony is entirely misplaced and based on a fundamental misapprehension of the

methodology and analysis used by the expert, the government submits that the defendant's

motion in limine should be denied on that basis alone.[38]

Jonas Lindh is a PhD candidate, employed as a forensic phonetic analyst for

the Swedish company Voxalys AB and as a University Lecturer and Research Engineer at

_____

[38] In light of Yusuf's challenge to the expert testimony of Mr. Lindh, the
government provided the expert additional materials to consider, including additional
Swedish intercepts and jail calls of the defendants.  In connection with his potential
testimony and in the course of his preparation, the expert made additional conclusions related
to both Ahmed and Yusuf and their appearance on highly inculpatory Swedish intercepts that
the government intends to offer at trial in this case and Yusuf's appearance in the al-Shabaab
propaganda video, "Inspire the Believers."

73

the Division of Speech and Language Pathology, Department of Clinical Neuroscience and Rehabilitation, Institute of Neuroscinece and Physiology, Sahlgrenska Academy at the University of Gothenburg in Sweden.  In connection with his initial retention by the Swedish government related to various threats made by Yusuf against Swedish artist Lars Vilks, Lindh conducted an analysis in which he compared four intercepted recordings involving Ahmed and Yusuf, and the video involving Yusuf.  Beginning in 2007, Vilks was vilified by various jihadists groups for drawing a series of sketches that were perceived to have been highly critical of the religion of Islam.   While many galleries in Sweden refused to publish Vilks' works, a Swedish newspaper carried one of his drawings to illustrate an editorial on self-censorship and freedom of religion.  Various plots and attempts on Vilks' life arose as a result.

In conducting his analysis, Lindh worked "in accordance with the guidelines and code of conduct from the International Association for Forensic Phonetics and Acoustics."  (See Lindh Draft Supplemental Analysis, dated December 19, 2014 at 2). Additionally, his conclusions were based on the "scale of the Swedish National Laboratory of Forensic Science" which, as of January 1, 2015, is set to become the Swedish "National Forensic Centre" upon the reorganization of the Swedish federal police force.  (Id. at 2).  In terms of his experience, Mr. Lindh has consulted in over 350 cases, most of which have involved his presentation of evidence in connection with various criminal proceedings in Sweden.  (Id. at 20).

His expert report reflects his use of three separate methods to analyze the voices at issue in the case.  First, he conducted a "phonetic and linguistic" analysis, which

74

involves an auditive analysis of speech behavior and features, such as laughter, intonation
and speech rhythm and timbre (or voice quality).  (Id. at 9-10).  Second, he conducted
various acoustic analyses, including an analysis of (a) the speaker's articulation rate or how
fast the person speaks, (b) a fundamental frequency analysis, which is a measurement of
pitch, and (c) a formant frequency analysis, which is an analysis of vowel articulation.  (Id. at
10-12).  Third, he conducted a biometrical statistical comparison of voices using an
automatic speaker recognition system, which extracts particular acoustic features from the
relevant audio and creates a model of those extractions which is comparable to other known
voices.  (Id. at 12-14).  Each of these three analyses produced judged or measured likelihood
ratios, which were combined and weighted, depending upon the quality of the available
samples, and results of the analysis are reduced to a numerical scale established by the
Swedish National Laboratory of Forensic Science.  (Id. at 16).

       In summary, Mr. Lindh concluded that the examination "strongly support[ed]"
the government's position that the speaker in the "Inspire the Believers" video was the same
as the audio recordings known to be of Yusuf.  He also concluded that the possibility that the
speaker was not the same as the audio recordings known to be of Yusuf was "very small" in
this case.  (Id. at 16).  Mr. Lindh also concluded that the examination "supported" the
government's hypothesis that speakers on certain of the Swedish intercepts were the same as
the audio recordings known to be that of Ahmed and Yusuf.  (Id.).  He also concluded, for
different reasons, that the possibility that the speakers were not the same as the audio
recordings known to be of Ahmed and Yusuf was "small" in this case.  (Id.).

At no point did Mr. Lindh conduct the outdated and flawed "aural spectrographic voice identification" complained of by the defendants and referenced in Angleton.  No suggestion has been made on the part of the defense that the actual techniques that Mr. Lindh has relied upon are not generally accepted in the scientific community and, as such, the government submits that on that basis alone, Yusuf's motion in limine should be denied or, in the alternative, the Court should require Yusuf to rearticulate his objection to the proffered testimony of the witness.

CONCLUSION

For the reasons set forth above, the Court should deny the defendants' motions

in their entirety.

Dated:  Brooklyn, New York
        December 23, 2014

                                        Respectfully submitted,

                                        LORETTA E. LYNCH,
                                        United States Attorney,
                                        Eastern District of New York


                        By:      /s/
                                 Shreve Ariail
                                 Seth D. DuCharme
                                 Richard M. Tucker
                                 Assistant U.S. Attorneys
                                 (718) 254-6616/6012/6204