Jane Simkin Smith
Attorney At Law
P.O. Box 1277
Millbrook, New York 12545
845 724 3415
Fax 888-391-5018
jssmith1@optonline.net

January 13, 2016

**By ECF**
Honorable John Gleeson
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: *United States v. Ahmed*, et al. 12 CR 661 (S2) (JG)

Dear Judge Gleeson:

This letter is submitted on behalf of defendants Mohamed Yusuf and Ali Yasin Ahmed in

connection with their sentencing scheduled for Friday, January 15, 2016.  It is submitted in reply

to the government's submissions filed on January 8 (ecf ## 338, 338-1, 338-2, 338-3, 339).

I.       **Matters About Which The Parties Agree**

We agree with the government when it says there is no "dispute that the defendants each

agreed to offer themselves in support of al-Shabaab, that they made their way to Somalia to join

its ranks, that they worked hand-in-hand with other al-Shabaab members and that they were

captured shortly after leaving Somalia in the summer of 2012."  (Ecf # 339, 4)[1]

There is also no dispute (again in the government's words) that "defendants' conduct was

wholly extra territorial" and "not specifically directed at Americans." (Ecf # 339, 10)

---

[1] The page numbers indicated on the top the ecf version of certain documents do not conform to
the page numbers on the bottom of the original.  In this memo, all page numbers following an
"Ecf # __" refer to the ecf pagination on the top.

Nor is there dispute that the "need for punishment is mitigated" "by the treatment they received" in custody in Djibouti[2], "as well as their agreement to removal from the United States following service of their respective sentences." (Ecf # 339, 10) (The government did not address defendants' arguments that the three years they have spent in solitary confinement and under SAMs in this country also mitigate the need for punishment (see, e.g., ecf # 328, 24-45).  We presume that its silence constitutes acquiescence -- that the prolonged isolation and deprivation suffered by these young men, while in the MDC and MCC, is an appropriate factor for the Court to take into account in fashioning a just sentence.) [3]

---

[2] The government claims that it took the defendants' torture in Djibouti (what it euphemistically calls "rough treatment") into account in formulating the plea agreement. It adds, "Notably too, there is no allegation – nor evidence to support – that the United States government was aware of, or complicit in any rough treatment to which the defendants were subjected." (Ecf # 339, 4, 10)  This apparently suggests that, if the United States were aware or should have been aware of, or complicit in, the torture, the torture would figure more substantially in reducing defendants' sentencing exposure.  As noted by Mr. Yusuf in his individual objections to the PSR (ecf # 331, 24), in several motions, defendants claimed that their arrest, detention and interrogations in Djibouti were conducted as part of a joint venture between the U.S. and Djibouti.  While the issue was not developed at any hearing (and, therefore, there is no public record in this case showing the government's knowledge or complicity), the government never denied that there was a joint venture or that no government officials were aware of the torture.  See also, https://news.vice.com/article/djibouti-was-complicit-in-cia-torture-of-terrorism-suspects-report-charges, and http://justiceforum.org/djiboutis-role-in-us-renditions/ (April, 2015 reports that six terrorism suspects captured by U.S. authorities after 9/11 were held incommunicado in Djibouti, where they were interrogated about ties to terrorism and subjected to interrogation techniques that rose to the level of torture).

[3] The government also does not address other matters discussed in the defendants' joint submission that call for a less than 15-year sentence (see ecf # 328, 45-61), namely, the analysis of sentences received by similarly situated defendants, and the guideline terrorism enhancement's failure to account for the lack of connection to the United States and overstatement of the defendants' criminal history.   Nor does it challenge Mr. Yusuf's understanding that, at the time he and Mr. Ahmed traveled to Somalia to join al-Shabaab in 2008, this was not a crime under Swedish law.  (Ecf # 331, 12)  (We note that Sweden is also not among the list of countries that, according to the government, have designated al-Shabaab as a foreign terrorist organization. (Ecf # 338, 3 n. 2)

II.     **The Central Dispute**

What the government does dispute is how this Court should view the defendants and their offense conduct – whether, as the government posits, the defendants should be seen as posing such a substantial threat to this nation's security that, despite lesser sentences regularly imposed in material support cases, the maximum allowable sentence should be imposed here; or whether, as defendants submit, they posed no threat to the United States during the life of the conspiracy, and, given the particular undisputed circumstances involved, a substantially lesser sentence is sufficient, and appropriate, to comply with the purposes of sentencing.

