1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
2
   - - - - - - - - - - - -   X
3
UNITED STATES OF AMERICA,    :   12-CR-661(JG)
4
            Plaintiff ,       :
5                                United States Courthouse
       -against-              :   Brooklyn, New York
6
ALI AHMED and MOHAMED         :
7 YUSUF,                          January 15, 2016
                                  2:00 p.m.
8          Defendants.         :

9   - - - - - - - - - - - -   X

10              TRANSCRIPT OF SENTENCING
           BEFORE THE HONORABLE JOHN GLEESON
11            UNITED STATES DISTRICT JUDGE.

12
APPEARANCES:
13
For the Government:          ROBERT L. CAPERS
14                           United States Attorney
                             BY: SHREVE ARIAIL
15                               SETH D. DuCHARME
                                 RICHARD TUCKER
16                           Assistant United States Attorneys
                             271 Cadman Plaza East
17                           Brooklyn, New York

18
For Defendant Ahmed:         SUSAN G. KELLMAN, ESQ.
19                           SARAH KUNSTLER, ESQ.

20
For Defendant Yusuf:         DAVID STERN, ESQ.
21                           JANE S. SMITH, ESQ.

22
Court Reporter:              Charleane M. Heading
23                           225 Cadman Plaza East
                             Brooklyn, New York
24                           (718) 613-2643

25 Proceedings recorded by mechanical stenography, transcript
   produced by computer-aided transcription.

1          THE CLERK:  United States versus Ahmed, et al.

2          MR. ARIAIL:  Good afternoon, Your Honor.  Shreve

3     Ariail, Seth DuCharme and Richard Tucker for the United

4     States.

5          THE COURT:  Good afternoon.

6          MS. KELLMAN:  Good afternoon.  Susan Kellman and

7     Sarah Kunstler for Ali Ahmed who is in the courtroom.

8          THE COURT:  Yes.

9          MR. STERN:  Good afternoon.  David Stern and Jane

10    Smith and we're assisted by Mayerlin Ulerio for Mohamed Yusuf.

11         THE COURT:  Good afternoon.

12         THE PROBATION OFFICER:  Jaime Turton from Probation.

13         THE COURT:  Yes.  Thank you for being here.  Thank

14    you for your work on the case.

15         Everyone can have a seat.

16         Okay.  There is a presentence report and a couple of

17    addenda.  Let me say at the outset how impressed I am with the

18    written advocacy in connection with this sentencing.  These

19    papers are fabulous, all around.  Thank you so much for them.

20    They are very useful.

21         Have you been over, Ms. Kellman and Mr. Stern, have

22    the two of you seen the presentence report and the two addenda

23    to it?

24         MS. KELLMAN:  Yes, Your Honor.

25         MR. STERN:  Yes.

1        THE COURT: Okay. Gentlemen, Mr. Yusuf and

2 Mr. Ahmed, let me address you individually.

3        Have you both had an opportunity to review these

4 documents?

5        Mr. Ahmed?

6        DEFENDANT YUSUF: Yes.

7        THE COURT: Mr. Yusuf?

8        DEFENDANT YUSUF: Yes.

9        THE COURT: You said yes to both.

10        MR. ARIAIL: I think Mr. Ahmed didn't answer.

11        THE COURT: Mr. Ahmed, have you seen these documents

12 or had them translated for you?

13        DEFENDANT AHMED: Yes, I have.

14        THE COURT: Okay. And have you had enough time to

15 go over them with your lawyers, Mr. Ahmed?

16        DEFENDANT AHMED: Yes.

17        DEFENDANT YUSUF: Yes.

18        THE COURT: Okay. There's a lot of back and forth

19 with objections to the presentence report. Let me share with

20 you my sense that this is a really difficult case. There are

21 some very difficult issues to address and I think that these

22 issues lie at the heart of the sentence determination.

23        One is the extent to which we have a situation where

24 one person's terrorism is another person's freedom fighting.

25 Another issue is the significance of the conditions of

1  confinement when they were first taken into custody in Africa.

2  Yet another is the conditions of confinement the last three

3  years here and going forward and those are all important

4  issues.  I want to hear oral advocacy on those as well.  And

5  then, and this is just an outcropping.  I'm not being

6  critical.  It is a result --

7              Let's swear the interpreter.

8              THE CLERK:  Magna, can you rise and raise your right

9  hand, please.

10              (Interpreter sworn.)

11              THE CLERK:  Please state your name for the record.

12              THE INTERPRETER:  Magna Czagany.

13              THE CLERK:  Thank you.

14              THE COURT:  One result of this careful, thorough

15  advocacy is a lot of back and forth on issues that I don't

16  really regard as necessary.  They don't really affect the

17  sentencing or I wouldn't consider them in any event.  You

18  know, it got down to the difference between statements of

19  something happened in late 2008 as opposed to December of

20  2008.  Good for you for fleshing that all out and bringing

21  those to the surface, but I don't want to get down in those

22  weeds.

23              It struck me in broad strokes that the objection

24  to -- it didn't just strike me, I'm ruling on this now so you

25  know -- but the objection to paragraphs 2 through 9, for

1    example, I am going to overrule that.  I think that

2    information is properly in the presentence report.

3           The information about Hashi, these are different

4    numbered paragraphs depending on which two presentencing

5    reports you are looking at, but the paragraph on the

6    activities of Hashi and others, Sakr, I'm sure I'm

7    mispronouncing them, Berjawi, I understand there is an

8    objection to the inclusion of this information, but I am

9    overruling the objection.

10          To the extent that that information might prejudice

11   the defendants, I understand that the inclusion of a

12   statement, for example, a statement that there's no evidence

13   that any of these defendants was involved in beheadings, I

14   think, recognizing you have your objection, I think those

15   statements -- there is another -- sorry, but I don't have the

16   notes that I made upstairs before me.  The government

17   mentions, for example, on page nine of its submission, a

18   modification with regard to the inclusion of a narrative about

19   foreign fighters.  I think these ameliorative measures do the

20   trick.  I don't regard that information as bearing on the

21   sentence.  I think the heart of the sentence are the three

22   issues that I've described for you.

23          So that's a long-winded preface to asking defense

24   counsel, and thank you for your reply submission, what, in

25   light of the agreements that you have with regard to the

1   presentence report, do you really think I need to resolve here

2   before I have argument about the appropriate sentence?

3           Do you understand the question?

4           MS. KELLMAN:  Your Honor, I think at least with

5   respect to Mr. Ahmed, I would say that the answer is if what

6   Your Honor is focusing on, and I think correctly, are the

7   first three issues that you highlight, then I'm happy to

8   restrict my comments to that and I, I have to say I think that

9   as advocates, we felt the need to respond to everything.

10          THE COURT:  I understand.

11          MS. KELLMAN:  But I think the Court appropriately

12  highlights the concerns that affect the sentence in this case

13  and I'm happy to abide by that.

14          THE COURT:  And just to flesh it out a little bit,

15  with respect to the heart of the case, I don't think either

16  side is right necessarily that, you know, it's not irrelevant

17  that the freedom fighting was done through the vehicle of

18  al-Shabaab.  Some inferences can be drawn that are adverse to

19  the defendants.  At the same time, simply joining al-Shabaab

20  doesn't necessarily carry with it all that inferential impact

21  that the government wants it to carry.  I mean, we will argue

22  about that.  But these more particularized objections to the

23  presentence report I don't really find necessary for

24  resolution.

25          Put another way, under Rule 32, they don't affect

1    the sentence in my judgment so I don't intend to address them.

2           Mr. Stern, Ms. Smith, do you want to be heard?

3           MR. STERN:  Can we just have one second?

4           (Pause.)

5           MR. STERN:  I think that's fine with us, Judge.

6    What we would like then is that fact that you just said, they

7    don't affect your sentence, be put in the presentence report.

8    Of course these reports follow them wherever they go so to

9    some extent, I agree with you.  Some of these things became

10   quibbles after a while, but we would like it then to be

11   reflected, wherever they go, the sentence was based on the

12   things we discussed in court here today and was not influenced

13   by the things you're suggesting don't influence you.