In letters to the Court, both Messrs. Ahmed and Yusuf explained that their offense conduct had nothing to do with the United States.  They made the difficult decision to leave Sweden and return to a war torn and ravaged Somalia, their homeland, in 2008 in order to help al-Shabaab forces fight against Ethiopian invaders and restore order there.   Their relationship with al-Shabaab ended in 2012, and all they want now is to return to Sweden to reunite with and support their families.

The government does not dispute that the situation in Somalia was horrendous when defendants decided to go there in 2008.  In fact, it acknowledges that a deeply unpopular administration was claiming authority, and that this group had sanctioned the unauthorized invasion of Ethiopian forces.   (Ecf # 338, 6)  Nevertheless, the government urges the Court to reject defendants' contention that the crisis in Somalia prompted their action.

The government posits that the defendants' explanations for their conduct "ring hollow" because the defendants joined a terrorist organization that not only "sought to destroy the elected

government of Somalia"[4], but also, according to the government (but not substantiated), had as

its "primary objective" the killing of "non-believers and apostates throughout the country." (Ecf

# 339, 13)  In other words, the government argues that the defendants should be sentenced to the

maximum based on the nature of al-Shabaab – an organization that, as the government puts it,

used "terrorist tactics" such as assassinations, beheadings, and suicide bombings, *and* embraced

"a twisted and radically conservative interpretation of sharia law."

In the government's view, even if the defendants did not personally engage in these kinds

of tactics and fought only on the battlefield in Somalia in a manner consistent with the laws of

war, they deserve a 15-year prison term because they must have supported and subscribed to "al-

Shabaab's horrific agenda."  With rhetorical fanfare, the government concludes that the

defendants are "international terrorists" who considered "martyrdom a public good, death as

paradise, and slaughter an imperative," and, it argues, the need to impose the 15-year maximum

sentence could not be higher. (Ecf # 338, 3, # 339, 14)[5]

The government paints an emotional but unsubstantiated picture of defendants as having

a "fascination with death and destruction" (ecf # 339, 14), and as committed to roaming the

---

[4] The government refers to the "elected government of Somalia," and "Sheikh Sharif" as the
"newly elected President" of Somalia. (Ecf # 339, 3, 13) The people of Somalia elected neither.
Sheikh Sharif was appointed in exile in Djibouti in January 2009; that "government" in exile was
not recognized by the United States, or by the citizens of Somalia.

[5] The government's "the-need-to-impose-the-maximum-could-not-be-higher" is hyperbole. In
virtually every case cited by the defendants in Table A-1 (a survey of material support cases in
the Second Circuit) Table A-2 (a survey of comparable Al-Shabaab cases in all Circuits), the
government argued for the maximum allowable sentence.

4

world as global jihadists on a quest to kill and be killed.   Nothing defendants did or said

supports this idea.[6]

III.   **The Government Tries To Link Defendants To Al-Qaeda, And Would Have The Court Base Sentencing On Innuendo and Suspicion Instead Of An Individualized Consideration Of Defendants And Their Conduct**

The government tries to bolster its case for the maximum sentence with repeated attempts

to link the defendants to al-Qaeda.  If successful, the government apparently hopes to suggest

that these young men pose a grave and continuing danger to Americans and American interests,

and, accordingly, that they "deserve a very serious sentence." (Ecf # 339, 8)

Thus, the government first emphasizes the publicly declared relationship between al-

Shabaab and "al-Qaeda and its global jihadist ideology" (ecf # 338, 14); it then conjures up a

specific connection between the defendants and al-Qaeda from "evidence" that the defendants