14          THE COURT:  All right.  Mr. Ariail?

15          MR. ARIAIL:  Your Honor, in terms of the objections,

16   I think we tried, we tried our best to come to agreement where

17   we could.  I think though there are two particular areas I

18   just want to make sure that I understand Your Honor correctly

19   as saying you are considering which are the, without reference

20   to the paragraphs, the November 2008 intercepts or wiretaps

21   that were conducted in Sweden and also the later intercepts in

22   2009 and 2010.  I just want to make sure that those are, those

23   remain.  I don't think those specific paragraphs were

24   referenced and I assume Your Honor is considering those.

25          THE COURT:  I think those are properly before me for

1  what they're worth.  There is no objection to that, I take it.

2         MS. KELLMAN:  No, Your Honor.

3         Your Honor, one question, though.  In the

4  government's submission early on in this submission, they

5  speak to certain of our objections and they say that they

6  agree with the defense as to this, that, and the other thing,

7  for example, that they weren't involved in beheadings and

8  suicide bombings.

9         THE COURT:  Yes.

10        MS. KELLMAN:  It would seem that, to further

11 Mr. Stern's comments to the Court, that perhaps those comments

12 would also be incorporated into the presentence report again

13 because they'll follow the defendants.

14        THE COURT:  Absolutely.  And what I think is useful

15 is for -- I looked at these addenda, but, for example, the

16 clarifying statement regarding beheadings.  Everybody agrees

17 that should go in the presentence report.

18        Jamie, could you make those modifications?

19        THE PROBATION OFFICER:  Yes, Your Honor.

20        THE COURT:  And put your heads together with

21 Mr. Ariail, Mr. DuCharme, and Mr. Tucker and Mr. Turton and

22 let's make those revisions that are agreed upon.  I'm all for

23 that.  And then I think you ought to append a copy of the

24 transcript of this sentencing proceeding to the judgment.

25        Does anybody object to that?

1    MR. STERN:  No.

2    MS. KELLMAN:  No, Your Honor.

3    MR. ARIAIL:  No, Your Honor.

4    THE COURT:  All right.  Anything else with regard to

5  the presentence report that anybody needs addressed before we

6  talk about what the appropriate sentence will be?

7    From the government?

8    MR. ARIAIL:  No, Your Honor.

9    MS. KELLMAN:  No, Your Honor.

10   MR. STERN:  No.

11   THE COURT:  Okay.  Who wants to go first?

12   MS. KELLMAN:  Your Honor, I think Mr. Stern has

13  asked to go first and I'm happy to yield.

14   THE COURT:  Sure.

15   MR. STERN:  A lot has been said in all of the

16  writings we've just been discussing about what Mohamed Yusuf

17  did in Somalia and for the most part, we agree.

18   He went to Somalia and fought as a soldier with

19  al-Shabaab.  A lot has been said about who al-Shabaab is, and

20  while we don't agree with a lot of it or all of it anyway,

21  it's true that there are people in al-Shabaab who did some

22  things but he didn't do those things.  I'm referring to

23  beheadings and bombings of civilian targets and bombings

24  outside the country.

25   What 3553(a) at least, in part, states is a

discussion of who the person is himself, not what organization
he belonged to, although I'm not saying that's irrelevant, and
not where he was but who he is and I'm going to confine my
comments mostly to just that.

I think we can all agree who he is not. He is not a
powerful figure in al-Shabaab. The government said he led a
platoon and translated for some kind of a cleric, but he was
really a soldier on the front lines fighting. We know he was
wounded. We know he carried a weapon. He has pled guilty and
doesn't deny any of those things.

One way we know he's not terribly important is how
little this case has been covered. We've all seen big cases,
big terrorism cases that are in the press every day, but no
one except for his family really cares what happens to him.
Al-Shabaab doesn't seem to care, the public doesn't seem to
care, the press doesn't seem to care, and that's some measure
of what a relatively unimportant role he played, not he
himself was unimportant, but the role he played in all of
this.

We know al-Shabaab doesn't care because I have done
cases where organizations make demands for people's release,
Sheik Abdel Rahman, the Islamic group was always making
demands for his release and kidnapping people to get him back.
No one from al-Shabaab has mentioned Mr. Yusuf. Once he was
taken, he was gone. They didn't send money to him. They

1   didn't hire a lawyer for him.  He was just another soldier.  I

2   think it's fair to say about all of these men, but I'm really

3   talking about Mr. Yusuf, that he's just cannon fire and I

4   don't mean that in a bad way about him or them.  That's what

5   soldiers are in some way.  But there's been no stir as a

6   result of his arrest and his prosecution in that organization.

7         It's worth noting about him that he is a profoundly

8   devout person and it's unfair to characterize his devoutness

9   as twisted.  Whatever you think of al-Shabaab, whatever the

10   government thinks of al-Shabaab, Mohamed Yusuf is a person

11   with real deep and thoughtful religiosity and he came to it in

12   a way that many people come to, not just in Islam but all

13   faiths, to his own religiosity.

14         He was born in Somalia, brought to Sweden and

15   instead of moving to Stockholm where there's a large Somalian

16   community, he went to a small town and felt terribly isolated.

17   There were people there who could drink and because of his

18   faith, he couldn't drink.  There were people there who could

19   date and because of his faith, he couldn't date.  He was one

20   of the few non-white children he was in school with.  While he

21   didn't have problems with them in the sense that they fought

22   or taunted him or things like that, he was completely isolated

23   and alienated because he had no one with whom he could bond.

24   It's easy to say, well, you could just change, you could give

25   up your faith, but we don't ask people do that and Sweden

1    doesn't ask people to do that.

2            At some point, he moved to Stockholm and all of the

3    sudden, he found a community of people with whom he had never

4    met before, a group of Somalis, many of whom were religious

5    like he was, many of whom were interested in his homeland like

6    he was, many of whom were black like he is, and he began to

7    absorb the things that community had to offer and one of the

8    things they had to offer was an outrage about what was going

9    on in Somalia and a respect for people who went to Somalia to

10   try to do something about it.

11           During this case, I went to Sweden while I was

12   trying to find witnesses for an issue that has nothing to do

13   with this sentencing and I went to a community meeting, the

14   Somali community.  When you go to this Somali community in

15   Sweden, you're in a different world.  I was staying downtown

16   in some hotel and I went to a community where everyone was

17   black and everyone was Somali and at this meeting, there were

18   speakers of all kinds and I was doing whatever I was doing

19   there and many, many people came up to me to praise the young

20   men who went to Somalia.

21           Now, one way to look at that is it's frightening

22   because all these other young men are going to go, but the

23   other way is to think of what it's like to live in a community

24   where many people -- I don't mean to speak for all people in

25   Somalia, but many people at least think that something has to

1     be done about what's going on in Somalia, about the invaders,

2     and this was, of course, after he was here.  I had no occasion

3     to visit before he was here.  And I say that because where he

4     came from in Stockholm, what he did, first of all, was not

5     criminal under Swedish law and was thought of as honorable by

6     people in the community.

7             I've also had a lot of conversations with him.  I am

8     not a person of faith and he is and he would talk to me about

9     what it meant to have faith and how surprised he was that I

10     didn't and in those conversations, he referred to his faith as

11     a light that is seen through what I think everyone agrees are

12     very difficult situations.  I think the situation in Somalia

13     was very difficult.  It was dangerous and frightening.  He was

14     under fire and he was firing at people and he feels that his

15     faith saw him through that.  When he was held in Djibouti and

16     things that you're well aware of happened to him in Djibouti,

17     he felt that his faith saw him through that and he felt that

18     his faith saw him through the years that he's been here in the

19     United States and I think that's what we expect faith to do.

20     We expect faith to be a guide in difficult times among other

21     things.  So, it's one thing for the government to characterize

22     what they think the philosophy of al-Shabaab is, but that

23     characterization does not apply to Mr. Yusuf's personal

24     philosophy.

25             He also thinks very deeply about his faith and what

1  it meant when he went, what he thought when he went, and I

2  mean went to Somalia, and how he felt that that was a way of

3  expressing his faith even though he did it at great personal

4  risk and at real pain to his family.