---

[6] The government points to the fact that Yusuf appeared "in an inflammatory al-Shabaab propaganda video", which, it says, urged "people to fight on behalf of al-Shabaab and to carry out jihadist attacks outside of Somalia." (Ecf # 339, 4; # 338, 15)  (The government labels Mr. Yusuf, "the voice of the call to jihad." (Ecf # 339, 11))   This video is, indeed, a propaganda piece, but it is clearly aimed at recruiting foreign fighters to join al-Shabaab in Somalia to help advance the organization's Islamo-nationalist agenda. The video is decidedly local –"Oh Muslim youth around the world, do not forget the call of your brothers in Somalia" – and does not promote a global Muslim nation, "global jihad," or an al-Qaeda worldview.   The video features footage of physical training, firing drills, urban tactics, heavy weapons training and operational footage all taking place in Somalia, along with the pleas of several foreign fighters from different countries, including Mr. Yusuf from Sweden, who, like the others, calls for Muslims in the West to come to "jihad in Somalia" to help repel invading Ethiopian crusaders.  Mr. Yusuf was given a script and performed as directed to the sound of the battle occurring around him in Mogadishu. His reference to the cartoonist Lars Vilks must be understood in this context:  Vilks' cartoons depicting the Islamic prophet Muhammed as a dog had inflamed Muslims in Sweden (and around the world, where, in many countries blaspheme is a serious crime and in several (like Saudi Arabia, Iran and Pakistan) a capital offense; people were deeply offended, and representatives of some 57 Muslim countries condemned the publication).  The video reflects the media wing producers' savvy exploitation of these passions as a recruitment tool, not Yusuf's individual belief system, a vision for hunting and killing infidels around the globe, or a commitment to fight an indefinite, unending war with the West.

were seeking to go to Yemen after they left Somalia in the summer of 2012 (ecf # 338, 20; ecf #

339, 4).  According to the government, from the supposed intention to travel to Yemen,

> there remains a fair inference, given the fact that the defendants have admitted to
> having agreed to provide material support to a terrorist organization, that – having
> fallen out with al-Shabaab leadership, aware of the setbacks al-Shabaab was
> facing in its ongoing battle against the TFG, having previously expressed a desire
> to die as martyrs for Islam, and having not achieved their stated goals of
> martyrdom – the defendants intended to travel to Yemen to join and fight in
> Yemen with al-Qaeda in the Arabian Peninsula there.  (Ecf # 338, 21)

Far from being a "fair inference," the charge that defendants intended to join al-Qaeda is

wildly inappropriate, as it is not based on anything the defendants said or did; rather, its

underpinnings are simply government *suspicions* about their plans.  Such unsupported suspicions

should not be part of the sentencing calculus.  Further, the defendants' history and

characteristics, as well as the circumstances leading to their decisions to join al-Shabaab,

strongly rebuts the government's musings. There is simply no evidence to support an inference

that the defendants had any desire or inclination to involve themselves in jihadi movements or

activities outside of Somalia.

The government's inferences concerning defendants' intentions upon leaving Yemen are

based on a snippet extracted from a sworn statement by co-defendant Madhi Hashi to the Special

Immigration Appeals Court in the United Kingdom (ecf # 337-2). In that statement, Hashi

explains his plan to go through Djibouti to Yemen with defendants Ahmed and Yusuf.  (Ecf #

228, 20)  In the same statement, Hashi went on to explain that the group intended go through

Yemen on their way to Saudi Arabia. (Ecf # 337-2, pp. 18-21)

The government dismisses Hashi as unreliable as to the intended Saudi Arabian

destination, but accepts his veracity insofar as he asserted a plan to go to Yemen.  It says, in

effect, there could be no reason for the defendants to be in Djibouti other than to go to Yemen,

6

and no reason for the defendants to go to Yemen to get somewhere else "given direct flights to Europe from Djibouti City."  (Ecf # 338, 20-21)  This is nonsensical.  In the same document, Hashi explained that he was traveling without a passport and that he wanted to go to Saudi Arabia because it was safe and he could visit a UK embassy there; he said that he chose this route through Djibouti as opposed to entering neighboring Kenya or Ethiopia which also bordered Somalia because of the dangers facing Somalis in those countries.  Given that the defendants were traveling without passports, Hashi's statement makes absolute sense: there was no Swedish embassy or consulate in Djibouti, and, without a passport, the defendants could hardly just hop on a direct flight to Europe in Djibouti City. [7]