5          The government, I think, belittles the letter that

6  Mr. Yusuf wrote saying it's too little, too late, or it's just

7  to get out of trouble, but they don't have the advantage I

8  have of knowing him and of having seen his thinking evolve.

9          He knows that now he has changed, he's older, he's

10  experienced new things, and he knows the situation in Somalia

11  has changed and that he no longer has a role there and it's

12  his belief that at least young men from Stockholm have no role

13  there.  He has said to you and he has said to me that he would

14  counsel young men against going there because it didn't

15  accomplish anything and there are better ways for them to

16  express their faith in a way that's more useful to everyone.

17          One of the things that we most often look at in

18  sentencing is whether or not a person has a place to go back

19  to, that is, whether or not when they get out of jail, they're

20  going to be in a place where they'll be supported and cared

21  for and loved.  He certainly has that.  I've spoken with many

22  members of his family, we've given you letters from some of

23  them, and they're all eager to have him come back and will do

24  all they can to reintegrate him into the community.

25          He hopes when he gets back to express one of the

CMH     OCR     RMR     CRR     FCRR

1    highest values of Islam by caring for his family.  He has a

2    wife and children in Somalia and he hopes to bring them back

3    to Sweden which he can only do once he is in Sweden.  I think

4    under Swedish law, he has a right to bring his family there

5    but not if he himself is not there.  So that he hopes that

6    when he gets back to Sweden, to bring his family there and to

7    let his children take advantage of all of the things the west

8    has to offer.  Where they live now, I think it's difficult.

9    The health care is poor.  The educational opportunities are

10   poor.  He knows that he benefited from the opportunity to grow

11   up in a western country and it's fair to say that he has no

12   animus whatsoever towards the west, towards Sweden, towards

13   the United States.  His fight was in Somalia.

14          Another thing I've learned from meeting him is that

15   he's a person who is open to new ideas.  The government has

16   the disadvantage of only meeting defendants really when

17   they're either cooperating and have a motive to tell them

18   things -- I don't mean untrue things but they have power over

19   them -- or when they're pleading guilty, things like that, but

20   I've had the chance to spend many, many, many hours talking to

21   Mr. Yusuf, talking about the plea which eventually we were

22   able to get in this case, talking about what it was like for

23   him in jail, talking about how much he misses his family, and

24   he's learned a lot sadly from being in jail.

25          You know, one of the things he learned is who

1    Americans are.  When you're not here, you hear lots of

2    opinions from lots of people about who Americans are and what

3    Americans are and he's learned for himself that he came to

4    this country, he was brought to this country, he met lawyers

5    who, for better or for worse, did their best for him, he met

6    jailers who, for the most part, were kind to him, and under

7    very difficult circumstances, he's learned that America is not

8    a bad place to be even in jail, not that he wishes to be in

9    jail, but that it's a humane place where people are given food

10   and commissaries and treated for the most part with respect.

11            He has many, many traits that we all admire in

12   people.  One of the things about him is that he is not a

13   whiner or a complainer and I don't say that lightly because

14   having represented many, many people over the years, some are

15   not as uncomplaining as others, but when Ms. Smith and I would

16   go see him, he never ever complained.  He was held under

17   circumstances that I would certainly be whining about.  He

18   never complains.  He would come out with a smile on his face.

19   He would greet the people in the facility and they would greet

20   him.  He would ask us why we were there and talk with us about

21   why we were there.  He never demanded things from us.  He was

22   a person who took what life brought him with equanimity and

23   didn't ever complain.

24            He's also a person who is always grateful and

25   polite.  There are plenty of clients for whom I have tried to

do things who, for whatever reason, for whatever damage
they've suffered, don't have it in them to be what I'm going
to loosely call appropriate.  He always, whatever we did for
him, was sure to thank us and sure to make sure that we felt
good which many clients don't really consider.

I think it's also fair to say that there's not any
indication that he's a dishonest person.  The government might
not like what he did, but I don't think they would
characterize him as a liar.

One of the most impressive things about him and
about his co-defendants is they are good friends to one
another.  They wanted to make decisions together.  They never
wanted one to be left behind.  They were, for example, very
concerned about Mr. Hashi because they both know that whatever
sentence they would receive, they have a home to go back to,
they go back to Sweden, but Mr. Hashi really has nowhere and
they would say, Mohamed would say, I'll take a longer sentence
if Hashi can get a shorter sentence because at least I have a
family and a home to go back to and he has nothing.

I've talked about him as being an open person and
one of the ways in which he's open is wanting to learn things
outside of his own world and maybe this seems insignificant to
you, I really don't know, but he would ask us for magazines,
he wanted National Geographic, he wanted history magazines
because he wanted to continue to learn and not just to

1 continue to believe and think the things he had always

2 thought.

3 The government in part of their presentation to you

4 wrote about things they had done wrong in jail. The truth

5 about him is that he has been a model prisoner. The only

6 thing they could dig up is to say that he once told his mom

7 that some of the evidence in the case against him was

8 conversations he had with his long time friend Mr. Ahmed and

9 that hardly seems like misbehavior to tell your mom what the

10 evidence in the case is against you.

11 And, finally, maybe in some ways most tellingly, he

12 had a very, very good relationship with prison personnel. We

13 would go there and officers would say to us, oh, he's so easy,

14 he's so nice. He would talk to them. They would talk to him.

15 He wasn't like clients that have a difficult time getting

16 along with prison personnel. He was a person who respected

17 them and they respected him.

18 I say all of this by saying he needs no more

19 deterrence. He's being punished for something he had no idea

20 was a crime in the U.S. in the first place but now he knows

21 and he's being punished for something that was not a crime in

22 his own country so he wasn't really on notice that he would

23 ever be prosecuted for it. He recognizes it's a crime here.

24 He pled guilty to what he now knows is a crime here. I would

25 say the nearly four years he's been in custody has certainly

1   made him aware of that and that nothing he's done has made

2   anyone think he'll be a continuing threat should he get out of

3   jail.

4         One of the considerations in sentencing is general

5   deterrence and I wanted to talk a little bit about that.

6         There are, I think, and I took this off the internet

7   so you could take them with whatever grain of salt you want,

8   something like 7 to 9,000 members of al-Shabaab and in the

9   government's view, all of them are co-conspirators.  Every

10  member of al-Shabaab is in a conspiracy with Mohamed Yusuf and

11  maybe that's legally true, maybe not, we didn't end up having

12  to litigate it, but the fact is that the U.S. is not going to

13  bring 7,000 or 5,000 or 2,000 or 1,000 al-Shabaab members here

14  and prosecute them.

15        So, sitting where he sits now is like being struck

16  by lightning.  He's the one guy, one of three guys, and I know

17  there's more than three, but one of a small number who get

18  picked up and brought here and I don't really think that for

19  the most part, young men fighting in Somalia are paying that

20  much attention to what happened to him.  Many of them are

21  there for the same reasons he was there and maybe they're

22  beyond deterrence, but to the extent that any of them can be

23  deterred, we should send out a message to them that is

24  measured:  If you didn't know, you know now, and this is what

25  happens to people, we mete out compassionate sentences for

1   people who didn't know what they were doing was a crime.

2          It was strange to me that the U.S. can reach across

3   the ocean and bring someone back here and have jurisdiction

4   wherever they land with them.  One of the first things he said

5   to me is, What am I doing here?  I'm where, in New York?  How

6   did I end up in New York?  And I really consider it to be a

7   fair question, but not one that is an attack on the

8   jurisdiction, we don't have to resolve that, but only to say

9   it's unusual to me and to him and I assume the people over

10  there, but if we reach out and get the people who attacked

11  civilians and we reach out and get people who do beheadings,

12  and we reach out and get people who attack outside their own

13  country, I think everyone knows you're not allowed to do that.

14  What they don't know and maybe will know now to the extent

15  this is a covered is this is something they're not allowed to

16  do.

17         I think when everything is balanced in this case,

18  Mr. Yusuf does not deserve a long sentence.  I don't intend to

19  talk at length about the conditions he's been under, but I

20  think it's at least worth noting that in Djibouti, and I

21  assume you've seen the affidavits that were filed by these

22  defendants, he was held in very, very difficult conditions and

23  then being held here under the conditions which he's been held

24  makes every day of a sentence much more difficult than most

25  people have to live through.