_____

[7] The debate among top legal advisers in the Obama White House concerning targeted killing of al-Shabaab members sheds light on the government's strategy. As reported in the recent book by New York Times reporter Charlie Savage, *Power Wars: Inside Obama's Post-9/11 Presidency*, Harold Koh (State Department legal adviser, 2009-2013) and Jeh Johnson (Department of Defense general counsel from 2009-2012, then Secretary of Homeland Security) and others debated the status of al-Shabaab throughout the period between 2009 and 2013. In 2009, both Koh and Johnson were convinced that al-Shabaab was *not* a single well-organized group, but rather a network of several factions, and, therefore, al-Shabaab's public pronouncements of association with al-Qaeda alone did not make al-Shabaab as a whole "an associated force" of al-Qaeda such that law-of-war detention and targeted killings of any al-Shabaab member would be authorized by the AUMF.  In other words, an individual's mere membership in al-Shabaab did not signal that the individual was an "enemy belligerent" because many in al-Shabaab had a purely local, nationalistic agenda; evidence of an individual's ties to al-Qaeda would be required before he could be targeted as an imminent threat. Johnson vacillated between 2011 and 2012, but ultimately concluded (based on intelligence that splits in the organization were growing) that they were "less a group than a cluster of disorganized, discombobulated factions." According to Savage, even as of today, there has not been a determination that al-Shabaab has joined al-Qaeda's fight against the United States. (Id. at 274-278)  The recognition by the government's top national security advisers that membership in al-Shabaab alone does not make an individual an enemy of the U.S. perhaps explains the government's attenuated efforts to tar the defendants with the motive to join al-Qaeda or to otherwise involve themselves in extremist activities outside of Somalia in order to justify imposition of the maximum sentence.

IV.   **The Government Is Asking This Court to Forgo Individualized Sentencing and to Sentence Our Clients on the Basis of Their Alleged "Ties" to Others**

The government also makes much of our clients' "ties" to a number of people it lists in its Sentencing Memorandum (Ecf # 339, 11-12), including Imran Hershi, Yassin Yare, Mr. Ahmed's brother, Osman Yasin Ahmed, and a number of foreign fighters. In many cases, the government fails to explain the nature of these so-called "ties", or to ascribe any particular action or conduct to the individuals with whom our clients purportedly have "ties." The government states that "[t]hese relationships have meaning, and ultimately extraordinary significance for purposes of understanding the conspiracy to which these defendants pled guilty"; and "are appropriately considered in fashioning a sentence" under 18 U.S.C. 3553(a). (Ecf # 339, 13) – despite a dearth of information as to why the majority of these people are relevant to this Court's sentencing determination. The government then builds upon the pyramid that it has failed to support by listing the defendants' "collective ties" with unspecified individuals it identifies as "suicide bombers", "al-Qaeda members", "those who relish decapitation" and "other jihadists bent on the destruction of Somalia, the United States, our East African and European allies, and so called non-believers and apostates around the world". In so doing, the government is asking the Court to forgo its responsibility to fashion individualized sentences grounded in the conduct of our clients, and instead, to sentence our clients on the basis of their alleged "ties" with others – some known and others unknown.

A closer look at some of the government's arguments with respect to certain of these individuals demonstrates the fallacy – and the danger – of their argument.

a.   **Imran Hershi**

The government argues that it is of "obvious relevance … that these three admitted terrorists were facilitated financially in their travels by" Mr. Hershi, an individual who resides in

8

London and who possessed a laptop, seized by authorities in the UK in July of 2012, that contained "numerous lectures by now deceased AQAP leader Anwar al-Aulaqi and instructions on how to build an improvised explosive device." (Ecf # 338, 21-22; PSRs ¶ ¶ 26-27; Ahmed PSR ¶ ¶ 32-33, 38-39, Yusuf PSR ¶ ¶ 32-33, 28-29).