1       He had 15-minute phone calls with his family every

2  month -- 30 minutes every month.  I'm sorry.  He would spend

3  15 minutes with his wife and 15 minutes with his family.

4  They're in different places so he would call in different

5  places.  He really had no one to talk to other than us and

6  prison personnel.  So, punishment is, of course, part of the

7  goal of sentencing and he has been punished.

8       In the end, we ask you to sentence him to a sentence

9  well below the 15-year maximum in this case.  We also ask,

10 although I know it's unusual, that you recommend to the

11 Department of Justice that at the earliest opportunity, he be

12 sent back to Sweden to serve the remainder of his sentence.

13 We know you can't order that, but we ask that for two reasons.

14 Well, three reasons.  One is his family is in Sweden and it's

15 extremely difficult to visit.  Another is Swedish prisons

16 offer education and he very much wants to further his

17 education while he's in jail.  And, finally, to the extent we

18 want people to be reintegrated into society and become active

19 and participating members of society, it's much more likely to

20 happen if he's able to complete his sentence in Sweden where

21 he's from and where the Swedes will, however they do it, work

22 on his reintegration.

23      I think unless you have questions, that's all we

24 have to say about sentencing in this case.

25      THE COURT:  Is there an understanding, an agreement

1  between the United States and Sweden about transferring

2  prisoners?

3          MR. STERN:  Well, it has to be on the agreement of

4  both parties.  I have reason to believe Sweden will certainly

5  agree.  Whether the U.S. does or not, they're not agreeing at

6  this moment, and whether they will, I have no way of knowing.

7          THE COURT:  I'm only familiar with this anecdotally

8  through a couple of other cases, but do you know whether,

9  assuming you get what you want, whether there is some analogy

10  to parole or what it does to sentence length if he gets sent

11  to Sweden?

12          MR. STERN:  I think, and the government will correct

13  me if I'm wrong on this, I think they would only be sent to

14  Sweden if Sweden would effectuate the same sentence they were

15  getting here.  I don't think they'll send you somewhere

16  knowing that the day you get there, you're going to be let go.

17  The government will correct me if I'm wrong, but that's my

18  understanding.

19          THE COURT:  My only other experience really was with

20  Israel where they did shorten the sentence but understood.

21  I'll hear from the government in a minute.

22          Thank you, Mr. Stern.

23          Mr. Yusuf, you have a right to speak before sentence

24  is imposed.  Is there anything you want to say?

25          MR. YUSUF:  I think my attorney has said everything

1  that needs to be said and I also wrote a letter.

2       THE COURT:  Yes, I read your letter.  Thank you for

3  it.  Okay.  Thank you, sir.

4       Ms. Kellman?

5       MS. KELLMAN:  Your Honor, may I have just one

6  personal request.  With the Court's permission, may I sit?  I

7  messed up my ankle.

8       THE COURT:  Yes, of course.

9       MS. KELLMAN:  Thank you, Judge.

10      Your Honor, in preparing my remarks today on behalf

11 of my client, I wanted very much to try to speak with his

12 voice instead of mine because I know my voice irritates a lot

13 of people and I thought that it might be helpful for the Court

14 to hear what I think my client would say if he were

15 representing himself and I talked to him a lot about trying --

16      THE COURT:  Excuse me.  One second.

17      Could you turn your mic off over there?

18      MR. STERN:  Sorry.

19      THE COURT:  Or stop talking.  That's another option.

20      MR. STERN:  I'll do both.

21      THE COURT:  Okay.  Sorry, Ms. Kellman.  Go ahead.

22      MS. KELLMAN:  Thank you, Judge.

23      So I thought if Mr. Ahmed were to speak for himself,

24 Judge, that he would want you very much to understand what

25 brought him today to this place and this time in his life and

1  he would speak with a kind of patience and the kind of grace

2  and dignity that I really don't have often when I speak in

3  public.

4          I echo some of what Mr. Stern has said, that my

5  client is and has been since I met him remarkably polite,

6  always respectful, and as frustrated as I often got with the

7  conditions of his confinement, it was he who always said

8  they're doing the best that they can and often urged me not to

9  intercede on his behalf.  I think that that is very much a

10 measure of who he is and I hope that through my remarks today,

11 that I'll be able to help the Court understand better about

12 who the young man who stands before him awaiting judgment is.

13         I think that the very first thing that my client

14 would say if he were to speak on his own behalf is that he

15 would say that he can't honestly apologize for his trip to

16 Somalia and his actions in Somalia and he would hope that he

17 could make the Court understand his motivations for traveling

18 to his homeland.

19         He would hope that the Court would understand as a

20 young Somalian male, he was forced to flee his homeland which

21 was in the midst of a very difficult and tumultuous civil war.

22 He left with the protection of an older sister leaving behind

23 his younger brother and his mother and at the time he left,

24 Judge, he was six years old.  It would be years before he

25 would be reunited with his mother, years of learning new

1    customs and a new language without a father, without a trade,

2    without money.  He went to school where nobody looked like him

3    and nobody spoke like him and nobody dressed like him.

4          As you read the letters from his family, Judge, you

5    will learn or have learned that he's a committed member of a

6    close-knit family and a close-knit community, both of which

7    things are important in the Court's consideration of the

8    ultimate sentence.  He is someone who is loved, he is someone

9    who is cared for, but he's also somebody who returns the

10   emotion.  You read letters from his family that he often was

11   called upon to care for and babysit for his younger nieces and

12   nephews, that he tutored them and he tutored other members of

13   the community at a community center because he was a good

14   student.

15         You read that he intervened on behalf of a woman and

16   rescued her from a robbery and that his own reaction, when he

17   was honored by his community and by the local police, was

18   pride and for him it felt like the first time he really

19   understood that he was a member of not only the Somali

20   community, but also of the broader Swedish community.  It was

21   something that made him feel very connected to the world

22   around him.

23         As he grew, Your Honor, he learned, he became more

24   aware of the world around him and he became increasingly aware

25   of the turmoil in his homeland, Somalia, a turmoil and a kind

1   of crisis that he had left behind a decade earlier when he was

2   a young child fleeing through other African nations and he

3   determined that the appropriate thing for him was to return to

4   Somalia to fight.

5          The government in its submission says that the

6   justification that he gave for returning to Somalia just

7   doesn't hold water and I think that the Court correctly

8   characterizes this as one of the things that it must decide

9   here as to whether or not these were the acts of terrorists or

10  the acts of freedom fighters.

11         My client has explained to me from the very

12  beginning that as Sweden welcomed more and more refugees into

13  its arms and into its midst in the early years, 2006, 2007,

14  that he began to learn more and more about the turmoil and the

15  tragedy that was being, that his people were experiencing in

16  Somalia.  He learned daily about the, the events that were

17  leading to the deaths of hundreds and thousands of civilians

18  during the incursion that was initiated again by the

19  Ethiopians.  I say again because while the government is

20  focused on an earlier incursion they refer to as limited, they

21  also have not nor do we need to here trace the entire history

22  of the relationship between Ethiopia and Somalia, but in

23  reading the government's own expert, Matthew Bryden, we

24  learned that the incursions by Ethiopia into Somalia spanned

25  the course of the century, not just a few decades.

1    And so the motivation behind my client's trip, while

2  I don't think he can pinpoint it with exact accuracy, I think

3  it's very clear that he was motivated by the Ethiopian

4  invasion into his country and the formulation of the TFG, the

5  transitional government that was formed in exile not

6  authorized by the United States Security Council according to

7  the government's own expert and viewed by the Somalians as an

8  illegitimate government.  It was this invasion and this

9  incursion, Judge, that led to the massive civilian casualties

10  at the hands of the Ethiopians that led so many Somalis to

11  flee to other countries in the world and, specifically,

12  Somalia where our client got to view these firsthand and it

13  was the notion that people who weren't as lucky as he was

14  weren't able to survive and had to remain without the help

15  they needed in Somalia.