Despite being "obvious" to the government, the relevance of Mr. Hershi and the inflammatory contents of his laptop to this Court's sentencing determination are far from clear. Hershi has apparently not been charged with any crime and is not alleged to be a member of al Qaeda, al-Shabaab, or any other designated terrorist organization. The government concedes that it has no basis for believing that either Ahmed or Yusuf had any knowledge regarding the contents of Hershi's laptop. (Indeed, there is no evidence that either defendant ever met him or knew anything about him.) The mere fact that Mr. Hershi had such material on his laptop establishes nothing about Hershi's beliefs and intentions, much less the beliefs and intentions of our clients.

The government justifies the inclusion of this material in the PSRs on the basis of our clients' admissions (in an affidavit each signed in order to have $100 of the $300 seized from them in Djibouti deposited into their respective commissary accounts upon their arrival in U.S. custody) that the money was sent to them by Hawala transfer by Mr. Hershi. Yet beyond the affidavits (*prepared by the government,* and provided to the defendants immediately upon their arrival in the U.S. as a condition precedent for access to funds the defendants needed to purchase toothbrushes, toilet paper, soap and religious items), there is no evidence of *any* relationship between Mr. Hershi and the defendants Ahmed and Yusuf. Despite this dearth of evidence, the government piles inference atop inference and asks this Court to accept that the defendants' affidavits establish that (1) Mr. Hershi's decision to download al-Aulaqi's speeches to his laptop

show that he was an adherent who subscribed al-Aulaqi's "jihadist ideology"; (2) there was a unity of ideology between the defendants and Mr. Hershi; (3) the money sent by Hawala transfer was intended by Mr. Hershi to finance the defendants travels out of Somalia so that they could join Al Qaeda or otherwise wage global jihad. Such rank and attenuated speculation demonstrates the irrelevance of these "facts" to this Court's sentencing calculation, and crystalizes the dangers of sentencing our clients on the basis of tenuous ties to a man they never even met.  The government seeks to inflame not illuminate.

### b.  Mohamed Sakr, Bilal al-Berjawi

We further objected to the inclusion of the conduct of Mohamed Sakr, Bilal al-Berjawi, and Mohamed Emwasi, other individuals whom our clients never met.[8]  (*See* Hashi PSR ¶¶ 29-33, Ahmed PSR ¶¶ 41-45, Yusuf PSR ¶ ¶ 35-39). The government argues that Hashi's relationship with Sakr and al-Berjawi (1) "are quite obviously relevant and extremely significant to complete the understanding of this case and provide insight into why the defendants were later arrested in transit through Djibouti" and (2) "provide a framework for understanding the scope of the conspiracy." (Ecf # 338, 22-23)

The government next offers a barely intelligible argument that "[b]ut for the deaths of Berjawi and Sakr, and Hashi's significant relationship with them, it is likely that Ahmed, Yusuf and Hashi, would not have left Somalia, and they might never have been arrested in Djibouti and charged in the United States." (Ecf # 338, 23) This argument is apparently based on the following unsupported and perplexing series of inferences: (1) Sakr and al-Berjawi's reported death in a U.S. airstrike led members of al-Shabaab's intelligence service to imprison Hashi on the suspicion that he was a spy, in part because of Hashi's alleged close relationship with Omar

---

[8] The PSR alleges that Mr. Hashi met with Sakr and al-Berjawi in London in 2008, and that Sakr had "ties" to Emwasi, also known as "Jihadi John."

Hammami, a foreign fighter who ran afoul of al-Shabaab leadership; (2) during Hashi's incarceration, "certain" unidentified foreign fighters became "more vocal" in their criticism of how the intelligence service treated Hammami and his supporters, including Hashi; (3) when Hashi was released, he was encouraged to look elsewhere for jihad; (4) Hashi and our clients left Somalia. (*Id.*)

The nonsensical nature of this argument is concisely illustrated by the following flawed syllogism:

> Hashi has "ties" to Berjawi and Sakr → Sakr has "ties" to Emwasi → Hashi is imprisoned → Hashi has "ties" to Hammami → Ahmed and Yusuf left Somalia because of the deaths of Berjawi and Sakr.