16    It was that, Judge, that motivated him to go to

17  Somalia and try to make a difference because he realized that

18  even as a child, as he fled, I don't think it would be fair to

19  say that he felt like he was one of the lucky people, but as a

20  teenager and more as he matures, he began to understand that

21  he was one of the lucky ones because he had a life and he had

22  a way of being with his family and feeling the love that comes

23  from a family and not living in a war-torn country anymore.

24    The government makes a lot of submissions about

25  different contacts or people that he was in touch with or

1  people that he knew, people that he knew in passing, and I

2  think the Court has appropriately said that to the extent that

3  many people in al-Shabaab did things that this defendant did

4  not do and was associated with and the Court will not

5  appropriately take them into consideration.  At the same time,

6  I feel the need to at least comment on the government's

7  repeated accusations with respect to his brother.

8        I say that, Your Honor, because for one, while the

9  government points out that his brother traveled a great deal

10  back and forth to Somalia, and that our client spoke with his

11  brother before he left for Somalia, I think it's important to

12  note that the trips notwithstanding, that his brother has

13  returned to Sweden and that he continues to travel back and

14  forth between Somalia and Sweden, but then he also maintains

15  full-time employment as a bus driver, a municipal employee in

16  Somalia -- I'm sorry, in Sweden.  I apologize, Judge.  And

17  that it's his ability to return to a life of normalcy that

18  keeps my client going on a daily basis.

19        When he talks to his brother and he talks to his

20  family and he hears about normal family life, he yearns for

21  that, he yearns for the ability to return to his family and to

22  the people who love him.  He too has a family, a wife and a

23  child, in Somalia and he hopes one day when he's back in

24  Sweden to be able to be reunited with his family.

25        I want to speak briefly, Judge, about the conditions

1  of my client's confinement and I think that the conditions of

2  his confinement are relevant to the Court's sentencing

3  considerations as Your Honor has acknowledged and I want to

4  speak to the government's I'll call it back-handed

5  representation of the rough, rough treatment that our clients

6  experienced when they were in Somalia and, when they were in

7  Djibouti, rather, and here at the BOP.

8          I think that to use the word "rough" is unfair and

9  dismissive.  When our clients were in Somalia, Your Honor,

10  they, they experienced extremely difficult circumstances, some

11  of which the government can confirm and some of which I think

12  they would never deny.  They can certainly confirm the extreme

13  heat in Djibouti and the notion that six people shared a

14  single cell in this heat is and of itself excruciating.

15          The government was there.  They can't refute that.

16  They can't refute that there were five other near naked men in

17  our client's, in Mr. Ahmed's cell, no mattress, no change of

18  underwear, no change of clothing, over the course of three

19  months.  The government calls this rough but nothing more.  I

20  think it's more properly characterized, Your Honor,

21  respectfully, as inhumane.

22          The government can't refute the fact that Mr. Ahmed

23  sustained himself on the only water that was available to him

24  and that was water from the toilet that he and five other men

25  shared.  Rough treatment or inhumane?  Or the fact that he was

hung upside down and beaten with computer cables so that other inmates could watch it. I think that that kind of treatment, Your Honor, is easily characterized as inhumane.

When my client arrived here in the United States, he wasn't able to hold food down. He suffered from stomach ailments that he hadn't had before he was forced to drink toilet water in order to survive. When he got to the United States, Judge, he had a terrible cough and for weeks, in fact, months, he coughed to a point where it was difficult for him to communicate with his lawyers. And while busy Brooklynites were freaking out in the streets of Sunset Park because they couldn't find parking, Ali was coughing in his cell in a way that made it impossible for him to communicate. Rough treatment or inhumane?

The ailment that was overlooked at the MDC, Your Honor, turned out to be tuberculosis and my client was then hospitalized for several weeks until the condition could be under control.

My client early on, Judge, was at the MDC, this was prior to Your Honor's taking over of this case, but while he was at the MDC, he also was in SAMs custody and it appeared to him at least that at the time, there was no SAMs unit at the MDC and there was nobody who was assigned to his particular unit and so on the weekends, he often wasn't fed. He was fed during the week because he had developed a relationship with a

lieutenant at the MDC who made sure that he was fed although it was after all of the other inmates were fed.

He suffered when he was at the MDC, Judge, and there came a time when he cut himself causing himself to lose a considerable amount of blood. The institution's response for that was to take away the 15 minutes a month that he was entitled to call his family and have some human connection. So he suffered additional punishment.

Recently, the former New York City Corrections Commissioner Bernie Kerik was released from federal prison and he complained publicly that he was incarcerated in solitary confinement for 90 days. He said that it was inhumane and that it was unconstitutional and that he almost, it almost drove him to be insane.

These young men, Your Honor, have been in solitary confinement for almost four years, confinement that is recognized by the entire world as torture. My client has explained to me how insular he feels. He has really tried so hard, Judge, in his letter to the Court to explain how difficult the process of writing to Your Honor actually was for him.

As his attorneys, we told him and counseled him that we thought it was best if Your Honor can hear his voice and hear what was happening in his head and we worked with him for a period of months trying to get him to communicate his

1   thoughts and writing.  One of the things that he told us,

2   Judge, was that in order to survive in solitary confinement,

3   he had to turn himself off emotionally and in having to write

4   to Your Honor, he had to turn himself back on and he feared

5   what would happen if he did that, he feared what would happen

6   if he couldn't turn himself back off.  He explained to us that

7   there were skills, emotional skills, triggers that he hadn't

8   felt in years and that he didn't know, that he was almost too

9   afraid to feel those things again.

10          Experts have told us, Judge, and we've recited it in

11  our papers to you that the emotional damage that's caused by

12  solitary confinement often isn't even detected or develops

13  after somebody leaves solitary confinement.

14          I think that the conditions of his confinement, of

15  both of these young men's confinement have been horrific,

16  Judge.  They were horrific in Djibouti.  They weren't much

17  better here in the United States.  And while there were, as

18  Mr. Stern points out, jailers who really felt compassion for

19  them, they felt compassion for them because of the extreme

20  conditions under which they were jailed.

21          I remember an incident one time when I was sitting

22  with my client trying to make a particular point through the

23  mesh where I really couldn't really see his face at the MDC

24  and afterwards, I said to the guard, a lieutenant who was

25  there with us, when he comes out of the cage, would you do me

1 a favor and just give him a crack in the head, like just make

2 sure that he's there, make sure he's heard what I've said.

3 They almost never open the cage when I'm there, but as I was

4 leaving the area, the cage was, in fact, opened and I saw the

5 guard put his arm around my client's throat and in a very

6 caring way, give him what I call a noogie, just let him have a

7 moment of human contact, and I saw my client's eyes glaze over

8 and I thought to myself what are we doing to human beings here

9 in Brooklyn.

10        Your Honor, there came a time when I learned that

11 one of my client's two children had passed away, a baby who he

12 had never gotten to see, and I remember going up to the MDC

13 with so much trepidation about how I was going to tell him

14 about it and I rehearsed different ways of trying to make that

15 kind of news humane.  If you want to understand my client,

16 Judge, and I'll close with this, I think the best way to

17 understand it is he saw how difficult it was for me to be able

18 to say this to him and he spent the next ten minutes that we

19 were together trying to comfort me for having to explain his

20 loss to him.

21        The man I've come to know, Your Honor, is a gentle

22 and intelligent human being who left a comfortable life

23 because he thought it was the right thing to do because he

24 wanted to help people in his country.  After two years of

25 battling in Somalia, he met a woman, he married her and they

1  had children together.  He was making a life for himself and
2  that life has completely been obliterated.  It's a woman who,
3  a wife he hasn't been able to speak to since he's been
4  incarcerated.  He explained, I think, in his own letter to
5  you, Judge, that he, when he was in Djibouti, not only did he
6  have no idea why he was there, but he had no idea if he would
7  ever get out of there.  He explains the way he trembled and
8  the terror that he fought every day so he could survive to the
9  next day.  With those things in my mind, Judge, the thing that
10  I can't get out of my mind is how upset he was that I was
11  upset at having to break the news to him about the child he
12  had lost.
13            I know that Your Honor will balance all of the
14  factors that 3553 dictates and I pray that Your Honor will
15  have the courage and the strength to impose a sentence of time
16  served on this young man.  I think it's appropriate under
17  these circumstances.  I think he's earned it and I think he
18  deserves it.
19            Thank you, Judge.
20            THE COURT:  All right.  Thank you, Ms. Kellman.
21            Mr. Ahmed, you have a right to speak.  Anything you
22  want to say to me before sentence is imposed?
23            DEFENDANT AHMED:  I hope my attorney has expressed
24  everything that has to be said and she did, my letters and the
25  letters from my family expressed.  I only want to say thank

1  you.  Thank you.