Far from providing a framework to understand the scope of the conspiracy, the inclusion of these individuals and their deaths serves only to inflame and obscure any legitimate sentencing considerations by the Court. Nothing in the government's game of illogical leapfrog justifies the inclusion of these individuals in our clients' PSRs or the Court's sentencing calculation.  Again, the inclusion of these individuals in the PSR is inflammatory and masks the absence of any evidence that, upon departing Somalia, defendants intended to join al-Qaeda and wage "global jihad."  The so-called "ties" to these individuals prove nothing.

### c.  Osman Yasin Ahmed

Finally, the government persists in its contention that Mr. Ahmed's brother Osman Yasin Ahmed was a "high-ranking" member of al-Shabaab, basing this contention on the following facts: (1) Osman had traveled from Sweden to Somalia "on numerous occasions" before the defendants went to Somalia in December of 2008; (2) Osman had in "some capacity" and "at some point" – both left unspecified by the government – fought with an unnamed "jihadist group against the Somali government"; (3) the defendants were intercepted, prior to traveling to

11

Somalia, discussing the importance of getting in touch with Osman; and, (4) an unidentified "second co-conspirator witness[9] has specifically identified Osman as a foreign fighter who had previously fought with al-Shabaab in Somalia." (Ecf # 338, 11-12) The government's speculations about Osman are belied by actual facts: (1) Osman returned to Sweden and has never been charged with any crimes related to his travel between Sweden and Somalia; and (2) Osman is gainfully employed as a municipal bus driver, and continues to travel between Sweden and Somalia, where his wife and children still live. However, even assuming *ex arguendo* that the government's claims about Osman were accurate, these claims have no place in our clients' PSRs and should have no bearing on this Court's sentencing calculation. Despite anything Mr. Ahmed's brother may or may not believe or may or may not have done, Messrs. Ahmed and Yusuf decisions to travel to Somalia and fight with al-Shabaab are theirs alone.

## V.   **Continued Objections To The PSR**

The government has disagreed with most of our objections to the PSR, agreed with a few, and offered some alternative language.  In an effort to keep this submission brief, we will not restate the objections and, for the most part, renew our objections without further argument. However, certain of the government's arguments and proposals require further comment and correction.

### a.  **Objection To PSR ¶ 13**  (Ecf # 328, 10)

We objected to the inclusion of a purported summary of telephone conversations between the defendants in Sweden in 2008 on the ground that the original recordings of these calls were destroyed, and that the English language summaries provided in discovery were inadequate to allow for an assessment of the context and/or an effective challenge to the characterizations

---

[9] There is no indication in ecf # 338 why this unnamed individual is identified as a "second co-conspirator witness" as no first co-conspirator witness is mentioned.

included in the summary.  The government responds that there is "no legal impediment" to including the information in the PSR (ecf # 338, 13), and, apparently in an effort to provide the Court with assurance that the summary is reliable, includes as an exhibit (ecf # 338-1, 3-10) various notes made by, or in connection with, Swedish government representatives regarding the intercepted calls.  We offer one alarming example to show the Court how, if anything, these notes make our point that ¶ 13 of the PSR should be stricken.

According to the PSR, during a telephone conversation between Yusuf and Ahmed, Yusuf expressed doubts about al-Shabaab after it carried out coordinated suicide bombing attacks in which 30 people were killed. Ahmed supposedly "advised Yusuf that, if suicide bombing was a sin, it was a forgivable sin, comparable to masturbation."

In its submission (ecf # 338, 12), the government paraphrases this obviously inflammatory observation, making Yusuf the "sinner".   It writes, "During their discussion, Ahmed suggested that al-Shabaab's suicide bombing of innocent persons was forgivable, just another as another `sin' (masturbation) committed by Yusuf was also forgivable."[10]

Remarkably, neither the version of the conversation included in the PSR nor the version offered by the government in its submission is supported by the tendered notes:  There is mention of "sin," but there is no mention of "masturbation" in either of the reports related to the 2008 conversation.