2          THE COURT:  All right.  Thank you.

3          Mr. Ariail?

4          MR. ARIAIL:  Your Honor, I think at the outset, I

5  think the appropriate thing at this point would be to address

6  the plea that was reached in this case.

7          As Your Honor recalls, you did not accept the plea

8  at the time of the guilty plea and that's significant.  It's

9  very significant for purposes of the government's position

10  with respect to these defendants because what we have here is

11  a negotiated resolution.

12          This was a case, if Your Honor recalls, where there

13  were multiple charges related to material support, there are

14  weapons charges that would require these defendants to be

15  sentenced to 30 years mandatory minimums in prison, and what

16  we arose at before trial was a negotiated resolution that in

17  the government's opinion, was the right resolution for this

18  case.

19          All three defendants pleaded guilty.  They accepted

20  responsibility at least for the crimes that they were charged

21  with, the elements of those crimes, before a jury had been

22  impaneled.  There was a global disposition.  This is an

23  extraordinarily complex case.  The defendants' conduct as they

24  pointed out was extraterritorial.  It was not specifically

25  directed at the United States or Americans.  And the need for

1  just punishment in our prison system was mitigated to some

2  extent by the treatment they received in foreign custody along

3  with their agreement to be removed from the United States for

4  both of these defendants to Sweden.

5          Given those circumstances and given the highly

6  unusual circumstances that surrounded this case, that's the

7  right thing to do.  That plea should be accepted and I ask

8  Your Honor to do that.

9          THE COURT:  All right.  I will, I will say this.  To

10  the extent you are suggesting that you did the judging and it

11  should stop there, there is a way to effectuate that through

12  11(c)(1)(C).  You know that.

13          MR. ARIAIL:  I do, Your Honor, and I'm not

14  suggesting that, Your Honor, that we supplant Your Honor in

15  doing the judging.  I'm just communicating to the Court the

16  considerations that this government took in fashioning the

17  sentence.

18          THE COURT:  I understand.

19          MR. ARIAIL:  And that's a significant point, I

20  think, that we want to make.

21          THE COURT:  Yes, it's part of your job, but it's

22  important to me for you to understand that even if some

23  considerations that are identical to the considerations that

24  go into the judging that results in a sentence go into your

25  plea agreement, that it's important to understand that in a

1  circumstance like this, the judging is not over.

2        MR. ARIAIL:  Understood, Your Honor.

3        THE COURT:  So, I accept under Rule 6B1.2, I accept

4  the agreement which was a charge bargain --

5        MR. ARIAIL:  And --

6        THE COURT:  Sorry.  Let me just briefly make the

7  record that no one ever makes including me but I will make it

8  here.

9        This is a charge bargain under 6B1.2(a) which says I

10 may accept it if I determine for reasons stated on the record

11 that the remaining charges adequately reflect the

12 seriousness -- "the remaining charges" meaning the charges he

13 pled guilty to -- adequately reflect the seriousness of the

14 actual offense behavior and that accepting the agreement will

15 not undermine the statutory purposes of sentencing or the

16 sentencing guidelines.

17       I so find because it is a complicated case.  It

18 doesn't involve nuanced considerations.  There's no binary

19 dimension to this at all.  By that, I don't mean to buy into

20 any notion that these men were either freedom fighters or

21 terrorists, they are a little bit of both, and there are ample

22 reasons for the government to have exercised its discretion in

23 a way that inures to their benefit.

24       Whether they get more benefit than the 15-year cap

25 is what we are here for, but I think the wisdom that went into

1   this plea agreement from the government's perspective is clear

2   and it deserves deference so I accept the agreement.

3          Sorry.  Go ahead.

4          MR. ARIAIL:  Thank you, Your Honor.

5          And I guess I would start to the extent that

6   Mr. Stern characterized this as a case that people don't care

7   about, I would respectfully disagree with that position.  I

8   can tell you there are a dozen people in the back of this room

9   who worked for the United States Government with the FBI and

10  they are here because they care immensely about it.  They care

11  immensely about it because it is their duty and it is our duty

12  as the Department of Justice to be a part of the apparatus

13  that exists in this world to stop folks from harming one

14  another through international terrorism.  It's a significant

15  role that we play and it is an important one.

16         In this case, I just want to talk a little bit about

17  this concept at least initially of freedom fighters because

18  we've had a number of comments from both sides about their

19  claim, these defendants' claims, and obviously Your Honor

20  finds it rather significant.

21         From the government's perspective, I think there's a

22  disconnect between the evidence, the facts that are laid out

23  in the PSR with respect to these defendants and that notion,

24  that notion that these men were going to Somalia with the

25  desire to do something to help.

1      Mr. Ahmed said, I felt a growing obligation to go

2 there and defend my people against Ethiopia. We talked a lot

3 about Ethiopia. In Mr. Yusuf's words, he claims he's not a

4 violent person or a fanatic. The reason he said he went to

5 Somalia was to help his people with political

6 self-determination and out of profound concern for the safety

7 and security and the future of Somalia. I put this in context

8 with the objections that the defense has made to the PSR

9 because I do think they are rather important.

10      The reason that the defendants in this case have so

11 strenuously objected to various pieces of evidence that are

12 articulated in the PSR and the government's submissions is

13 that the information in the wiretaps, in the videos, in the

14 testimony of the witnesses in the various countries where we

15 did Rule 15 depositions fundamentally underlines that notion

16 and I think it does away with that theory of mitigation nearly

17 entirely and also serves to show that these defendants I don't

18 think have fully accepted responsibility for what it is they

19 did.

20      They talked today about Ethiopia, they talked about

21 political self-determination, but if you listen to the

22 recordings, review the reports from 2008 before they left,

23 never once did they talk about Ethiopia, never once did they

24 talk about political self-determination, never once did they

25 talk about helping the people of Somalia.

1    What they do talk about is they talk about speeches

2  by members of al-Shabaab.  Mohamed Yusuf talks about how

3  Mukhtar Robow's speech, a significant member of al-Shabaab's

4  speech made his blood boil so badly that he cried while

5  watching it.  They talked about how while driving a taxi is

6  forbidden in Islam because they might have to pick up a

7  homosexual and drive him around Stockholm.  They get excited

8  about people throwing stones at buses in Stockholm.  They get

9  excited about the idea that Shabaab is whipping people

10  exacting sharia law in Mogadishu.  Yusuf unequivocally,

11  unequivocally explains that he made his decision to go to

12  Somalia to join al-Shabaab because life on earth is short and

13  life in paradise is eternal.  They are upset that other

14  Muslims don't support the idea that we should stone unfaithful

15  women.

16    Most assertively, they talk about a suicide bombing

17  attack that was carried out in October of 2008 on Bosaso and

18  Hargeisa carried out by six suicide bombers against a United

19  Nations facility.  Dozens of people were killed, innocent

20  civilians, and they have some sort of a subtle debate about

21  whether or not that is a forgivable sin.  Ahmed says it is a

22  forgivable sin and compares it to an act that I will not

23  mention here but is obscene.

24    The calls from 2008, the audiotapes from 2009 and

25  2010 that they didn't realize the Swedish government was

1  listening to, they squarely placed the defendants in an

2  al-Shabaab training camp with Mugisha Mahmoud, a participant

3  in the July 2010 attacks in Kampala.  They put themselves, the

4  wiretaps put them in a training camp with Yassin Yare,

5  Sheikh Yahye, a cleric, a close friend whose idea about

6  jihadists' intentions didn't relate just to Somalia, but with

7  a global vision:  Once you finish in Somalia, you go elsewhere

8  in the world to fight.