---

[10] The government also wrote about this 2008 conversation between Ahmed and Yusuf comparing suicide bombings to masturbation in its opposition to the defendants' pretrial motions (ecf # 153, 17) This was the only part of the government's 80-page submission reported by the press: on December 29, 2014, under a headline that screamed, "Accused terrorist told comrade suicide bombings against civilians were a `forgivable sin' like masturbation: feds", the New York Daily News told its readers, "Federal prosecutors opened a window into the twisted mind of al-Shabaab goon Ali Yasin Ahmed…"http://www.nydailynews.com/news/crime/terror-suspect-suicide-bombings-forgivable-sin-article-1.2059337

Moreover, there are significant differences between the two reports and neither report supports the version of the conversation invented for the PSR.  Compare ecf # 338-1, 4 ("13 November 2008: Mohamed tells Ali that he is starting to have his doubts about al-Shabaab suicide attack in Hargeisa, in which many civilians died.  Mohamed is unsure whether he approves of this.  Ali convinces him that it must have been a mistake, just as Mohamed sometimes makes mistakes and sins.  Everyone makes mistakes, says Ali, even `our leaders' (al-Shabaab leaders."); and ecf # 338-1, 10 ("21-24/11/2008  …Mohamed was upset about the bombings in Hargeisa and sometimes hesitant about the journey. [Redacted] indicated that he recalled additional details related to this call, including a discussion between Yusuf and Ahmed in which he suggested that al-Shabaab's suicide bombing of innocent was forgiveable, just as another `sin' committed by Yusuf was forgiveable.")

We reiterate: without the tapes, it is impossible for the Court to know what was said or to understand the context in which things were said, and it is impossible for the defendants to effectively challenge the characterizations improvised by the government and recited in the PSR. The matter should be stricken.

**b. Credibility Of Foreign Deposition Witnesses**

Defendants objected to the accuracy of portions of PSR ¶¶ 11-19.  These sections were apparently derived from foreign deposition testimony of witnesses whose credibility defendants vigorously challenged in the course of the depositions and in their objections to the PSR. (Ecf # 328, 9-12; ecf # 331, 21-22)

The government counters that the witnesses were credible and points to the "Court's prior findings as to the credibility of the two witnesses in question." (Ecf # 338-9).   The government's

characterization of the Court's "prior findings" is misleading; the "prior findings" are not entitled to the weight assigned to them by the government.

Judge Townes made no generalized ruling as to the credibility of the deposition witnesses. Rather, in denying a defense motion to suppress the witnesses' testimony on the ground that these witnesses had been tortured, Judge Townes found the witnesses credible on the sole issue before her – specifically that the deponents had testified voluntarily. (Ecf # 292, 4) Her credibility finding was limited to the voluntariness of the testimony for purposes of ruling on the motion to suppress, and was by no means a wholesale credibility determination that can be used to categorically overrule defendants' objections to the PSR or to categorically adopt the foreign witnesses' testimony. ███████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████. Further, many of our objections to the PSR pertained not only to the credibility of the witnesses, but also to the strained characterization of their testimony.[11]

---

[11] The government also strains the content of witness testimony in its submission. For example, in its "Background" section (ecf # 339, 3), the government recites, without any testimonial attribution, that:

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

## VI.    The Government's Proposed "Amendments" to the PSR Related to the Defendants' Incarceration at the MDC/MCC

The government proposes a number of "amendments" the PSR relative to specific alleged incidents of the defendants' conduct during their incarceration in the United States, "many of which" the government contends are specific violations of the SAMs. (Ecf # 338, 26-28)  The government does not identify which ones it perceives to be violations and which ones are not. These incidents include one call in which Mr. Ahmed's family placed him on speakerphone; one call in which Mr. Ahmed gave his brother his wife's telephone number and asked him to call her; one call in which Mr. Ahmed's brother attempted to connect him to a friend; and one call in which Mr. Yusuf told his mother that the evidence against him included telephone calls that the Swedish government had provided to the United States.  Most appear trivial (four involving Mr. Ahmed and one involving Mr. Yusuf), and Messrs. Ahmed and Yusuf object to their inclusion in the PSR.