9        Mr. Yusuf was captured on a video, a piece of

10  propaganda which was put out by al-Shabaab recruiting other

11  young Muslim men from around the world, Europe, the United

12  States, to come to Somalia and, in his own words, to embrace

13  the death wish of jihad in Somalia, to take part in this

14  blessed jihad which is between good and evil, between light

15  and darkness and between truth and falsehood.

16        He mimics and he threatens the death of Lars Vilks

17  who he claims was behind the caricatures defaming the prophet,

18  and I quote:  "I say to Lars Vilks that wherever you are, if

19  not today or tomorrow, know that we haven't forgotten about

20  you.  We will get ahold of you and with Allah's permission, we

21  will catch you wherever you are in whatever hole you are

22  hiding Inshallah, know what waits you, as it will be nothing

23  but this.  It will be slaughter for that is what you deserve.

24  To my brothers and sisters, I call you to make Hijra and if

25  you can kill this dog Lars Vilks, then you will receive a

1    great reward from Allah."

2         So these claims that they make about why they were

3    going to Somalia, they don't hold up if you look at the

4    evidence and the testimony that we put forth in the PSR.

5         Now, to the extent that Mr. Yusuf argues that he was

6    somehow not aware that what he was doing was illegal, he does

7    appear, although he doesn't claim to be seeking to relitigate

8    his due process claims before the court, he has admitted that

9    he knew what he was going to do was illegal.  We would

10   respectfully disagree with the idea that what he did was not

11   illegal in Sweden at that time.  Just the other day, two men

12   were convicted and sentenced in Sweden to life in prison for

13   conduct very similar to that carried out by Mr. Yusuf and

14   Mr. Ahmed.

15        With respect to the treatment, Your Honor, the

16   treatment that these men suffered, as I've indicated to you

17   before, we took that into significant consideration when we

18   fashioned a plea in this case, both from an evidentiary

19   perspective and both from a mitigation perspective with

20   respect to these defendants.  The treatment that they received

21   while brief was unconscionable and inappropriate.  We do not

22   condone it.

23        THE COURT:  Going forward, what is their custody

24   going to look like once they are designated out?  Is it going

25   to differ in kind from the conditions of their confinement of

1  their pretrial detention?

2       MR. ARIAIL:  Certainly, Your Honor.  There's a

3  couple of different things that can play out in terms of where

4  they're getting sentenced.

5       First of all, the SAM restrictions that the

6  defendants are under, they're up for reconsideration in

7  April 2016.  I don't have an answer for the court in terms of

8  whether they would be continued under SAM, but if they are

9  continued under SAM, they won't be continued under SAM within

10 the detention facilities that they're currently in and the

11 facilities that they could go to, they would be afforded other

12 opportunities to interact with inmates outside of the

13 restricted conditions that they're currently in.

14      So, yes, I think that there's a high -- it's highly

15 likely that the conditions when they ultimately get sentenced

16 will be much better than they are right now.

17      THE COURT:  And when you look just at the offense

18 behavior, is there any reason in your judgment to

19 differentiate between the two?

20      MR. ARIAIL:  Between the two, I don't think that, on

21 the whole, there is a distinction.  Obviously there are

22 particular things that the Court can consider.

23      So, for example, Mr. Ahmed appears to be the one who

24 convinced Mr. Yusuf to travel.  I think that's significant.

25 Mr. Yusuf, however, when he arrived in Somalia, rose in rank

1  within al-Shabaab and was more of a leadership figure there.

2  But, no, generally, no.

3        I think, Your Honor, in this case, as always,

4  deterrence is a significant factor and as I stand before you

5  today, obviously, I don't know what's going through the minds

6  of these men, but I can't help but think how much the words

7  here today that they say, their characterization of their

8  conduct then and now is at odds with the evidence, the

9  wiretaps, the videos, the conversations and the actions that

10  were revealed by the cooperating witnesses who fought

11  alongside of them, and I seriously doubt that their arrest and

12  incarceration has actually changed their perspective.

13        I think that 15 years from now, they will continue

14  to adhere to the same twisted version of Islam that they have

15  been shown to adhere to and I don't have any doubt that when

16  they're released, that they will, if not return to some

17  battlefield to fight jihad, they will likely seek to recruit

18  others to join organizations like al-Shabaab and I think a

19  message needs to be sent here in this case.  Deterrence is

20  important, not just specific deterrence for these individuals,

21  but deterrence to others who would join groups like

22  al-Shabaab, in particular, in this case, many of the Americans

23  who live in Minneapolis and other parts of the country who

24  would think seriously about joining that organization.

25        This was, as I said before, a difficult case and the

1  decision to resolve this case in the manner that we did took

2  into account all of the issues that have been raised before

3  the Court today.

4         I can tell you there are many folks here who do not

5  believe that a 15-year sentence is adequate to address and to

6  appropriately deter these defendants.  I can tell you that

7  there are many people here who think a 15-year sentence will

8  not afford the appropriate protection of the public for the

9  crimes, from further crimes.  Personally, I sympathize with

10 those folks because I actually believe they're right, but as

11 the Court knows, we don't make these decisions on our own.  We

12 make these decisions in consultation with our supervisors, the

13 Department of Justice, the Federal Bureau of Investigation,

14 our intelligence partners around the world and we have taken

15 all of these issues extraordinarily seriously.  I think every

16 single one of us who agreed to the resolution in this case did

17 agree with the full expectation that the defendants would be

18 sentenced to 15 years and thereafter be deported without

19 litigation and that's the bargain we struck.

20         THE COURT:  No, it's not.

21         MR. ARIAIL:  That we struck, Your Honor, I

22 apologize, ourselves.

23         THE COURT:  Yes.

24         MR. ARIAIL:  I understand, Your Honor.

25         THE COURT:  Right.

1    MR. ARIAIL:  I believe though seriously that we have

2    done the hard work.  I understand that obviously it is

3    Your Honor's discretion in sentencing, but I think we have

4    thought long and hard about this and I respectfully request

5    that the Court take that into very serious consideration in

6    fashioning a sentence and I recommend the Court sentence these

7    defendants to 15 years in prison.  I don't think it's a hard

8    thing to do.  I think it's a straightforward decision for the

9    Court to make.

10           THE COURT:  Thank you.

11           MR. ARIAIL:  You're welcome, Your Honor.

12           THE COURT:  Anything further from the defendants?

13           MS. KELLMAN:  Very briefly, if I may, Judge.

14           I mean I don't think I have to comment that much

15    about 11(c)(1)(C).  The Court obviously understands that as

16    well as anyone.  We never had a discussion with the government

17    at all about a 15-year sentence, we never had a discussion

18    about an 11(c)(1)(C), we never negotiated a number of years

19    and certainly from our point of view, the purpose of

20    materially supporting the plea was that it gave the Court

21    latitude between zero and 15 years.  That's what we negotiated

22    for and there was never any discussion to the contrary.

23    That's really all.

24           THE COURT:  Mr. Stern?

25           MR. STERN:  No, Your Honor.

1          THE COURT:  Okay.  Well, thank you again, all of

2    you, for your advocacy in writing and orally.  It's very

3    useful to me.  Before I impose sentence, I want to just say a

4    couple of words about the fact of this advocacy in this case.

5          You know, I was asked to testify earlier this week

6    in front of a committee that's studying the Criminal Justice

7    Act.  Chief Justice Roberts created this ad hoc committee to

8    examine whether the way we delivered defense to the 80 percent

9    of the people in our courtrooms that are like Mr. Yusuf and

10   Mr. Ahmed, that is, they can't afford their own lawyer,

11   whether that ought to be restructured so we can do the best we

12   can to provide independent and high quality, properly

13   resourced defense counsel to them.

14         It is so important because our criminal justice

15   system distinguishes itself in so many ways.  It's extremely

16   putative.  It's far reaching.  This case demonstrates that.

17   It's staffed on the prosecution side by some of the very best

18   lawyers in the country, some of whom are sitting right there

19   at that table.  The integrity of our system requires constant

20   attention to the need to make sure that we provide exactly

21   that, independent counsel, high quality counsel, counsel who

22   are supportive, so that our three-legged system, we've got

23   judges, we've got prosecutors and we've got defense counsel

24   and, you know, if we fail in any one of those three, the

25   systems fails.