The government's efforts to include this information in the PSR, and by extension, make it a part of the Court's sentencing calculus, demonstrates the callous indifference with which the government views the severe deprivation our clients suffer every day in solitary confinement and under SAMs. Clearly, Mr. Ahmed has no control over whether, despite his clear and frequent



warnings to the contrary, his family puts him on speakerphone or hands the telephone to a third party. Further, given our clients' near total isolation, their infrequent telephone calls with family, which take place once a month for 15 minutes  (that is, if it is convenient for their jailers and they are able to arrange for an agent to monitor the calls in real time, and sometimes, due to poor connections, changes in telephone numbers or the unavailability of relatives, not at all), the fact that Mr. Ahmed might deign to ask someone to call his wife or Mr. Yusuf should share a fragment of the case against him with his concerned mother is of no moment and should not adversely impact our clients at sentencing.

The government also cites Mr. Ahmed for mentioning a former member of the Ras Kamboni Brigade in a July 2013 telephone call with his brother, and informs the Court that Ras Kamboni "is an Islamic jihadist group with ties to al-Shabaab." ████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████ ████ █████████████████████████ █████████████████████████████████████████████████ ██████████████████████████████████ ███████████████████████████████████ For this reason, it is inappropriate for the fact of this conversation to be included in the PSR.[13]

---

[12] ████████████████████████████████████████████████ ████████████

[13] The government's remaining claim is that in April of 2014, a "coded message" was found hidden behind some books in Mr. Ahmed's cell. This is the first we or Mr. Ahmed have heard about the alleged infraction, for which no disciplinary proceedings were initiated, and no

Frankly, the suggestion that our clients' would do anything to violate the SAMs in telephone calls (that are monitored and recorded and could result in the loss of their only connection to their families and the outside world) defies credulity. Should the Court consider the government's proffered litany of telephonic infractions (infractions that the government will no doubt use to justify continuing renewal of the SAMs and isolation of our clients from any human contact or relationship in the federal prison system), we submit that they are *de minimis*, and, given the duration of our client's extremely restrictive confinement, relatively few in number, and clearly part of the trial and error of learning to live and interact with ones loved ones under the severe restrictions of the SAMs. Rather than strikes against our client at sentencing, they are, in fact, emblematic of the deprivation that distinguishes our clients' incarceration from that of the average federal inmate, and from many inmates convicted of material support offenses who are not subject to the same restrictions.

## Conclusion

In both its sentencing submission and letter to Probation, the government ignores the history and characteristics of our clients as members of Somali refugee communities deeply connected to the pain and suffering of the people of their homeland.  It also ignore the nature and circumstances of their decision to return to Somalia and join al-Shabaab, which was made during the reign of a deeply unpopular government, that, assisted by the invading forces of a hostile neighboring country, was participating in torture, mass arrests, rapes, looting, and unlawful and indiscriminate killing of civilians.[14]

---

punishment meted out. Given the total lack of documentation supporting this incident, we ask that it not be included in the PSR.

[14] *See* Amnesty International, *Routinely Targeted: Attacks on Civilians in Somalia*, AFR 52/006/2008 at available at http://bit.ly/1MAb0Mu

The government, casually acknowledging the "rough treatment" our clients endured in Djibouti -- where over the course of several months, they were tortured, starved, and left for dead on the hot dirt floor of tiny cells in a secret prison they believed they would never escape -- assures the Court that it took this treatment into account in its formulation of the plea agreement, and asks the Court to impose the maximum sentence. In so doing, the government attempts to shift the focus from the defendants and their conduct to their supposed "ties" to others named and unnamed, and makes vague, unsupported claims about what else they might have planned, grounding its arguments in fear and speculation.

We humbly ask this Court to consider all of the factors in 18 U.S.C. § 3553(a), and to impose a sentence that is "sufficient, but not greater than necessary" to meet the goals of sentencing as outlined in that statute.  For all the reasons set forth by the defendants in our previous submissions, we urge the imposition of a sentence well below the 15-year maximum, and well below the 177 months recommended by Probation.

Respectfully submitted,

Jane Simkin Smith
David Stern
Attorneys for MOHAMED YUSUF

Susan G. Kellman
Sarah Kunstler
Ezra Spilke
Attorneys for ALI YASIN AHMED

cc: Counsel of Record via email

19