1    These men have every reason to wonder why they were

2  placed in custody in Africa and brought here.  I don't wonder.

3  I think it was completely appropriate.  I applaud the people

4  in the back who were part of this apparatus as Mr. Ariail

5  described it.  I understand why someone on another continent

6  who joins this terrorist organization can properly be brought

7  to America, I have no problem with that, but I couldn't help

8  in preparing for today to think about, and now I can't help to

9  point it out the following point which I think is so important

10 and it relates to this obviously vigorous, well-funded,

11 independent high quality counsel that both of these men have

12 been provided.

13    The point is if the tables were turned and

14 al-Shabaab were to capture members of our military and pull

15 them out of Afghanistan or some other country and bring them

16 to Somalia, something tells me, without being an expert on the

17 subject, that you would be treated much differently.  It means

18 a lot to our system of justice.  I don't feel at all

19 self-conscious in pointing this out because in the dimensions

20 in which we fail, and we have injustices, I point that out, I

21 haven't been shy about that, credit where credit is due, the

22 system that delivers indigent defense for the most part works,

23 not just in cases like this.

24    I agree with Mr. Ariail the world watches cases like

25 this.  It's very important for us to provide the kind of

defense these men got.  And it happens not just in the cases
where the world watches, but in the 99 percent of the
remaining cases where really and truly no one cares except the
defendant himself or herself.  So, good for counsel in the
case on all sides.  It's so important that cases be litigated
like this.

I said at the outset, this is a very difficult case.
It's very difficult for me.  It's interesting.  I have already
suggested my take that this is not a black and white
situation.  There are certain issues I am not troubled by at
all.

I am not troubled by Mr. Stern's argument about not
knowing about the law.  That's fine with me, that the
defendants did not know about our material support law, but
the law does not generally require the defendant to be aware
of the law that his conduct violates.  What it requires, as a
general matter -- there's only a few exceptions to this, none
of which comes anywhere close to a case like this -- all it
requires is that the defendant knowingly and intentionally do
what the law forbids.  I have no doubt that these defendants
were aware that when they joined al-Shabaab, they knew that
that was culpable conduct.  I'm not playing gotcha with anyone
here, that they're not aware of the material support statute
in my view passes in the night with general principles about
how and when we hold people accountable for their behavior.

1          I don't think either side is right in characterizing

2     the conduct.  By that I mean, yes, I accept the defense

3     contention that in the main, the conflict that these men

4     sought to lend their support to was an internecine conflict.

5     Whether it involved Ethiopia or not, it was an internecine

6     conflict about the control of their homeland, what they

7     perceived to be their homeland, was their homeland, Somalia,

8     but the vehicle through which they engaged in that conduct was

9     al-Shabaab.

10          These are intelligent men.  They understood what

11    that organization was and the breadth of its interests and the

12    fact that many of its interests are in such profound conflict

13    with the security of this country and other countries and they

14    need to be held accountable for that.

15          On the other hand, I don't accept all of the

16    inferences the government wants me to draw.  Yes, the people

17    that they associated with and they conspired with certainly

18    had designs beyond the conflict in Somalia, they knew that

19    they were associated with people who had those designs and

20    they need to be held accountable for that, but when it comes

21    down to the granular detail of their involvement, there's not

22    that much support for the notion that they sought to involve

23    themselves in al-Shabaab's conduct outside of Somalia.  Did

24    they sympathize with it?  Yes, of course.  Does that matter?

25    Of course.

1    I do not think principles of general deterrence, I

2  mean, they can never really be demonstrated to operate in any

3  context and I am not persuaded that they operate here.  It's

4  hard to believe that the nuanced difference between a 15 year

5  sentence and a lower sentence, a few years lower than 15 years

6  is really going to matter to the folks who might become

7  jihadists.

8    This notion of specific deterrence or incapacitation

9  is a difficult one here.  I'm sure a lot of people in this

10  courtroom will lie awake.  Those who objected to the 15-year

11  cap that the government placed by virtue of its own barter

12  join me in lying awake at night wondering what's going to

13  happen when these men are released from custody in this case.

14  I don't have a crystal ball.  Nobody else does either.  One

15  would hope that their claims that have been made here in that

16  regard are made genuinely and they stick to them.  That's a

17  very difficult dimension to this decision.  It is difficult to

18  calibrate that into a sentence.

19    The need to punish this behavior, to impose a

20  sentence that demonstrates the seriousness of the criminal

21  conduct is a powerful factor here.  This is a notorious

22  terrorist organization, the affiliation with which, the joiner

23  in which needs to be punished and will be punished.

24    The sentence I am imposing is ameliorated, is made

25  more lenient by the conditions of confinement in Djibouti, the

1   conditions of confinement prior to the imposition of this

2   sentence, and I have no doubt whether the restrictions are

3   lucent, but I have no doubt that the quality, the quality of

4   life that they have in serving the remainder of their sentence

5   is going to be substantially below that, that an ordinary

6   customer of the Bureau of Prisons would have.  So I have

7   considered that.

8            The last thing I want to mention is this.  I don't

9   begrudge you at all, Mr. Ariail, your assertion that's kind of

10  thinly veiled that plenty of judging was done, maybe even too

11  much judging by the government.  What I mean by that is what

12  you are telling me is you have considered the circumstances

13  that warrant a sentence less than that mandatory 30 years and

14  in doing so, you have arrived at this 15 year max and what

15  you're telling me, and, again, I don't begrudge you for

16  telling me this, is that all the things that I should probably

17  take into account have already been factored into your

18  decision.  I understand that.

19           MR. ARIAIL:  That's correct, Your Honor.

20           THE COURT:  I understand your belief that that's the

21  case, but it is my job to do the judging.  There have been

22  occasions in which I myself have expressed a view that a

23  sentence that was negotiated in this way was insufficiently

24  punitive, but I have deferred to your judgment as I think I

25  should.

1          To my mind here, I am weighing as a judge, not as a

2    prosecutor, the same factors that in your Office's judgment,

3    if not your own, warranted a measure of leniency, an outside

4    limit provided I accepted the plea agreement, outside limit of

5    15 years in prison, but I weigh them slightly differently and

6    that is why I am not imposing a 15-year sentence.

7          I say that respectfully, but I think it is important

8    that we all understand whose responsibility it is in the end

9    of the day in a case like this where discretion hasn't been

10   taken from me entirely, whose responsibility it is to weigh

11   those factors and it is mine.  All I can do is the best I can.

12         The sentence is 11 years in the custody of the

13   Attorney General and the sentence is imposed on each of the

14   defendants.

15         The recommendation here, Jamie, is there would be no

16   supervision, I guess, in contemplation of the deportation, the

17   return of the defendants back to I guess it will be Sweden?

18         THE PROBATION OFFICER:  Yes, Your Honor.

19         THE COURT:  Okay.  There's a $100 assessment but no

20   fine.

21         Does the government want to be heard with regard to

22   this recommendation that DOJ allow them to be sent to Sweden?

23         MR. ARIAIL:  I don't think we'll take a position at

24   this point, Your Honor.

25         THE COURT:  All right.  That's granted.

1       And in a case like this, does the recommendation

2  into a place of incarceration make any sense?

3       MR. STERN:  I'm not sure if we're able to do that

4  with the SAMs on them.  I think it would be nice, if possible,

5  to have them together so there's someone who they can speak to

6  if they're allowed as Mr. Ariail suggested to be in an area

7  together.

8       THE COURT:  I think that's a judgment best left to

9  the Bureau of Prisons.

10       MR. STERN:  So I don't know how to make a

11  recommendation.

12       THE COURT:  Anything further?

13       MS. KELLMAN:  No, Your Honor.

14       THE COURT:  Anything further?

15       MR. ARIAIL:  No, Your Honor.

16       THE COURT:  Thank you all.  Have a good day.

17       (Matter concluded.)

18

19              *    *    *    *    *

20

21  I certify that the foregoing is a correct transcript from the
   record of proceedings in the above-entitled matter.

22

23   /s/ Charleane M. Heading              January 16, 2016
   _____        _____

24     CHARLEANE M. HEADING                      DATE

25